No. 23-2609

# United States Court of Appeals
# for the Ninth Circuit

——————————

PACIFIC SURF DESIGNS, INC., a Delaware corporation,

*Plaintiff-Appellant,*

– v. –

WHITEWATER WEST INDUSTRIES, LTD.; GEOFFREY CHUTTER, an individual; FLOWRIDER, INC., a California corporation; MARSHALL MYRMAN, an individual; AQUATIC DEVELOPMENT GROUP, INC., a New York corporation; DAVID KEIM, an individual; THOMAS LOCHTEFELD, an individual,

*Defendants-Appellees.*

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR SOUTHERN CALIFORNIA IN CASE NO. 3:20-CV-01464-BEN-DDL, ROGER T. BENITEZ, DISTRICT JUDGE

## BRIEF OF APPELLANT

JENNIFER DUNCAN HACKETT
JAMES ROBERTSON MARTIN
ZELLE LLP
1775 Pennsylvania Avenue, Suite 375
Washington, DC 20006
(202) 899-4100
jhackett@zellelaw.com
jmartin@zellelaw.com

*Attorneys for Plaintiff-Appellant*

CP COUNSEL PRESS     (800) 4-APPEAL • (327754)

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. Civ. P. 7.1, Plaintiff Pacific Surf Designs, Inc. states that there is no parent company or publicly held company owning 10 percent or more of its stock.

## **TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ....................................... ii

TABLE OF CONTENTS ................................................................ iii

TABLE OF AUTHORITIES ...................................................vi

INTRODUCTION .................................................................1

JURISDICTIONAL STATEMENT ..........................................4

STATEMENT OF ISSUES PRESENTED FOR REVIEW ....................4

STATEMENT OF THE CASE................................................5

I.      FACTUAL BACKGROUND.............................................5

      A.     Sheet-Wave Machines Were Developed in the Early 1990s to Mimic a Surfing/Bodyboarding Experience ........................................5

      B.     PSD and Whitewater Both Operate in the Sheet-Wave-Machine Market ....................................................................6

      C.     Mr. Alleshouse Departs Wave Loch to Form PSD and Begins Designing New and Inventive Products After All Material Patents Expired ...........................................................8

      D.     Whitewater Acquired Wave Loch Assets and Accepted the Obligation to Sue Mr. Alleshouse and PSD Through the Contribution Agreement...........................................11

      E.     PSD Immediately Disrupts the Market ................................12

      F.     Whitewater Withdraws Fraud, Breach of Contract, and Patent Infringement Claims Against PSD and Its Owners Only After Achieving Their Intended In Terrorem Effect on the Market.............13

            1.     WhiteWater initiates litigation against PSD ............................13

            2.     WhiteWater threatens to destroy PSD unless Mr. Alleshouse ceased competing and joined WhiteWater.............15

            3.     WhiteWater dismisses the Actions ...........................................16

4.      WhiteWater uses the Actions as a stalking horse to improperly tell buyers that PSD would not survive the lawsuits ......................................................................17

G.      Whitewater Files Two Patent Actions and a Breach of Contract Action and Continues to Weaponize the Litigations in the Market....19

1.      WhiteWater learns of competition with PSD and files the 2015 Surf Waves/FlowRider Surf Action.................................20

2.      The 2017 Alleshouse Litigation and 2017 WhiteWater actions are filed and utilized as talking points with more market participants ..................................................................23

3.      WhiteWater's series of litigation comes to an end ...................27

4.      WhiteWater's business plans reveal that WhiteWater deliberately engaged in the pattern of litigation ......................27

II.      PROCEDURAL HISTORY ............................................................29

A.      Proposed Jury Instructions ..................................................29

B.      In Limine Ruling ..................................................................36

C.      The Jury Finds in Favor of PSD on Relevant Market, but Finds that PSD Failed to Meet the Clear and Convincing Standard on the Element of Anticompetitive Conduct...................................................37

SUMMARY OF THE ARGUMENT ......................................................38

ARGUMENT ..........................................................................................42

I.      THE DISTRICT COURT'S INSTRUCTIONS AND VERDICT FORM ON ANTICOMPETITIVE CONDUCT WERE ERRONEOUS......42

A.      De Novo is the Appropriate Standard of Review ................................42

B.      The Jury Should Have Been Instructed to Evaluate the Evidence as a Whole to Determine Whether Whitewater Willfully Maintained Monopoly Power Through Anticompetitive Conduct by a Preponderance of the Evidence Standard of Proof .............................42

1.    The District Court should have instructed the jury to evaluate the evidence in its totality ............................................ 43

2.    The District Court erred by instructing the jury that it should apply the clear and convincing evidence standard on the question of anticompetitive conduct ............................. 48

3.    The District Court erred by instructing the jury that it should apply the objectively baseless test on the question of anticompetitive conduct ......................................................... 50

II.    THE DISTRICT COURT ERRED BY PREVENTING THE JURY FROM HEARING EVIDENCE OF THE BAY HILL TAVERN MEETING ................................................................................... 53

A.    Standard of Review ........................................................... 54

B.    The Bay Hill Tavern Meeting was not Inadmissible Pursuant to Rule 408 ........................................................................... 55

C.    The Bay Hill Tavern Meeting Would Have Been Admissible Even if it had Been a Settlement Negotiation ..................... 56

III.    PSD IS ENTITLED TO A NEW TRIAL ..................................... 57

CONCLUSION .................................................................................... 58

# TABLE OF AUTHORITIES

## Cases

*Advanced Display Sys., Inc. v. Kent State Univ.*,
   212 F.3d 1272 (Fed. Cir. 2000) .......................................................57

*California Motor Transport Co. v. Trucking Unlimited*,
   404 U.S. 508 (1972)........................................................................32

*Cassino v. Reichhold Chems., Inc.*,
   817 F.2d 1338 (9th Cir. 1987) ........................................................55

*City of Anaheim v. Southern Cal. Edison Co.*,
   955 F.2d 1373 (9th Cir. 1992), *overruled on other grounds by Pacific Bell
   Telephone Co. v. linkLine Comm., Inc.*, 555 U.S. 438 (2009)............43

*City of Mishawaka, Ind. v. American Elec. Power Co., Inc.*,
   616 F.2d 976 (7th Cir. 1980) ..........................................................44

*Cmty. Infusion Servs., Inc. v. Nat'l Org. of Rare Disorders, Inc.*,
   No. SACV 11-00719 JVS(MLGx), 2012 WL 13018425 (C.D. Cal. Apr. 11,
   2012) ................................................................................................56

*Commonwealth Capital Corp. v. City of Tempe*,
   No. 2:09-CV-00274 JWS, 2011 WL 1429624 (D. Ariz. April 14, 2011)..........56

*Construction Cost Data, LLC v. The Gordian Group, Inc.*,
   No. 4:16-cv-00114, 2019 WL 1060352 (S.D. Tex. Jan. 22, 2019) ...................47

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
   370 U.S. 690 (1962)....................................................................2, 43

*Coston v. Nangalama*,
   13 F.4th 729 (9th Cir. 2021) ...........................................................42

*Ecolab, Inc. v. Paraclipse, Inc.*,
   285 F.3d 1362 (Fed. Cir. 2002) .......................................................57

*In re Epipen (Epinephrine Injection, USP), Marketing, Sales Practices,
   and Antitrust Litig.*,
   Case No. 17-md-2785-DDC-TJJ, 2017 WL 6524839
   (D. Kan. Dec. 21, 2017).................................................................45

*In re FCA US LLC Monostable Elec. Gearshift Litig.*,
    598 F. Supp. 3d 639 (E.D. Mich. 2022) ........................................56

*Flowrider Surf, Ltd. v. Pac. Surf Designs, Inc.*,
    No. 3:15-cv-01879-BEN-BLM, 2020 WL 5645331
    (S.D. Cal. Sept. 22, 2020)..............................................................27, 53

*Herman & MacLean v. Huddleston*,
    459 U.S. 375 (1983).............................................................................49

*Hibbs v. State Farm Fire and Cas. Co.*,
    No. 6:22-cv-00532-MK, 2022 WL 17751701 (D. Or. Dec. 19, 2022) ..............55

*Hung Lam v. City of San Jose*,
    869 F.3d 1077 (9th Cir. 2017) ...........................................................42

*IHS Dialysis Inc. v. Davita, Inc.*,
    No. 12 Civ. 2468(ER), 2013 WL 1309737 (S.D.N.Y. Mar. 31, 2013) ..............45

*Int'l Bhd. of Elec. Workers Local 48 v. Rosendin Elec., Inc.*,
    No. 3:23-cv-00297-HZ, 2023 WL 3981282 (D. Or. June 12, 2023)..................55

*Kaiser Found. Health Plan, Inc. v. Abbott Labs., Inc.*,
    552 F.3d 1033 (9th Cir. 2009) ...........................................................49

*Klein v. Meta Platforms, Inc.*,
    Case No. 3:20-cv-08570-JD, 2022 WL 17477101 (N.D. Cal. Dec. 6, 2022) ....44

*Kobe, Inc. v. Dempsey Pump Co.*,
    198 F.2d 416 (10th Cir. 1952) ...........................................................44

*Litton Sys., Inc. v. Am. Tel. & Tel. Co.*,
    700 F.2d 785 (2d Cir. 1983) ..............................................................48

*In re Neurontin Antitrust Litig.*,
    MDL No. 1479, 2009 WL 2751029 (D.N.J. Aug. 28, 2009) ............................45

*Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.*,
    311 F. Supp. 2d 1048 (D. Colo. 2004)................................................44

*Nunag-Tanedo v. E. Baton Rouge Par. Sch. Bd.*,
    711 F.3d 1136 (9th Cir. 2013) ......................................................46, 49

*Octane Fitness LLC v. Icon Health & Fitness, Inc.*,
  572 U.S. 545 (2014)...................................................................49

*Professional Real Estate Investors v. Columbia Pictures Indus.*,
  508 U.S. 49 (1993).....................................................................32

*Ramsey v. United Mine Workers of America*,
  401 U.S. 302 (1971)...................................................................48

*Reiter v. Sonotone*,
  442 U.S. 300 (1979).....................................................................1

*Sosa v. DIRECTTV, Inc.*,
  437 F.3d 923 (9th Cir. 2006) .....................................................50

*Stewart v. Wachowski*,
  No. CV 03-2873 MMM (VBKx), 2004 WL 5618386
  (C.D. Cal. Sept. 28, 2004)..........................................................54

*U.S. Wholesale Outlet & Distribution, Inc. v. Innovation Ventures, LLC*,
  89 F.4th 1126 (9th Cir. 2023) .....................................................42

*United States v. Mirama Enterprises, Inc.*,
  185 F. Supp. 2d 1148 (S.D. Cal. 2002) ...............................54, 55

*United States v. Topco Associates, Inc.*,
  405 U.S. 596 (1972)...................................................................48

*United States v. Zinnel*,
  725 F. App'x 453 (9th Cir. 2018) ...........................................54-55

*USS-POSCO Indus. v. Contra Costa Cnty. Bldg. & Constr. Trades Council, AFL-CIO*,
  31 F.3d 800 (9th Cir. 1994) .................................................31, 51

*Wall Data Inc. v. Los Angeles Cnty. Sheriff's Dep't*,
  447 F.3d 769 (9th Cir. 2006) ...............................................54, 55

*WhiteWater W. Indus., Ltd. v. Alleshouse*,
  981 F.3d 1045 (Fed. Cir. 2020) ............................................25, 27

**Statutes**

15 U.S.C. § 1 ................................................................................4

15 U.S.C. § 26 ..............................................................................4

28 U.S.C. § 1291 ..........................................................................4

28 U.S.C. § 1331 ..........................................................................4

28 U.S.C. § 1337 ..........................................................................4

**Rules**

Fed. R. Evid. 408 ................................................... 36, 41, 54, 55, 56, 57

Fed. R. Evid. 408, 2006 Advisory Committee Notes on Rules –
2006 Amendments ...................................................................57

**Other Authorities**

ABA Model Jury Instructions in Civil Antitrust Cases ....................................46, 49

## INTRODUCTION

This case presents important questions of antitrust law that have not been directly addressed in this, or any other, Circuit. The matter involves a monopolist's use of serial "predatory litigation" as one component of an anticompetitive scheme to exclude a rival from the market. The facts are unique. They involve a relatively small market and a niche product – sheet-wave machines that allow people to simulate a surfing experience in locations other than the ocean.

But at a high level the facts present a common scenario – a wealthy and powerful monopolist with the wherewithal to harass a rival and abuse the courts and patent processes to preserve its monopoly power. Such conduct permeates markets such as technology and pharmaceuticals – all at the expense of American consumers. The antitrust laws exist to deter such conduct and Congress enacted Section 4 of the Clayton Act, which provides a private right of action and treble damages, specifically to encourage private challenges to antitrust violations. As the U.S. Supreme Court wrote more than 40 years ago, private antitrust actions "provide a significant supplement to the limited resources available to the Department of Justice for enforcing the antitrust laws and deterring violations." *Reiter v. Sonotone*, 442 U.S. 300, 344 (1979).

In this case, the monopolist is WhiteWater West Industries, Inc. ("WhiteWater"), a Canadian company that controlled more than 90% of the relevant

1

market. The challenger is Pacific Surf Designs, Inc. ("PSD"), which was started by Richard Alleshouse, a former employee of WhiteWater's predecessor-in-interest to take the "second mover advantage" that is common in so many markets dominated by a single player. WhiteWater recognized Mr. Alleshouse as a masterful engineer capable of building better and cheaper sheet-wave machines. WhiteWater responded the way many monopolists do – it embarked on a multifaceted campaign to squelch its new rival. It threatened to sue PSD out of business and its founders into bankruptcy, and sought to make good on that threat by filing a series of actions alleging claims ranging from fraud to patent to, unsurprisingly, violation of a non-compete clause (which was so wildly overbroad that it was held to be invalid as a matter of California law). WhiteWater not only pursued these actions, all of which resulted in favorable outcomes for PSD, but also used them as a pretext to convince the relatively small number of consumers in the market that PSD could never survive WhiteWater's onslaught.

It has long been established that juries must evaluate the evidence by looking at an antitrust defendant's conduct as a whole to determine whether the defendant's conduct unreasonably restrained competition. *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) (plaintiffs must be given the "full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each."). Except for a narrow window of

2

cases known as "sham litigation," courts direct juries to apply the preponderance of evidence standard to questions of fact.

The District Court departed from these bedrock principles in two very important respects. First, it crafted a bespoke "sham litigation" instruction that asked the jury to focus solely on WhiteWater's previous litigation against PSD rather than WhiteWater's conduct as a whole in evaluating the question of anticompetitive conduct. Second, it instructed the jury that it must apply the clear-and-convincing standard to that question because one aspect of WhiteWater's conduct involved the unsuccessful prosecution of patent claims. The District Court also erred in excluding powerful evidence of WhiteWater's anticompetitive intent – a conversation in which Mr. Alleshouse's former boss told him days after the first lawsuits were filed that Mr. Alleshouse did not have the "stomach or funds" to litigate and that Mr. Alleshouse could make the lawsuits go away only by giving up his competitive venture and going to work for WhiteWater.

At trial, the jury found that PSD had proved the relevant market – sheet-wave machines sold worldwide excluding China – but found that PSD did not meet the high standard of clear and convincing evidence that WhiteWater's lawsuits were "objectively baseless." The District Court's decision should be reversed.

## JURISDICTIONAL STATEMENT

The District Court had subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as the complaint raised a federal question, and § 1337, as the claims were asserted under Section 16 of the Clayton Act (15 U.S.C. § 26) and Section 1 of the Sherman Act (15 U.S.C. § 1). This Court has jurisdiction under 28 U.S.C. § 1291. The District Court entered a Final Judgment Order in the case underlying this appeal on September 5, 2023. 1-ER-2. Plaintiff filed a timely notice of appeal on October 2, 2023. 12-ER-2424.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1. Whether the District Court erred by declining to instruct the jury that it must consider a monopolist's conduct as a whole in determining whether WhiteWater willfully maintained monopoly power through anticompetitive acts.

2. Whether the District Court erred by instructing the jury that it must apply the clear and convincing evidence standard to one of three questions in the jury verdict form addressing anticompetitive conduct.

3. Whether the District Court improperly applied Fed. R. Evid. 408 to exclude evidence of a monopolist's threat to pursue frivolous litigation against a rival and its founders unless the rival ceased competing and the founders joined the monopolist.

4

# STATEMENT OF THE CASE

## I.     FACTUAL BACKGROUND

### A.     Sheet-Wave Machines Were Developed in the Early 1990s to Mimic a Surfing/Bodyboarding Experience

"Sheet-wave machines" are water attractions that simulate a surfing or bodyboarding experience using a "flow board" over a thin, powerful sheet of water which flows up an angled, tensioned, or padded ride surface.  4-ER-556:8-14, 4-ER-657:13-658:6; 12-ER-2280.  The sheet-wave machine was developed in 1991 by Tom Lochtefeld, who founded the company Wave Loch and invented the FlowRider—which at the time was "the only product in the world" in this market.  5-ER-783:10-13;  5-ER-786:17-23;  7-ER-1308:10-16;  9-ER-1683:15-16.  The FlowRider originally had a "patent set" that included more than two dozen patents and was essentially the only viable sheet-wave machine offering on the market for the two ensuing decades.   4-ER-668:22-669:3;  4-ER-692:3;  7-ER-1308:10-16.  Wave Loch subsequently licensed the FlowRider to WhiteWater and Aquatic Development Group, Inc. ("ADG").  7-ER-1319:2-6; 8-ER-1538:23-1539:5. These licensing agreements allowed Wave Loch to sell the FlowRider through various sales channels and obtain royalties from WhiteWater and ADG in the process of doing so.  4-ER-709:9-17; 6-ER-1007:2-10.

During the relevant time period, sheet-wave machines were typically sold to waterparks, public entities such as municipalities, resorts, cruise ships, and other

entertainment venues.  12-ER-2287; 4-ER-658:13.  Sheet-wave machines also are installed as part of a standalone venue.  In these standalone settings, the sheet-wave machine is the primary attraction around which food and beverage concessions and other forms of entertainment can be established.  *Id.*

WhiteWater contended at trial that the relevant product market included not only sheet-wave machines, but other machines that simulated a surfing experience, such as "deep wave" machines which allow riders to use a real surfboard. 4-ER-660:6-14; 10-ER:1911:21-1912:2.  The evidence at trial demonstrated that "deep wave" machines are materially different in multiple respects. *See, e.g.*, 6-ER-1085:18-1086:14.  As the name reflects, they move a lot of water, which requires more pumps and electricity and substantially more square footage.  4-ER-661:1-14; 5-ER-912:1-16.  A WhiteWater executive, Andrew Thatcher, would tell potential customers that an owner would have to open its own nuclear power plant to operate a deep-wave machine.  5-ER-912:8-16.

At trial, the jury found that PSD met its burden of proving by a preponderance of the evidence that the relevant product and geographic markets were sheet-wave machines using sheet-wave technology in the world excluding China.  2-ER-11.

## B.    PSD and Whitewater Both Operate in the Sheet-Wave-Machine Market

San Diego, CA-based Plaintiff-Appellant PSD and British Columbia, Canada-based Defendant-Appellee WhiteWater are both entities which make and sell sheet-

wave machines. PSD sheet-wave machines are marketed as the ProFlow series and the Supertube. 4-ER-556:17-19. WhiteWater sheet-wave machines include the FlowRider, Flowbarrel, and WaveOZ. 4-ER-556:22-24. WhiteWater acquired the rights to the FlowRider from Wave Loch after previously licensing the product for a number of years. 5-ER-817:12-15; 5-ER-879:18-20.

WhiteWater, which has around 400 employees worldwide, is the dominant maker of sheet-wave machines. 4-ER-681:11-14; 9-ER-1672:18. In addition to selling the machines, WhiteWater had a license agreement with ADG that allowed ADG to manufacture and sell FlowRiders in the United States and Eastern Canada from November 10, 2011 through April 30, 2022. 6-ER-998:17-24; 8-ER-1540:8-19; 10-ER-1972. This agreement, which was similar to ADG's prior license with Wave Loch, authorized ADG to sell FlowRiders in its territories in return for a royalty payment to WhiteWater. 5-ER-963:10-964:6 and 8-ER-1540:8-19; 12-ER-2304 ¶ 4. As a result, ADG and WhiteWater did not generally compete for sales of sheet-wave machines, 5-ER-964:7-13; 7-ER-1318:23-1319:13; 11-ER-2220–21; 4-ER-658:13-16, worked cooperatively to deliver a consistent message, and used the same marketing materials, operations, and training guides. 12-ER-2419:18-2420:6. ADG's interrogatory responses in this action included a single entity defense, asserting that it could not be deemed a co-conspirator with WhiteWater because ADG and WhiteWater were a single entity. 11-ER-2220–21; 4-ER-658:13-16.

Considering these factors, Dr. David Barth, an economist expert for PSD, combined the sales of WhiteWater and ADG when calculating market share. 6-ER-1092:12-25. Dr. Barth testified that from 2013-2019, WhiteWater and ADG accounted for over 72% of the sale and installation of sheet-wave machines in the relevant geographic market and, accordingly, WhiteWater possessed monopoly power. 6-ER-1094:2-6; 6-ER-1103:2-13. At the time of trial, there were more than 200 FlowRiders installed around the world. 9-ER-1686:10-17. Franceen Gonzales, a WhiteWater regional vice president, testified that WhiteWater had an average of 20-40 projects per year. 7-ER-1317:24-1318:9. By contrast, PSD, which has primarily operated as a two-person operation since its inception, had installed nine sheet-wave machines at the time of trial. 4-ER-654:13-655:1; 5-ER-752:22-753:3; 7-ER-1190:16-18. It was only after WhiteWater's conduct ceased that PSD was able to anticipate a year of significant revenue generation. At the time of trial, PSD was forecasting over $3 million in anticipated revenue for 2024, as "the cloud of litigation finally lifted" and the economy continued to rebound following the impact of the Covid-19 pandemic. 7-ER-1224:11-16.

### C. Mr. Alleshouse Departs Wave Loch to Form PSD and Begins Designing New and Inventive Products After All Material Patents Expired

Mr. Alleshouse, PSD's Chief Operating Officer, accepted a position with Wave Loch working on the installation of a sheet-wave machine project after

8

graduating from UC-Berkeley in December of 2004. 4-ER-662:9-23. After that project was completed, Mr. Alleshouse returned to Wave Loch in the fall of 2007 as a field engineer installing sheet-wave machines. 4-ER-664:8-665:13. Mr. Alleshouse installed sheet-wave machines for Wave Loch "all over the world," 4-ER-666:25-667:4, and was considered to be a talented and promising engineer. 5-ER-894:11-23.

During his tenure at Wave Loch, Mr. Alleshouse obtained his MBA from UC-San Diego. 4-ER-667:5-10. Because his position at Wave Loch offered little "room for growth," in mid-2012 he began looking for other career options where he would have the opportunity to employ this MBA. 4-ER-671:7-672:3. Recognizing the potential of a "second mover advantage" in the sheet-wave machine industry, Mr. Alleshouse left the company in July of 2012 and joined Yong Yeh to start PSD with the intention of designing and manufacturing sheet-wave machines to compete with WhiteWater. 4-ER-673:1-21. PSD incorporated in August of 2012. 7-ER-1199:2-5. After numerous consultations with patent attorneys to ensure that PSD's planned products did not infringe the few remaining Wave Loch patents, 4-ER-691:6-693:19, Messrs. Yeh and Alleshouse began designing three model sheet-wave machines to present at an upcoming trade show. 7-ER-1200:4-16, 1202:20-22. Following a period of designing, researching, and developing in Mr. Alleshouse's garage, 7-ER-1203:9-1205:8, Messrs. Yeh and Alleshouse filed a provisional patent application

that ultimately culminated in the issuance of three patents in which they were named inventors. 4-ER-557:18-20, 736:9-11, 691:6-13. These patents covered a half pipe design, a water proofing solution for padding systems, and a unique nozzle design configuration for regulating the flow of water. 4-ER-691:6-13. PSD invented these technologies after Mr. Alleshouse left Wave Loch, a fact WhiteWater conceded before the Federal Circuit during one of the litigations it brought against PSD— stipulating that **the inventions PSD patented were not conceived until after Mr. Alleshouse left Wave Loch**, nor did they use any trade-secret or other confidential information belonging to Wave Loch. 12-ER-2318.

From the outset, PSD's goal was to provide competition in a sheet-wave machine market that was controlled by "[a] single, dominant competitor" with quality products, a "diverse sheet wave portfolio," and lower prices. 12-ER-2280; 4-ER-705:7-19; 4-ER-695:18-696:3. In addition to the patented inventions, Mr. Alleshouse also improved PSD's designs with other innovations that reduced operating costs and added safety measures. 4-ER-682:18-686:7, 693:20-694:18. These improvements, coupled with the patented inventions, presented PSD's sheet-wave machines as "distinct products" from the FlowRider. 4-ER-695:21-696:3. Mr. Alleshouse analogized PSD's products to the Samsung Galaxy, which followed the iPhone. *Id.*

**D.      Whitewater Acquired Wave Loch Assets and Accepted the Obligation to Sue Mr. Alleshouse and PSD Through the Contribution Agreement**

After Mr. Alleshouse departed from Wave Loch, WhiteWater and Wave Loch continued negotiations for the sale of the Wave Loch FlowRider patents, technology, and assets that WhiteWater had been licensing from Wave Loch in years prior.  8-ER-1599:2-25.  The parties finalized the sale in January of 2014 through the signing of the Contribution Agreement.  11-ER-2028; 8-ER-1599:14-19.  The acquisition provided WhiteWater with Wave Loch's FlowRider line of business, including the rights to certain patents.  11-ER-2139–43.  The Contribution Agreement also included a provision requested by Wave Loch stating that WhiteWater would bring suit against Mr. Alleshouse for patent infringement.  11-ER-2104; 9-ER-1717:8-15.

Ultimately, a series of five lawsuits alleging claims ranging from fraud to patent infringement were filed against PSD and its founders.  4-ER-715:7-13; 8-ER-1526:3-6.  All of these lawsuits were ultimately resolved in PSD's favor.  While WhiteWater did not prevail in any of the actions it filed against PSD, the lawsuits distracted PSD from its business, consumed its limited resources, and drastically limited its ability to compete on the merits.  *See, e.g.*, 7-ER-1209:3-9.  As shown below, WhiteWater used the lawsuits as a pretext to accuse PSD of nefarious conduct and convince the limited number of consumers in the marketplace that WhiteWater would make good on its threat to squash Mr. Alleshouse and PSD. 11-ER-2209.

11

### E.    PSD Immediately Disrupts the Market

One of PSD's first projects was to build a machine that the Guinness Book of World Records accepted as the tallest sheet-wave machine ever built.  4-ER-690:8-11, 702:17-19.  It was met with customer interest and quickly caused an impact on WhiteWater's profits.  *See, e.g.*, 6-ER-1082:20-1084:3.

In November 2012, just months after the formation of PSD, WhiteWater's licensee, ADG, saw PSD's products being advertised and forwarded the ad to WhiteWater.  11-ER-2212.  Mr. Alleshouse's former boss at Wave Loch and WhiteWater's then President Marshall Myrman responded that "we are on it. Richard has gone rogue on us."  *Id.*  ADG asked, "You are on it, what does that mean? How long have you known about this?  ***Richard needs to be shut down now***. . . . ***What do you have in place that can be used to quash this new venture.***"  *Id.* (emphasis added).

Months later, Mr. Thatcher wrote internally:

> Richard (Pacific Surf Designs) is also a big threat from a product stand point.  He has no cash so he is struggling. ***Now is the time to squash him.***  He was the main engineer for the FlowRider for 5 years and HE HAS MADE IMPROVEMENTS.  He has no sales force but his product is good.  If we do nothing then this will be a problem."  11-ER-2209 (emphasis added).

Geoff Chutter, CEO of WhiteWater, responded that he first had to "get this deal signed," referring to the acquisition of Wave Loch's assets, "so that Tache can

12

start this progress." *Id.*  Mr. Tache was WhiteWater's attorney. 5-ER-902:2-3; 9-ER-1691:11-19.

In August 2013, Mr. Tache advised Mr. Chutter and WhiteWater that "the patents remaining in Wave Loch's portfolio . . . are of negligible value as a barrier to entry because of their focus on specific components of the overall system." 11-ER-2178; 9-ER-1702:5-9.  Mr. Tache's advice came on the heels of losses suffered by Wave Loch in lawsuits it filed against another ex-employee who started a company that made a different water attraction (a deep-wave surfing machine). *Id.*

### F.    Whitewater Withdraws Fraud, Breach of Contract, and Patent Infringement Claims Against PSD and Its Owners Only After Achieving Their Intended *In Terrorem* Effect on the Market

#### 1.  WhiteWater initiates litigation against PSD

On May 1, 2014, WhiteWater, through its wholly owned subsidiaries Surf Waves Limited and FlowRider, filed its first two actions: (1) *Surf Waves Ltd. v. Pacific Surf Designs, Inc., et al.*, Case No. 14-cv-01108-BEN-JMA (S.D. Cal.) ("*2014 Surf Waves Action*") and (2) *Flowrider Surf, Ltd. v. Alleshouse, et al.*, Case No. 14-cv-01110-GPC-BLM (S.D. Cal.) ("*2014 Flowrider action*").  9-ER-1819:20-1820:19.   These complaints alleged very serious allegations targeting Messrs. Alleshouse, Yeh, and PSD.

The *2014 Surf Waves action* alleged a claim for infringement of Patent No. 8,088,016, titled "Half Pipe Water Ride."  *Id.*  WhiteWater was not the inventor of

this patent, instead having purchased the intellectual property rights to the '016 patent from Douglas Murphy in lieu of proceeding with an infringement claim against Murphy's Waves Limited.  12-ER-2337; 9-ER-1703:8-1704:10.

The *2014 FlowRider action* alleged claims for infringement of Patent No. 6,491,589, titled "Mobile Water Ride Having Sluice Slide-Over Cover."  9-ER-1820:5-19.  It additionally alleged that Mr. Alleshouse breached an agreement with Wave Loch that he signed on September 8, 2008, titled "Covenant Against Disclosure and Covenant not to Compete."  *Id.*

These lawsuits accused PSD, as well as Mr. Alleshouse and Mr. Yeh personally, of fraud and deceit, tortious interference, unfair business practices, and unlawful use of confidential information.  4-ER-716:2-7; 9-ER-1705:13-1706:13; 12-ER-2342.   WhiteWater alleged that Mr. Alleshouse stole its trade secrets "including its yet-to-be-marketed products, customer lists, marketing strategies, business plans, supplier information, and the like."  12-ER-2347–48 ¶ 20. WhiteWater accused Mr. Alleshouse of lying to WhiteWater (then Wave Loch) employees "to extract proprietary information from Wave Loch so that he could start a competing company," stealing customers, "remov[ing] proprietary and confidential information belonging to Plaintiff, without authorization, or in excess of his authorization, for his personal economic advantage," and acting "willfully and

14

maliciously, with the deliberate intent to injure [WhiteWater's] business." 12-ER-2348 ¶ 25, 2351 ¶ 45, 2353 ¶¶ 56, 58.

### 2. WhiteWater threatens to destroy PSD unless Mr. Alleshouse ceased competing and joined WhiteWater

On Friday, May 9, 2014, WhiteWater served Mr. Alleshouse with process in the first two lawsuits it filed. 3-ER-316–317; 3-ER-346–349. The day after he was served, Mr. Myrman asked to meet Mr. Alleshouse at a "local dive bar," the Bay Hill Tavern. 3-ER-327:7-17, 328:13-16. The meeting occurred just a few days later. 3-ER-328:10-12. Mr. Myrman recalled it as an "off the record conversation," but testified that he could not recall what was said. 3-ER-344:8-9. Mr. Alleshouse asked for permission to record the meeting. Mr. Myrman refused. As a result, almost immediately after the meeting Mr. Alleshouse documented what was said. As confirmed by Mr. Alleshouse's notes and testimony, Mr. Myrman told him he was there "as a friend," "I don't know if you have the funds or stomach for this," and the "only way out" was for Mr. Alleshouse to quit competing with WhiteWater and return to work for him designing and installing FlowRiders. 3-ER-332:12-15; 3-ER-327:12-15, 328:17-22. Mr. Alleshouse's former colleague, Andrew Thatcher, later confirmed the lawsuit was nothing but a "power play designed by Marshall" to force Mr. Alleshouse to return to the FlowRider business. 3-ER-328:1-5.

For his part, Mr. Myrman recalled only having a beer with Mr. Alleshouse and that "I may have mentioned that the easiest way for this to go away was to come

work for us, but I don't -- I don't remember the specifics of the conversation."  3-ER-344:6-345:6, 332:25-333:14.  WhiteWater offered no evidence that Mr. Myrman was authorized to engage in settlement discussions.  To the contrary, a tolling agreement executed more than a month later recites that "On June 9, 2014, the parties met to discuss a possible business relationship that potentially would resolve all of the issues raised in the Actions."  3-ER-471 ¶ B.  It makes no mention of Mr. Myrman's "off-the-record" conversation.

### 3.  WhiteWater dismisses the Actions

Two months after filing, WhiteWater voluntarily dismissed both the 2014 actions.  9-ER-1820:20-22.  At trial, the jury heard evidence that WhiteWater had brought the first two lawsuits in order to fulfill its obligations under the Contribution Agreement.  *See, e.g.*, 9-ER-1707:18-1709:8.  Two weeks before the claims were dismissed, Mr. Chutter wrote an email to WhiteWater COO Michael Heaven, noting, "We have been legally required to go this far with our agreement with Tom. We have now fulfilled that agreement."  *Id*.  A 2019 FlowRider Value Stream Business Plan affirms that WhiteWater "had an 'obligation' through our License agreement with ADG, and our acquisition agreement with Tom, to pursue PSD."  12-ER-2253.

For the Panel's convenience the chronology of key events is set forth in the table below.

16

| Date | Event | Cite |
|------|-------|------|
| **May 1, 2014** | The *2014 Surf Waves Action* is filed; The 2014 Flowrider Surf Action is filed. | 3-ER-314 |
| **May 9, 2014** | Whitewater serves Mr. Alleshouse with the complaints in both actions. | 3-ER-346–349 |
| **May 10 or 11, 2014** | Mr. Myrman calls Mr. Alleshouse to meet for a beer. | 3-ER-327:7-17 |
| **May 14, 2014** | Mr. Myrman and Mr. Alleshouse have a beer at the Bay Hill Tavern. Mr. Myrman says he is there "as a friend." | 3-ER-328:13-16, 332:5-15 |
| **May 22, 2014** | Email chain stating, "Richard has requested a meeting through his counsel." | 3-ER-315 |
| **June 9, 2014** | "[T]he parties met to discuss a possible business relationship that potentially would resolve all of the issues raised in the Action." | 3-ER-356 |
| **June 27, 2014** | Tolling agreement executed, which makes no mention of the May 14 meeting but characterizes the June 9, 2014 meeting as *the first* settlement discussion. | 3-ER-356 |

Many of the allegations never again saw the light of day. WhiteWater never refiled the fraud claims, the tortious interference claims, or the unlawful use of confidential information claims.

### 4. WhiteWater uses the Actions as a stalking horse to improperly tell buyers that PSD would not survive the lawsuits

The 2014 lawsuits quickly had WhiteWater's intended effect in the marketplace. "Essentially, that lawsuit served its purpose for WhiteWater . . . And so everybody we talked to from that day forward the whole paradigm was, aren't you going out of business? Aren't you guys done for? Isn't WhiteWater suing you out of business?" Mr. Alleshouse testified. 4-ER-721:16-722:5. The 2014 actions

17

put a "brand on us," he testified. "They established our brand as not being innovators but being crooks and that was basically used against us at every front, from designers, consultants, pretty much everybody that that was the brand that was put on us by the biggest 500-person company in the room in this whole industry." 4-ER-722:9-14.

PSD was in negotiations for two sales of sheet-wave machines during this period of time and was competing with FlowRiders on multiple projects. PSD had entered into agreements with two customers—one in Texas and one in France. 4-ER-690:2-11. PSD had competed with a FlowRider for the former, 4-ER-714:12-15; 5-ER-939:2-15, and was also competing with the FlowRider for a project in Trinidad at this time. 4-ER-723:7-13. The lawsuits raised concerns that potential customers would ultimately pull out of their deals with PSD. 4-ER-721:16-723:6. WhiteWater executives conceded at trial that "customers talk to each other a lot" and that information from one customer "can get to the next customer." 7-ER-1369:2-11; *see also* 5-ER-960:8-961:11  One such individual, Mike Pappalardo, testified that he was "warned by" employees of Wave Loch or FlowRider "that they were in litigation" and "were going to go out of business" and that he was told not to buy from PSD "'because if you buy their wave, you're not going to have any support.' So it gave us cold feet." 12-ER-2422:21-2423:15.

The early litigation also prevented PSD from growing in two respects. First, it prevented PSD from obtaining outside funding. As Mr. Yeh testified at trial, "And the cloud of litigation, given it was kind of a serial litigator, any investor would look at an investment with PSD as potential liabilities were uncertain." 7-ER-1208:23-1209:2. Second, revenue from its early sales of ProFlows that would have otherwise allowed PSD to be a profitable entity was sunk into litigation expenses: "After our initial investment of 90,400, we were doing -- we were profitable from day one, if you discount any litigation expenses; but what happened, every project we sold, every penny we made as profit, went to litigation expenses." 7-ER-1209:5-9.

Ultimately, the 2014 lawsuits prevented PSD from reaching its 2015 sales goals. 4-ER-689:22-690:1. When asked why PSD was only able to install one wave in 2015, Mr. Alleshouse stated, "It was due to litigation, repeated litigation being used against us in the marketplace." 4-ER-690:12-22. Mr. Yeh echoed this sentiment, stating, "So starting in 2014 after we were able to kind of get our first project, we started being sued; and once that happened, we had this cloud of litigation over us all the time; and it would be from word of mouth and in the street." 7-ER-1213:5-8.

### G. Whitewater Files Two Patent Actions and a Breach of Contract Action and Continues to Weaponize the Litigations in the Market

As the impact of the 2014 lawsuits waned, WhiteWater became increasingly concerned about the competitive threat that PSD posed. Mr. Chutter said the quiet

part out loud at trial: "PSD was continuing to grow and thrive." 8-ER-1649:1-10. Having seen the deterrent effect of the first cases on PSD's growth, WhiteWater instigated a second wave of litigation.

Between 2015 and 2017, *years* after Mr. Alleshouse left Wave Loch to form PSD, WhiteWater filed three additional lawsuits against PSD and its founders. These included (1) *Flowrider Surf, Ltd., et al. v. Pacific Surf Designs, Inc.,* Case No. 15-cv-01879-BEN-BLM (S.D. Cal.) ("*2015 Surf Waves/Flowrider Surf Action*"), (2) *WhiteWater West Industries, Ltd. v. Pacific Surf Designs, Inc., et al.*, No. 17-cv-01118-BEN-BLM (S.D. Cal.) ("*2017 Whitewater action*"), and (3) *WhiteWater West Industries, Ltd. v. Alleshouse, et al.*, No. 17-cv-00501-DMS-NLS (S.D. Cal.) ("*2017 Alleshouse Litigation*"). WhiteWater then weaponized the lawsuits by using them as talking points with PSD's potential customers and other market participants to discourage them from doing business with PSD. 5-ER-953:11-25. This involved a number of projects, including Ocean Park, Cirque Du Soleil, Six Flags, Moon Palace, Baha Mar, Whale's Tale, and Typhoon Texas.

### 1. WhiteWater learns of competition with PSD and files the 2015 Surf Waves/FlowRider Surf Action

In late 2014, WhiteWater was in the process of submitting bids for a project called Ocean Park in Hong Kong and discovered that PSD was also competing for the project. 11-ER-2230; 5-ER-944:2-945:17. Mr. Thatcher, seeking a competitive advantage over PSD, wrote to Mr. Myrman, "Where are we with the Patent

Infringement case and Pacific Surf Designs? . . . . ***Now that we are going up against PSD in HK it may be within our best interest to get that suite (sic) going . . ..***" *Id.* 11-ER-2230 (emphasis added); 5-ER-947:19-948:18. Mr. Thatcher was aware that this course of action had been effective with Ocean Park in the past. While employed at WhiteWater's predecessor, Wave Loch, the FlowRider was competing with a company called American Wave Machines ("AWM"). 5-ER-944:20-945:8. Wave Loch was in litigation with AWM at the time and, despite losing the lawsuit, successfully discouraged Ocean Park from doing business with AWM. 5-ER-945:18-946:11; 11-ER-2174.

Separately, on January 30, 2015, Mr. Chutter was informed that the president and owner of a significant player in the water park industry had called to recommend that WhiteWater "dig into [PSD] a little bit." 12-ER-2296; 8-ER-1654:2-16; 9-ER-1712:2-14.

Following these email exchanges, WhiteWater caused to be filed on August 24, 2015, an action against PSD again alleging infringement of the '016 and '589 patents. 9-ER-1820:23-1821:3. On September 10, less than a month after filing, Mr. Chutter wrote internally to WhiteWater that "Ocean Park needs to be notified." 11-ER-2174. Mr. Thatcher, hoping that the lawsuit would encourage Ocean Park to select WhiteWater over PSD, proposed a letter to Ocean Park reading, "As a courtesy we wish to inform you that we have filed suit against Pacific Surf Designs for

21

infringement on patents owned by WhiteWater West Industries of which we believe they are infringing. The suit was filed ten days ago." 11-ER-2174; 5-ER-951:9-952:2.

In 2016 and 2017, while the patent litigation was pending, WhiteWater and PSD were competing for a separate project for the joint venture of Vidanta and Cirque de Soleil in Mexico. 7-ER-1303:2-6; 12-ER-2302; 7-ER-1336:15-1337:12. Despite having not been informed that PSD was actually infringing any patents or making any attempt to learn about the lawsuits (7-ER-1325:11-1326:3), Ms. Gonzales told Mr. Myrman that she would incorporate the patent infringement litigation "in our selling points page." 12-ER-2240. That same day, Ms. Gonzales emailed a Vidanta employee, stating that "we have some proprietary, patented technologies we are proposing to your company and we believe a competitor may be proposing something similar which infringes on our patent." 12-ER-2243.

In the following weeks, Ms. Gonzales continued to reiterate that PSD violated WhiteWater patents and that Vidanta should be made aware of this. For instance, on January 26, 2017, Ms. Gonzales told another WhiteWater employee, Emily Columbo, that they would "strategically point [ ] out" that PSD was pitching "stuff they have never done and which violates our patents." 12-ER-2239; 7-ER-1333:2-8. Just over a week later, on February 2, Ms. Gonzales informed Mr. Myrman that

22

she had mentioned the litigation to Vidanta "but have not been blatant about it as yet. Easy for me to do so." 12-ER-2232; 7-ER-1336:2-9.

Days later, Ms. Gonzales told Mr. Chutter that "we have to pull out our final cards and be blatant about patent infringement . . ." 12-ER-2245. Mr. Chutter responded affirmatively and noted that "the cards were played last evening." *Id.* Ultimately, WhiteWater had Mr. Tache, their attorney, speak with Vidanta about the lawsuits and PSD was not awarded the project. 5-ER-958:21-959:2.

Shortly after "the cards were played," the District Court dismissed the '589 Patent claims on May 25, 2017, finding that WhiteWater, not FlowRider Surf, was the proper plaintiff. 9-ER-1821:3-6. PSD then filed a request with the Patent Trial and Appeal Board ("PTAB") for *inter partes* review ("IPR") of the '016 and '589 patents. 9-ER-1821:7-24.

### 2. The 2017 Alleshouse Litigation and 2017 WhiteWater actions are filed and utilized as talking points with more market participants

On March 13, 2017, WhiteWater sued Mr. Alleshouse, Mr. Yeh, and PSD asserting claims for breach of contract and correction of inventorship. 9-ER-1822:19-21. This was the second action pertaining to Mr. Alleshouse's employment agreement. 9-ER-1714:23-1715:11. Then, on June 1, 2017, WhiteWater filed a lawsuit alleging that PSD infringed the '589 patent (regarding the nozzle flap). 9-ER-1823:20-24.

23

In July, after the lawsuits were filed, Ms. Gonzales was informed of an opportunity to bid on a project with the Six Flags Theme Park. 12-ER-2237. Ms. Gonzales responded, "Need to be aggressive. Really push the patent infringement with John. I bet he has no idea." *Id*. As with the Cirque Du Soleil project, Ms. Gonzales did not have any knowledge of an actual patent infringement finding at this time (because there never was one). 7-ER-1339:13-1340:6.

At this point, portions of all three lawsuits comprising the second wave of litigation were pending against PSD. On January 17, 2018, after IPR of the '016 patent in the *2015 Surf Waves/FlowRider Surf Action*, the PTAB issued a written decision finding that the asserted claims were unpatentable. 9-ER-1821:21-24. (This decision was summarily affirmed by the appellate court on July 1, 2019. *Id*.) On May 7, 2018, based on the decision of the PTAB, the trial court entered judgment dismissing the '016 claims, finding "that Surf Waves had no reasonable basis for arguing that its claims were well grounded" and "failed to undertake an adequate pre-suit filing investigation." 9-ER-1821:25-1822:5.

Nevertheless, in September of 2018, WhiteWater again considered involving Mr. Tache. WhiteWater had learned that PSD secured a project with Moon Palace and sought to unwind the deal as it had successfully done with Ocean Park and AWM years before. 12-ER-2235, 5-ER-956:4-957:1. In a September 11 email, Mr. Thatcher wrote to Mr. Myrman, "We need to get Tache involved to explain to them

about [the] litigation" and that "I anticipate that if our lawyers informed Moon Palace that we are in a litigation with PSD then they may drop the deal with PSD for fear of getting embroiled in a law suit." 12-ER-2235. Mr. Thatcher acknowledged the strategy had worked before with Vidanta. *Id.*

In March of 2019, the Alleshouse Litigation proceeded to trial. On March 27, the judge held that (a) Mr. Alleshouse breached the Non-Compete Agreement, the agreement was valid under state law, and WhiteWater was therefore entitled to assignment of WhiteWater's patent interests, and (b) Mr. Yeh was improperly joined as an inventor. PSD, Mr. Alleshouse, and Mr. Yeh then appealed. 9-ER-1823:2-10. On appeal, WhiteWater conceded that (1) "the inventions at issue were not conceived until after Mr. Alleshouse left his job at Wave Loch" and (2) "Mr. Alleshouse did not use any trade-secret or other confidential information belonging to Wave Loch (now Whitewater) in arriving at the patented inventions." *WhiteWater W. Indus., Ltd. v. Alleshouse*, 981 F.3d 1045, 1050 (Fed. Cir. 2020).

The day after the Court's decision, Ms. Gonzales was asked to send a press release regarding the outcome of the Alleshouse Litigation to potential customers for a resort in the Bahamas called Baha Mar, which was considering the installation of a sheet-wave machine. 12-ER-2248, 7-ER-1341:4-1342:12. After confirming that PSD was a potential bidder on the project, Ms. Gonzales wrote to WhiteWater employees that while "the US court finding may not be enforceable" in the Bahamas

or Mexico, WhiteWater could still "certainly appeal to the client on an integrity basis . . .." 12-ER-2248. At trial, Ms. Gonzales testified that the fact of litigation could be relevant to companies considering sheet-wave machines. 7-ER-1345:3-5.

Again, in June of 2019, Ms. Gonzales sent an email to Pat Finnegan, a WhiteWater salesperson, claiming that Mr. Alleshouse and Mr. Yeh were "basically stealing designs from Wave Loch and then using them for Pacific Surf . . ." 12-ER-2251. At the time, Mr. Finnegan "was meeting with lots of different customers" and had met with a company called Whale's Tale—which had previously purchased from PSD—the day before emailing with Ms. Gonzales. 12-ER-2251; 7-ER-1321:7-1322:14. In the same email, Ms. Gonzales implied that WhiteWater should inform Whale's Tale about the purported patent infringement, writing, "Maybe they need to know the facts and that might help them understand at least that point." 12-ER-2251.

In December of 2019, the *2017 WhiteWater action* was tried to a jury for seven days. 9-ER-1823:25. On December 18, the jury unanimously found that PSD did not infringe on any of WhiteWater's asserted claims in the '589 Patent. 9-ER-1823:25-1824:13. Following the trial, the Court denied PSD's motion for attorney's fees. *Id.* WhiteWater did not appeal.

26

### 3. WhiteWater's series of litigation comes to an end

In 2020, the last of the multi-year series of litigation was finally resolved in PSD's favor with two decisions. First, in September, the District Court ruled that the *2015 Surf Waves/FlowRider Surf action* "was at least in part motivated by WhiteWater's desire for payback for PSD's ongoing competition in the global water attraction market." 9-ER-1822:11-14; *Flowrider Surf, Ltd. v. Pac. Surf Designs, Inc.*, No. 3:15-cv-01879-BEN-BLM, 2020 WL 5645331, at *2 (S.D. Cal. Sept. 22, 2020). Second, the Federal Circuit reversed the Alleshouse Litigation bench verdict, finding that the provisions drafted by Mr. Lochtefeld were void as a matter of law. 9-ER-1823:10-13; 12-ER-2318. The Federal Circuit wrote that the "restraining effect" of the overbroad employment contract "is evident" because it would effectively preclude Mr. Alleshouse from ever competing in the sheet-wave machine industry. *Alleshouse*, 981 F.3d at 1052. That decision also memorialized WhiteWater's belated acceptance of two critical facts: the inventions at issue were not conceived until *after* Mr. Alleshouse left his job at Wave Loch, and he did not use any trade-secret or other confidential information belonging to Wave Loch (or, later, WhiteWater) in arriving at the patented inventions. *Id.* at 1050.

### 4. WhiteWater's business plans reveal that WhiteWater deliberately engaged in the pattern of litigation

WhiteWater's business plans throughout this period affirm that it had an intentional strategy of touting the later lawsuits to discourage customers from doing

business with PSD. For instance, WhiteWater's 2019 business plan states, "***Pacific Surf Design (PSD) - it is easy to argue that they aren't a threat, but the actual litigation has kept people away from them.  We know customers on the sidelines are awaiting the verdict.***  Typhoon Texas (#40160) is one example, where they actually told me this, in person."  12-ER-2266 (emphasis added).  Typhoon Texas was a project that PSD was unable to secure at the time.  During the trial underlying this appeal, Mr. Yeh was made aware of WhiteWater's business plan and learned for the first time of WhiteWater's admission that it was the litigation against PSD which was the actual cause of PSD's inability to obtain the project.  7-ER-1226:7-1230:7. WhiteWater's 2021 business plan contained a similar statement as well: "it is easy to argue that they aren't a threat, but the actual litigation has kept people from dealing with them."  11-ER-2194.  This time, Typhoon Texas was not specifically mentioned.  Mr. Yeh testified at trial as to what changed between 2019 and 2021, noting that "we had just won a trial" and therefore there was no longer a reason to "put that in the business plan that they were keeping us from Typhoon Texas."  7-ER-1227:8-1228:1.  Mr. Yeh also testified that, with WhiteWater's conduct having finally ceased, PSD was, at the time of trial, anticipating revenue from the sale of a FlowRider to Typhoon Texas. 7-ER-1224:11-1225:3.

28

## II.　　PROCEDURAL HISTORY

Plaintiff filed this action on July 29, 2020.  12-ER-2427.  In May 2023, Defendants moved for summary judgment arguing, *inter alia*, that Plaintiff's Section 2 claim should be dismissed because Plaintiff could not show that Defendants possessed monopoly power in the sheet-wave machine market and the *Noerr-Pennington* doctrine operated as a complete defense to "sham litigation" allegations. 4-ER-533–42.  In its Order, the District Court rejected these arguments, and scheduled the case for trial.  4-ER-476.

### A. Proposed Jury Instructions

In its Order, the District Court found, *inter alia*, that WhiteWater's conduct should be viewed as a whole and that the sham litigation allegations, even viewed in isolation, presented the "factual question of whether defendant WhiteWater engaged in a 'policy of starting legal proceedings without regard to the merits and for the purpose of injuring a market rival.'"  4-ER-507.

The parties filed joint proposed jury instructions, which identified both agreed-upon instructions and disputed instructions, on July 27, 2023.  3-ER-360. The parties did not agree with respect to a number of instructions.  First, PSD proposed an instruction on willful maintenance of monopoly power that was grounded in the ABA Model Instructions and the District Court's summary judgment order.  Specifically, PSD proposed the following instruction.

29

The next element PSD must prove is that WhiteWater possessed monopoly power in that market, then you must determine whether PSD has also proven that WhiteWater willfully maintained monopoly power through anticompetitive acts or practices. PSD contends that WhiteWater engaged in an anticompetitive scheme that includes (1) filing multiple lawsuits pursuant to a policy of starting legal proceedings without regard to the merits and for the purpose of injuring a market rival policy, (2) using the fact of the lawsuits to discourage potential customers from doing business with PSD, and (3) disparaging PSD to customers and potential customers. WhiteWater contends that its actions were all taken for a pro-competitive business purpose.

In analyzing the evidence, you must consider the evidence as a whole, giving PSD the full benefit of its proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each.

Anticompetitive acts are acts, other than competition on the merits, that have the effect of preventing or excluding competition or frustrating the efforts of other companies to compete for customers within the relevant market. Harm to competition is to be distinguished from harm to a single competitor or group of competitors, which does not necessarily constitute harm to competition. Some examples of harm to competition include increased prices, decreased production levels, and reduced quality.

Mere possession of monopoly power, if lawfully acquired, does not violate the antitrust laws. The maintenance of monopoly power by supplying better products or services, possessing, lawful patents, or superior business skills, or because of luck, is not unlawful.

A monopolist may compete aggressively without violating the antitrust laws, and a monopolist may charge monopoly prices without violating the antitrust laws. A monopolist's

conduct only becomes unlawful where it involves anticompetitive acts.

The difference between anticompetitive conduct and conduct that has a legitimate business purpose can be difficult to determine. This is because all companies have a desire to increase their profits and increase their market share. These goals are an essential part of a competitive marketplace, and the antitrust laws do not make these goals or the achievement of these goals unlawful, as long as a company does not use anticompetitive means to achieve these goals.

In determining whether WhiteWater's conduct was anticompetitive or whether it was legitimate business conduct, you should determine whether the conduct is consistent with competition on the merits, whether the conduct provides benefits to consumers, and whether the conduct would make business sense apart from any effect it has on excluding competition or harming competitors. . . .

If you find that PSD has proven by a preponderance of the evidence that WhiteWater willfully maintained monopoly power through anticompetitive acts, then you must consider whether PSD has proved the remaining elements of this claim. If, however, you find that PSD did not prove this element by a preponderance of the evidence, then you must find for WhiteWater and against PSD on this claim. 3-ER-400–04, 250–54.

PSD additionally proposed an instruction on predatory litigation adapted from the District Court's summary judgment order and the cases on which the District Court relied, *USS-POSCO Indus. v. Contra Costa Cnty. Bldg. & Constr. Trades Council, AFL-CIO*, 31 F.3d 800 (9th Cir. 1994), *California Motor Transport Co. v.*

31

*Trucking Unlimited*, 404 U.S. 508 (1972), and *Professional Real Estate Investors v. Columbia Pictures Indus.*, 508 U.S. 49 (1993). That proposed instruction stated:

> The Constitution ensures the right of everybody, whether acting alone or in combination or agreement with others, to petition or appeal to the courts for judicial action, recognizing that when people do so, they will naturally seek judicial action that favors them and also may be unfavorable to others. The law provides that the right to use the courts to seek judicial action is an important right, and that the exercise of that right, even by an agreement, does not normally violate the antitrust laws. But when a defendant files multiple lawsuits as part of a pattern or practice of successive filings undertaken essentially for purposes of injuring a market rival, that conduct may – without more –serve as a very effective restraint on trade because litigation is invariably costly, distracting and time consuming. As I instructed you above, PSD alleges an anticompetitive scheme that includes, but is not limited to, the filing of multiple lawsuits and you should make your determination based on your analysis of the evidence as a whole and WhiteWater's course of conduct as opposed to the merits of any given proceeding. In determining WhiteWater's purpose in filing the lawsuits, you may consider whatever direct and circumstantial evidence of WhiteWater's motivation for bringing the lawsuits is available to you. 3-ER-409, 269–71.

WhiteWater proposed instructions that assumed the case consisted solely of sham allegation claims. 3-ER-264–68; 2-ER-151–56, 100–04, 92–97; 87–90. The District Court took the proposed instructions under advisement. 4-ER-651:15-652:1.

On August 21, 2023, after PSD presented its case in chief, the District Court informed the parties that its holdings in its order denying summary judgment were

not "terribly applicable" to the dispute over jury instructions relating to predatory litigation. 8-ER-1504:4-12. To address the District Court's comments on this issue, PSD filed a trial brief proposing alternative jury instructions that would treat the question of anticompetitive conduct as an element of proof that the plaintiff must meet and "sham litigation" as an affirmative defense. 2-ER-75. Using this approach, the jury would have first been asked whether PSD introduced evidence that, viewed as a whole, shows anticompetitive conduct. If the jury answered that question in the affirmative, it would then be instructed that WhiteWater contends that the evidence shows only pursuit of lawful lawsuit. Lastly, the jury would have been informed that the "sham" litigation doctrine is a complete defense unless (1) the conduct shows that WhiteWater filed multiple lawsuits as part of a pattern or practice of successive filings undertaken essentially for purposes of injuring a market rival, or (2) one or more individual lawsuits were objectively baseless and that WhiteWater's primary objective in bringing the lawsuit or lawsuits was to hurt PSD by bringing or continuing the lawsuit regardless of the ultimate outcome of the lawsuit. *Id.*

On August 25, 2023, after PSD presented its case in chief, the District Court issued its jury instruction ruling. PSD challenges two of these rulings. The first instruction, titled "Sham Litigation," stated:

> The Constitution ensures the right of everybody, whether acting alone or in combination or agreement with others, to petition or appeal to the courts for judicial action, such as initiating lawsuits. When people do initiate lawsuits,

33

they will naturally seek judicial action that favors them and also may be unfavorable to others. The law provides that the right to initiate lawsuits is an important right, and that the genuine exercise of that right, even by an agreement, does not normally violate the antitrust laws.

Bringing or continuing multiple lawsuits against PSD does not violate the antitrust laws unless the lawsuits were a sham. To prove that the litigation PSD challenges was a sham, and thus a violation of the antitrust laws, PSD must prove, by clear and convincing evidence, two things: (1) that the lawsuits were objectively baseless as a whole; and (2) that the lawsuits were an attempt to harass, interfere directly with the business relationships of, or otherwise injure PSD.

Objective Baselessness

A lawsuit is objectively baseless if no reasonable litigant could realistically expect to win. Just because a lawsuit was unsuccessful does not mean that it was objectively baseless. In other words, if someone in WhiteWater's position could have had a reasonable belief that there was a realistic chance of winning, the suit was not objectively baseless. A series of lawsuits can be considered baseless as a whole if they were brought pursuant to a policy of starting legal proceedings without regard to the merits. In other words, the lawsuits were filed without probable cause. The Court(s) who presided over the previous lawsuits at issue in this case made findings regarding the baselessness of the individual lawsuits. I will provide a summary of the lawsuits and the prior Judges' findings to you in another instruction.

If you find that the litigation was not objectively baseless as a whole, then you do not need to consider whether the litigation was brought to injure PSD. Instead, you must find for WhiteWater and against PSD.

Primary Objective

If you find that the lawsuits were objectively baseless as a whole, then you must determine WhiteWater's primary objective in bringing the lawsuits. PSD contends WhiteWater's true purpose in bringing the lawsuits was not to win favorable judgments but were brought to harass PSD and prevent PSD from competing in the relevant market. WhiteWater contends that the true purpose in bringing the lawsuits was to enforce its patents and contractual rights. This requires you to determine whether WhiteWater brought the collective litigation against PSD in good or bad faith. The law recognizes a presumption that the assertion of a duly granted patent is made in good faith. This presumption is only overcome by affirmative evidence of bad faith, such as actual knowledge that a defendant knew it would not prevail.

In determining WhiteWater's purpose, you may consider whatever direct evidence of WhiteWater's motivation for bringing the lawsuits is available to you. Of course, you also may consider circumstantial evidence of WhiteWater's true purpose, such as whether WhiteWater engaged in any misrepresentations in the conduct of the lawsuit. If WhiteWater engaged in misrepresentation in a judicial proceeding, you may consider that to be evidence of an improper purpose.

Conclusion

If you find that no reasonable person could have realistically expected to succeed in the lawsuits WhiteWater brought or maintained against PSD, and that WhiteWater's primary purpose in bringing or continuing the lawsuits was to inflict harm on PSD, as opposed to the relief sought, then you must next consider whether the remaining elements of PSD's monopolization claim have been proven. If you do not find that PSD has proven the elements of sham litigation by clear and convincing evidence, then you must find for WhiteWater and against PSD. 2-ER-38–40; 9-ER-1817:1-1819:16.

35

The District Court issued a separate instruction on willful maintenance of monopoly power which tracked the ABA Model Instruction but omitted the language proposed by PSD regarding WhiteWater's anticompetitive scheme and the jury's obligation to evaluate the evidence as a whole.  2-ER-34–36; 9-ER-1812:14-1816:4.  In addition, the District Court instructed the jury on the clear and convincing evidence standard.  2-ER-45; 9-ER-1824:14-21.

### B.     *In Limine Ruling*

PSD challenges the District Court's *in limine* ruling granting WhiteWater's motion to exclude evidence of the Bay Hill Tavern meeting, finding that it was protected by Fed. R. Evid. 408.  1-ER-5.  The District Court based its decision on its ruling in the prior patent litigation.  But in that case, WhiteWater sought to exclude the evidence as "an impermissible effort to influence the jury to decide this case on evidence wholly unrelated to the merits of WhiteWater's infringement claim."  3-ER-313.  PSD alleges that in this case, the Bay Hill Tavern meeting was important because it was a part of the anticompetitive scheme.  The District Court held that it "previously (and rightly) determined this conversation was a settlement discussion. The notes reflect several topics which are germane to settlement negotiations."  1-ER-2.

### C. The Jury Finds in Favor of PSD on Relevant Market, but Finds that PSD Failed to Meet the Clear and Convincing Standard on the Element of Anticompetitive Conduct

The District Court approved a verdict form, over PSD's objections, that contained several questions that PSD respectfully submits were unnecessary and confusing. The verdict form identified eight questions for the jury to answer regarding PSD's unlawful monopolization claim (not including questions on antitrust injury and damages). The first two questions asked the jury to rule on the relevant product and geographic markets. The third question asked the jury: "Has PSD proven by clear and convincing evidence that the prior litigation, viewed as a whole, was objectively baseless and pursued in bad faith?" The fourth question asked, "Has PSD proven by a preponderance of the evidence that WhiteWater made negative statements about PSD which constituted disparagement?" The fifth question asked whether WhiteWater's conduct harmed competition in the relevant market. The sixth question asked whether WhiteWater and its licensee acted as a single entity for antitrust purposes and, therefore, their respective market shares can be combined. The seventh question asked, "Did PSD prove by a preponderance of the evidence that WhiteWater possessed monopoly power in the relevant market from 2013-2020?" The eighth question asked, "Did PSD prove by a preponderance of the evidence that WhiteWater willfully acquired or maintained monopoly power in the relevant market by engaging in the anticompetitive conduct?" 2-ER-9.

37

Following a two-week jury trial, the jury answered the first two questions in the affirmative, finding that PSD had proven the relevant market consisted of sheet-wave machines using sheet-wave technology sold worldwide excluding China. But the jury answered no to the third question, finding that PSD had not "proven by clear and convincing evidence that the prior litigation, viewed as a whole, was objectively baseless and pursued in bad faith." 2-ER-11. The jury did not reach the remaining questions on the verdict form. 2-ER-12–14.

## SUMMARY OF THE ARGUMENT

This appeal presents an opportunity for this Court to confirm that black-letter antitrust law principles should be applied when a monopolist engages in an anticompetitive scheme to exclude its most significant market rival, even where aspects of that conduct involve the monopolist's assertion of meritless patent litigation. The facts of this case are unique. Courts have weighed in on actions involving anticompetitive schemes. Courts have considered actions involving the assertion of invalid patents to squelch competition. But no appellate court has had the opportunity to address a case in which a monopolist engages in predatory litigation – comprised of not only patent infringement allegations, but other civil claims – as a component of a broader, anticompetitive scheme. It is a situation, however, that is bound to occur more often as monopolists in various industries – technology and pharmaceuticals, to take two examples – look for ways to preserve

38

their market dominance other than by competing on the merits through lowering prices or improving product quality.

This is a case in which the monopolist, WhiteWater, asserted that it should exclusively control the market for sheet-wave machines, even though all of the critical patents had long since expired. WhiteWater not only tried to weaponize its spurious proprietary right to the market, but it also attempted to assert ownership over Mr. Alleshouse, whose decision to form a rival company threatened to inject true competition into the market for sheet-wave machines. The antitrust laws exist to deter exactly the type of conduct at issue here.

PSD respectfully disagrees with various aspects of the District Court's rulings at trial. First, the structure and sequence of the District Court's jury verdict form improperly tracked the elements of proof at issue in this case and prevented the jury from considering various aspects of WhiteWater's alleged anticompetitive scheme as a whole. The jury form was organized as a sequential series of questions, and jurors were instructed to proceed to the next question only if and when they had answered the prior question in favor of PSD. The order of the questions and the nature of the form contradict both the letter and the spirit of Section 2 of the Sherman Act.

Relatedly, the District Court erred in declining to instruct the jury that it should consider WhiteWater's conduct as a whole in determining whether

WhiteWater maintained its monopoly power by engaging in anticompetitive conduct. The District Court's refusal cannot be reconciled with *Continental Ore* and its sequelae. It has long been the law that a monopolist's conduct viewed in its totality may be anticompetitive even when no single aspect of that conduct would constitute a violation in isolation.

Second, the District Court compounded the first error by improperly instructing the jury that PSD had to show, by clear and convincing evidence, that the unsuccessful lawsuits WhiteWater filed against PSD and its founders were "objectively baseless as a whole and brought with subjective bad intent." 2-ER-11. That instruction would be appropriate *if* PSD's antitrust case relied solely on allegations that WhiteWater sought to enforce an invalid patent against PSD. In that case, the *Noerr-Pennington* doctrine would warrant such an instruction. This, however, is not such a case. Here, the lawsuits that WhiteWater filed were components of a broader scheme. Moreover, of the meritless legal theories alleged by WhiteWater, only two involved patent violations. Ultimately, the jury should have been instructed to apply the preponderance of the evidence standard and any instruction regarding the right of a company to petition the government should have been provided solely for context so that the jury could decide whether WhiteWater's conduct, viewed as a whole and taking into account its right to pursue legitimate legal claims, violated Section 2 of the Sherman Act.

The jury found in favor of PSD on the elements of relevant market but decided that PSD did not clear the exceedingly high burden of proof imposed by the District Court. This is an issue that transcends the instant action because of the growing number of antitrust actions that implicate patent law. The risk of the District Court's ruling is that monopolists will feel emboldened to squelch competition by adding meritless patent allegations as ingredients to their monopoly broth.

These flawed instructions were also at odds with the District Court's ruling and findings in its Summary Judgment Order. Despite both parties submitting proposed jury instructions before jury selection, as well as filing briefs supporting their contested positions during trial, the Court did not issue a decision or reveal its jury verdict form until after Plaintiff had already rested its case in chief. As a result, PSD was not provided adequate notice of what it needed to prove and by what standard, which erroneously undermined PSD's right to a fair and impartial trial.

Finally, the District Court erred in excluding powerful evidence of WhiteWater's unlawful motive and intent when it held that the Bay Hill Tavern meeting was protected by Rule 408 of the Federal Rules of Evidence. Merely filing a lawsuit and threatening a competitor and its founders to drop the action only in exchange for an agreement not to join the monopolist is facially anticompetitive.

## ARGUMENT

**I.    THE DISTRICT COURT'S INSTRUCTIONS AND VERDICT FORM ON ANTICOMPETITIVE CONDUCT WERE ERRONEOUS**

### A.    *De Novo* is the Appropriate Standard of Review

The standard of review of a district court's jury instructions depends on the error that is alleged. *U.S. Wholesale Outlet & Distribution, Inc. v. Innovation Ventures, LLC*, 89 F.4th 1126, 1136 (9th Cir. 2023). "[This Court] review[s] legal issues *de novo*, including whether a district court's jury instructions accurately state the law." *Id.* (citing *Coston v. Nangalama*, 13 F.4th 729, 732 (9th Cir. 2021) (quoting *Hung Lam v. City of San Jose*, 869 F.3d 1077, 1085 (9th Cir. 2017)). Here, PSD argues that the structure and substance of the District Court's jury instructions and verdict form inaccurately reflect the relevant antitrust laws and therefore ought to be reviewed *de novo*.

### B.    The Jury Should Have Been Instructed to Evaluate the Evidence as a Whole to Determine Whether Whitewater Willfully Maintained Monopoly Power Through Anticompetitive Conduct by a Preponderance of the Evidence Standard of Proof

The District Court erred in three fundamental respects. First, it refused to instruct the jury on its obligation to look at the conduct as a whole by failing to issue a totality of the evidence instruction and unilaterally deconstructing the alleged anticompetitive scheme into its component parts in both the jury instructions and verdict form. Second, in (improperly) formulating a "sham litigation" instruction and verdict form question, the District Court incorrectly instructed the jury to apply

42

the clear and convincing standard of proof. Third, the District Court's anticompetitive conduct instruction mistakenly invoked the objectively baseless test, which is not applicable to the nature or circumstances of the underlying lawsuits at issue in this case.

### 1. The District Court should have instructed the jury to evaluate the evidence in its totality

It is a bedrock principle of antitrust law that the trier of fact should consider an antitrust defendant's conduct as a whole. *Cont'l Ore Co.*, 370 U.S. at 699 (plaintiffs must be given the "full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each."). In addition, courts have long accepted the principle that an antitrust defendant's conduct, when viewed in its totality, may violate the antitrust laws *even if* no single act would be a violation if viewed in isolation. *Id.* at 707 (it is "well settled that acts which are in themselves legal lose that character when they become constituent elements of an unlawful scheme"); *City of Anaheim v. Southern Cal. Edison Co.*, 955 F.2d 1373, 1376 (9th Cir. 1992), *overruled on other grounds by Pacific Bell Telephone Co. v. LinkLine Comm., Inc.*, 555 U.S. 438 (2009). PSD proposed such an instruction. The District Court did not give it. Instead, in both the jury instructions and verdict form, the District Court chose to break the anticompetitive scheme down into subparts, thus depriving PSD of the right to have

43

the jury evaluate the anticompetitive scheme in its totality. The jury should have been asked just one question on anticompetitive conduct, not three.

The jury verdict form is discordant with the totality of the evidence approach courts have regularly applied in cases like this one, where various exclusionary acts contribute to an overarching anticompetitive scheme. *See, e.g.*, *City of Mishawaka, Ind. v. American Elec. Power Co., Inc.*, 616 F.2d 976, 986 (7th Cir. 1980) (it "is the mix of the various ingredients . . . in a monopoly broth that produces the unsavory flavor"); *Klein v. Meta Platforms, Inc.*, Case No. 3:20-cv-08570-JD, 2022 WL 17477101, at *2 (N.D. Cal. Dec. 6, 2022) ("Under a 'monopoly broth' theory of liability, a plaintiff can state a Section 2 claim by alleging a series of practices that are anticompetitive, even if some of the activities would be lawful if viewed in isolation."); *Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.*, 311 F. Supp. 2d 1048, 1109 (D. Colo. 2004) (explaining that "the individual aspects or events of a defendant's conduct viewed in isolation need not be supported by sufficient evidence to amount to a section 2 violation for liability to exist. Rather, it is enough that the incidents taken together as a whole create sufficient evidence of attempted monopolization."); *Kobe, Inc. v. Dempsey Pump Co.*, 198 F.2d 416, 425 (10th Cir. 1952) (affirming judgment against a patent holder for violating the Sherman Act because the patent holder's "infringement action and the related activities, of course, in themselves were not unlawful, and standing alone would not

44

be sufficient to sustain a claim for damages which they may have caused, but when considered with the entire monopolistic scheme which preceded them . . . they may be considered as having been done to give effect to the unlawful scheme."); *In re Neurontin Antitrust Litig.*, MDL No. 1479, 2009 WL 2751029, at *15–17 (D.N.J. Aug. 28, 2009) (explaining that "[i]f an antitrust plaintiff can allege that a series of actions, when viewed together, were taken in furtherance and as an integral part of a plan to violate the antitrust laws, that series of actions may trigger antitrust liability as an overall scheme," and holding that plaintiffs "adequately stated a claim for monopolization and attempted monopolization on the basis of allegations that [defendant had] engaged in an overall scheme to monopolize"); *In re Epipen (Epinephrine Injection, USP), Marketing, Sales Practices, and Antitrust Litig.*, Case No. 17-md-2785-DDC-TJJ, 2017 WL 6524839, at *15 (D. Kan. Dec. 21, 2017) (allegations viewed in plaintiffs' favor and taken as a whole, allege anticompetitive conduct sufficient to state a plausible claim for an overall scheme to monopolize violating Sherman Act § 2); *IHS Dialysis Inc. v. Davita*, *Inc.*, No. 12 Civ. 2468(ER), 2013 WL 1309737, at *7 (S.D.N.Y. Mar. 31, 2013) (holding that allegations that did not adequately allege independent "predatory hiring" and "disparagement" claims could still be considered anticompetitive when viewed in the aggregate).

Here, the jury verdict form prevented jurors from considering the anticompetitive conduct alleged in the aggregate because it compartmentalized the

45

anticompetitive conduct into discrete questions to be considered and answered in isolation. 2-ER-9. For example, the first question in the section titled "Anticompetitive Conduct" asked the jury "Has PSD proven by clear and convincing evidence that the prior litigation, viewed as a whole, was objectively baseless and pursued in bad faith?" Per the express instructions of the form, however, a finding for WhiteWater on this issue would end the inquiry, which is exactly what happened during deliberations. *Id.* PSD never argued that the prior litigation alone was the basis for its allegations, but the verdict form was improperly structured as though it had.

Rather than separate the anticompetitive acts into individual questions, the jury should have been instructed to consider the prior litigation *and* the negative statements together, along with the evidence as a whole. As PSD argued in its brief in support of its proposed jury instructions, the Court ought to have followed the guidance offered by the ABA Model Jury Instructions in Civil Antitrust Cases ("Model Instructions") in drafting its instruction on the element of anticompetitive conduct. The Model Instructions treat the question of anticompetitive conduct as an element of proof that the plaintiff must meet and "sham litigation" as an affirmative defense. *See also Nunag-Tanedo v. E. Baton Rouge Par. Sch. Bd.*, 711 F.3d 1136, 1140 (9th Cir. 2013).

46

Through this structure, the jury would first be asked whether PSD had introduced evidence that, viewed as a whole, shows anticompetitive conduct. Only if the jury were to answer that question in the affirmative, would it then be instructed that WhiteWater contended that the evidence shows only pursuit of lawful lawsuits, and that the "Constitution ensures the right of everybody, whether acting alone or in combination or agreement with others, to petition or appeal to the courts for judicial action" and then articulate the applicable affirmative defense law. Rather than adopt this framework, the District Court conflated the two concepts, asking the jury to resolve the separate issues with one question.

Indeed, there have been monopolization cases in which jurors answered questions relating to sham litigation in favor of the defendant but ultimately returned a verdict for the plaintiff, concluding that the legitimate conduct was nevertheless one piece alongside various anticompetitive acts. *See, e.g.*, *Construction Cost Data, LLC v. The Gordian Group, Inc.*, No. 4:16-cv-00114, 2019 WL 1060352 (S.D. Tex. Jan. 22, 2019) (jury answering "No" to whether the defendant's pre-litigation correspondence was "objectively baseless in the sense that no reasonable litigant could reasonably expect success on the merits" and proceeding to find defendant liable for plaintiffs' monopolization claim). The format of the jury verdict form here erroneously foreclosed such an outcome.

47

**2. The District Court erred by instructing the jury that it should apply the clear and convincing evidence standard on the question of anticompetitive conduct**

In merging the sham litigation defense with the anticompetitive conduct element, the District Court misapplied the standard of proof related to the former to the latter. In civil litigation, including antitrust cases, the preponderance of the evidence standard of proof is the default. For example, in *Litton Sys., Inc. v. Am. Tel. & Tel. Co.*, the Second Circuit rejected the argument that the sham exception to the *Noerr Pennington* doctrine must be demonstrated by a "'clear and convincing' rather than a "preponderance' evidentiary standard." 700 F.2d 785, 812 (2d Cir. 1983).

The Second Circuit reasoned that a "clear and convincing" evidentiary standard was unnecessary as "requiring a plaintiff to prove that a defendant's conduct was a sham, the Supreme Court has already struck a rough balance between the competing First Amendment and antitrust interests." *Id.* at 813. After further noting the antitrust laws' importance to the "preservation of economic freedom and the free enterprise system," the Second Circuit held "[w]e see no reason to impose any higher burden of proof on the antitrust plaintiff asserting sham than would ordinarily be applicable in any civil issue." *Id.* at 813-14 (citing *United States v. Topco Associates, Inc.,* 405 U.S. 596, 610 (1972)); *see also Ramsey v. United Mine Workers of America*, 401 U.S. 302 (1971) (plaintiff in an antitrust action against a

labor union need only prove his case by a preponderance of the evidence); *Octane Fitness LLC v. Icon Health & Fitness, Inc.*, 572 U.S. 545, 558 (2014); *Herman & MacLean v. Huddleston*, 459 U.S. 375, 390 (1983).

The clear-and-convincing standard is reserved for a small, unique category of claims in which the defendant properly asserts a "sham litigation" affirmative defense to **patent** litigation. *Nunag-Tanedo*, 711 F.3d at 1140; Model Instructions Chapter 7, Instruction 4: Sham Litigation. Specifically, courts apply the clear-and-convincing standard in so-called *Walker Process* claims, where the defendant is accused of acquiring a patent by fraudulent means and then used that fraudulent patent to exclude a competitor from the market. *Kaiser Found. Health Plan, Inc. v. Abbott Labs., Inc.*, 552 F.3d 1033, 1045 (9th Cir. 2009).

That is not this case. As shown above, PSD alleged an anticompetitive scheme in which patent litigation was but one ingredient of the monopoly broth (and in one of those two patent claims, the court found that WhiteWater's prosecution of the '016 patent was objectively baseless and "at least in part motivated by [WhiteWater's] desire for 'payback' for [PSD's] ongoing competition in the global water attraction market."

WhiteWater's prior lawsuits also alleged fraud claims – which WhiteWater unilaterally dismissed after the damage was done. Alleshouse testified that meritless fraud allegations and other aspects of the lawsuit deterred customers from doing

business with PSD. WhiteWater also alleged other tort claims as well as contract claims. Even for its patent claims, WhiteWater bore the burden of proof at trial and it lost in a rout.

Ultimately, the District Court should not have given a clear-and-convincing evidence instruction.

### 3. The District Court erred by instructing the jury that it should apply the objectively baseless test on the question of anticompetitive conduct

In combining the anticompetitive conduct element with the "sham" litigation defense, the Court's hybrid instruction not only applied the inapposite clear and convincing standard to Plaintiff's third element of proof, but it also elided the differences between the distinct circumstances in which "sham" litigation arises, producing a confusing amalgam of separate tests.

"Sham" litigation results from one of three circumstances: (1) where the defendant filed a lawsuit that was objectively baseless and the defendant's motive in bringing it was unlawful; (2) where the conduct involves a series of lawsuits "brought pursuant to a policy of starting legal proceedings without regard to the merits" and for an unlawful purpose; or (3) where the allegedly unlawful conduct consists of "a party's knowing fraud upon, or its intentional misrepresentations to, the court [which] deprive[s]the litigation of its legitimacy." *Sosa v. DIRECTTV, Inc.*, 437 F.3d 923, 938 (9th Cir. 2006) (citations omitted). PSD argued in its Opposition

Brief to WhiteWater's Summary Judgment Motion and in its Brief filed in Support

of its Proposed Jury Instructions that this case only implicates the second of those

circumstances, as set forth in *USS-POSCO Indus.*, 31 F.3d 800.

As the District Court recognized in its Order denying WhiteWater's motion

for summary judgment, the legal test "is more forgiving when the allegation involves

a series of lawsuits because 'the filing of a whole series of lawsuits and other legal

actions without regard to the merits has far more serious implications than filing a

single action, and can serve as a very effective restraint on trade.'" 4-ER-505–06

(citing *USS-POSCO*, 31 F.3d at 811). Under the series exception, "the question is

not whether any one of [the lawsuits] has merit…but whether they are brought

pursuant to a policy of starting legal proceedings without regard to the merits and

for the purpose of injuring a market rival. The inquiry in such cases is prospective:

Were the legal filings made, not out of a genuine interest in redressing grievances,

but as part of a pattern or practice of successive filings undertaken essentially for

purposes of harassment?" 31 F.3d at 811.

Importantly, in its Summary Judgment Order, the District Court agreed with

PSD that the "sham series exception can be applied in this case." 4-ER-476–507.

However, instead of issuing a ruling on the proposed jury instructions to resolve

whether or not the sham series instruction applied or allowing the question of its

applicability to go before the jury, the District Court inexplicably cobbled together

components from the distinct standards and applied the "objectively baseless" test applicable to the first sham litigation exception to the series exception from *USS-POSCO*. This bespoke instruction is an erroneous articulation of the applicable legal standards and lacks any factual or doctrinal justification.

Furthermore, even if the Court had concluded that the series exception was inapplicable, putatively justifying its refusal to instruct the jury on it, the objectively baseless test would still have been incorrect in light of PSD's claim being premised on a "monopoly broth" theory, as opposed to separate allegations of "sham litigation" and "disparagement." In addition to asserting that WhiteWater's five unsuccessful lawsuits (and multiple legal claims stuffed within them) constituted a series of sham litigation, PSD also argued that these lawsuits were but one ingredient of a "monopoly broth" which, when viewed in its totality, violated Section 2 of the Sherman Act. The Court accepted PSD's "monopoly broth" theory in its July 10, 2023 Order denying WhiteWater's motion for summary judgment. 4-ER-508 Despite PSD timely submitting proposed jury instructions consistent with the Summary Judgment Order ahead of trial, the District Court not only omitted these instructions, but it issued its decision and jury verdict form *after* PSD had already rested its case-in-chief. In presenting its case, PSD reasonably relied on the Court's Summary Judgment Order and was consequently denied adequate notice of the

standards by which the jury would be instructed to evaluate the elements of its claims.

As PSD argued in its trial Brief regarding the inapplicability of the *Walker Process* Doctrine, this is not a case stitched together from a series of perfectly legal acts, as evidenced by the Court's prior finding that competition in the global water attraction market." *See* 2-ER-99 (citing *2015 Surf Waves/Flowrider Surf Action*, No. 3:15-cv-01879-BEN-BLM, 2020 WL 5645331, at *2 (S.D. Cal. Sept. 22, 2020).

In addition, the objective baselessness standard is not even arguably implicated by the litigations involving the Alleshouse employment agreement. Thus, the objectively baseless standard, even if it were implicated, would still be inapplicable in these circumstances.

## II.     THE DISTRICT COURT ERRED BY PREVENTING THE JURY FROM HEARING EVIDENCE OF THE BAY HILL TAVERN MEETING

As detailed above, the day after he was served with process on May 9, 2014, for the first two lawsuits filed by WhiteWater against him and his company, Richard Alleshouse received a call from his former boss, Mr. Myrman, who asked to meet him for a beer at a local San Diego "dive bar." 3-ER-327:7-328:22, 331:22-333:14. They met one or two days later at the Bay Hill Tavern. 3-ER-328:10-12, 329-332:16-20.

53

The discussion that ensured is among the anticompetitive acts that the jury should have been allowed to consider in deciding whether WhiteWater engaged in unlawful conduct. It demonstrates anticompetitive intent and is relevant, for example, to the factual question "whether Defendant WhiteWater engaged in a 'policy of starting legal proceedings without regard to the merits and for the purpose of injuring a market rival.'" 4-ER-507. Evidence of that meeting should not have been excluded under Rule 408 as the meeting occurred prior to settlement discussions having "crystallized." *Wall Data Inc. v. Los Angeles Cnty. Sheriff's Dep't*, 447 F.3d 769, 783-84 (9th Cir. 2006).

Similarly, there was no offer of "valuable consideration," which is a requirement of Rule 408. Nor would testimony of the meeting have been offered to prove invalidity of claims in the prior litigations. Fed. R. Evid. 408; *United States v. Mirama Enterprises, Inc.*, 185 F. Supp. 2d 1148, 1157 (S.D. Cal. 2002). Moreover, even if one assumed *arguendo* that the Bay Hill Tavern conversation was governed by Rule 408 (it was not), the testimony would still be admissible to show WhiteWater's motive and intent. *Stewart v. Wachowski*, No. CV 03-2873 MMM (VBKx), 2004 WL 5618386, at *5 (C.D. Cal. Sept. 28, 2004).

### A.    Standard of Review

A District Court's decision on whether to admit evidence over Rule 408 objections is reviewed for abuse of discretion. *United States v. Zinnel*, 725 F. App'x

453, 459 (9th Cir. 2018) (citing *Cassino v. Reichhold Chems., Inc.*, 817 F.2d 1338, 1342 (9th Cir. 1987)).  Here, the District Court's ruling amounted to an abuse of that discretion in light of WhiteWater's own admission that the first settlement discussions occurred weeks after WhiteWater tried to strong-arm Alleshouse into shutting PSD down and returning to work for Myrman.

### B.    The Bay Hill Tavern Meeting was not Inadmissible Pursuant to Rule 408

Determining whether a statement was made during compromise negotiations is a fact-intensive inquiry.  *Int'l Bhd. of Elec. Workers Local 48 v. Rosendin Elec., Inc.*, No. 3:23-cv-00297-HZ, 2023 WL 3981282, at *8 (D. Or. June 12, 2023).  The Court must consider, among other things, "when settlement negotiations have crystallized."  *Id.* (citing *Wall Data Inc. v. Los Angeles Cnty. Sheriff's Dep't*, 447 F.3d 769, 783–84 (9th Cir. 2006)).  To invoke Rule 408, the party asserting it bears the burden of making a "substantial showing that the communications were part of the attempts to settle the dispute." *Hibbs v. State Farm Fire and Cas. Co.*, No. 6:22-cv-00532-MK, 2022 WL 17751701, at *3 (D. Or. Dec. 19, 2022); *see also Mirama*, 185 F. Supp. at 1156–57 (same).  The Court improperly found that WhiteWater met that heavy burden in its Motion in Limine Ruling.  1-ER-5.  Indeed, WhiteWater did not identify any communications from the May 2014 meeting that could have constituted a settlement offer or offer to compromise.

Contrary to the Court's ruling in its Order on the Motions in Limine, there is no evidence that the conversation alluded to settlement; it neither referenced the allegations in the complaint nor otherwise suggested that the lawsuits had merit. Even if the Bay Hill Tavern conversation could be viewed as an invitation to initiate settlement discussions, Rule 408 does not apply to such invitations. *See Commonwealth Capital Corp. v. City of Tempe*, No. 2:09-CV-00274 JWS, 2011 WL 1429624, at *1, 3 (D. Ariz. April 14, 2011); *In re FCA US LLC Monostable Elec. Gearshift Litig.,* 598 F. Supp. 3d 639, 645 (E.D. Mich. 2022).

Nor did Mr. Myrman offer "valuable consideration," as required by Rule 408 to find the existence of a settlement communication. *Cmty. Infusion Servs., Inc. v. Nat'l Org. of Rare Disorders, Inc.*, No. SACV 11-00719 JVS(MLGx), 2012 WL 13018425, at *5 (C.D. Cal. Apr. 11, 2012) ("FRE 408 governs 'offering to accept' valuable consideration, not just offering. '[V]aluable consideration' is required to be offered in satisfaction of a claim."). To the contrary, he merely suggested that Mr. Alleshouse could make the lawsuit disappear if he ceased competing against WhiteWater and returned to work for him.

### C.  The Bay Hill Tavern Meeting Would Have Been Admissible Even if it had Been a Settlement Negotiation

There is no blanket prohibition on the admissibility of settlement discussions. Rule 408 only precludes such evidence when offered to prove the validity or invalidity of a claim or to impeach a prior inconsistent statement. Such evidence

56

can be admitted for other purposes, such as showing that an insurer engaged in bad faith. *Hill*, 2022 WL 17751701, at *3-4; *see also* 2006 Advisory Committee Notes on Rules – 2006 Amendments ("The intent is to retain the extensive case law finding Rule 408 inapplicable when compromise evidence is offered for a purpose other than to prove the validity, invalidity, or amount of a disputed claim."). Here, the evidence could have been admitted for purposes other than showing the validity or invalidity of the (dismissed) lawsuits. It could have been admitted solely to show WhiteWater's motive and intent.

## III.    PSD IS ENTITLED TO A NEW TRIAL

"A party seeking to alter a judgment based on erroneous jury instructions must establish that 'those instructions were legally erroneous,' and that 'the errors had prejudicial effect.'" *Ecolab, Inc. v. Paraclipse, Inc.*, 285 F.3d 1362, 1373 (Fed. Cir. 2002) (quoting *Advanced Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272, 1281 (Fed. Cir. 2000)).

PSD respectfully submits that the errors in the jury instructions and verdict form were consequential to the jury verdict and therefore had a prejudicial effect requiring a new trial.

## <u>CONCLUSION</u>

For the reasons set forth above, PSD respectfully asks that the judgment be reversed and remanded for a new trial.

DATED:  February 23, 2024                    Respectfully Submitted,

**ZELLE LLP**

By:  <u>*/s/ Jennifer Duncan Hackett*</u>
     Jennifer Duncan Hackett
     James Robertson Martin
     1775 Pennsylvania Avenue, Suite 375
     Washington, DC 20006
     (202) 899-4100
     jhackett@zellelaw.com
     jmartin@zellelaw.com

     *Attorneys for Plaintiff-Appellant Pacific Surf Designs, Inc.*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number(s)**    23-2609

The undersigned attorney or self-represented party states the following:

(●) I am unaware of any related cases currently pending in this court.

(○) I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

(○) I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature**    /s/ Jennifer Duncan Hackett    **Date**   2/23/2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* *forms@ca9.uscourts.gov*

**Form 17**                                                                                      *New 12/01/2018*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 23-2609

I am the attorney or self-represented party.

**This brief contains** | 13,371 | **words,** including | 143 | words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

⦿ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [          ].

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | /s/ Jennifer Duncan Hackett | **Date** | 2/23/24

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** | *Rev. 12/01/22*