No. 23-2609

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

PACIFIC SURF DESIGNS, INC.,

*Plaintiff-Appellant,*

v.

WHITEWATER WEST INDUSTRIES, INC.,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Southern District of California
No. 3:20-CV-01464-BEN-DDL
Hon. Roger T. Benitez

**APPELLEE'S ANSWERING BRIEF**

Joshua M. Robbins
Roger L. Scott
Robert M. Dato
**BUCHALTER APC**
18400 Von Karman Avenue, Suite 800
Irvine, CA 92612-0514
(949) 224-6284

*Attorneys for Defendant-Appellee*
Whitewater West Industries, Ltd.

## CORPORATE DISCLOSURE STATEMENT

Defendant-Appellee WhiteWater West Industries, Ltd. is a Canadian corporation. It is wholly-owned by Chutter Ventures Ltd., a Canadian corporation. Under Federal Rule of Appellate Procedure 26.1(a), WhiteWater is not obligated to make any further corporate disclosure.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT .........................................................i

TABLE OF CONTENTS................................................................. ii

TABLE OF AUTHORITIES ..........................................................v

INTRODUCTION ................................................................1

ISSUES PRESENTED...............................................................5

STATEMENT OF THE CASE..........................................................6

    A.    Industry, Product, and Patents..........................................6

    B.    Alleshouse Leaves Wave Loch, Forms PSD, and Designs "Knockoffs."..................................................7

    C.    WhiteWater Sues PSD and Its Owners for Patent Infringement. .........8

    D.    WhiteWater Sues PSD and Alleshouse for Technology Theft. ..........11

    E.    Two Judges Find that WhiteWater's Lawsuits Were Reasonable and in Good Faith. ............................................13

    F.    WhiteWater Tells Only a Few Outsiders About the Litigation. .........15

    G.    PSD Sues WhiteWater for Antitrust and RICO Violations. ...............17

    H.    The Parties Propose Jury Instructions, the Court Provides Its Own Proposed Version—Without Objection from Either Party—and the Jury Finds for WhiteWater. ............................................18

SUMMARY OF ARGUMENT ..................................................23

STANDARD OF REVIEW ..................................................25

ARGUMENT ...................................................................................29

I.  The District Court Did Not Err, Let Alone Plainly Err, in Instructing the Jury on Anticompetitive Conduct and *Noerr-Pennington* Immunity. ..........................................................29

  A.  PSD cannot circumvent *Noerr-Pennington* by combining prior litigation with related statements into an antitrust "scheme." ....................................................................30

  1.  Lawful conduct cannot be combined with other lawful conduct to establish anticompetitive activity. ...........................31

  2.  Conduct protected by *Noerr-Pennington* cannot be combined with other conduct to establish anticompetitive activity. ..................................................................36

  B.  PSD cannot overcome *Noerr-Pennington* and sham litigation requirements by citing WhiteWater's filing of more than one prior lawsuit. ....................................................40

  1.  The *USS-POSCO* "series" test does not apply because the number of lawsuits WhiteWater filed was insufficient. ..........41

  2.  The *USS-POSCO* test requires a showing of objective baselessness. ............................................................43

  3.  The *USS-POSCO* test requires that the plaintiff establish the exception by clear and convincing evidence. ...........................47

II.  The District Court Did Not Abuse Its Discretion in Excluding Evidence of Settlement Discussions. ..................................................49

  A.  The 2014 conversation was a settlement communication. .......50

  B.  PSD sought to introduce the 2014 conversation to prove the invalidity of WhiteWater's prior litigation claims. ...................51

III.    Any Error in the Instructions or Exclusion of Evidence Would Not Justify Reversal Because It Would Not Have Affected the Result.....52

    A.    Even under its preferred instructions, PSD did not prove WhiteWater pursued litigation in bad faith...............................52

    B.    PSD did not prove that WhiteWater had monopoly power. .....54

    1.    WhiteWater and ADG were not a single entity. .......................54

    2.    Even combined, WhiteWater and ADG lacked sufficient market share for monopoly power under the indirect test. .......56

    3.    PSD presented no direct evidence of monopoly power............57

    C.    PSD did not prove WhiteWater's conduct harmed competition....................................................................................59

CONCLUSION .........................................................................................61

CERTIFICATE OF COMPLIANCE.......................................................62

CERTIFICATE OF SERVICE .................................................................63

STATEMENT OF RELATED CASES .....................................................64

iv

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*3Shape Trios A/S v. Alight Tech., Inc.*,
  2019 WL 3824209 (D. Del. Aug. 15, 2019).....................................................38

*Amarel v. Connell*,
  102 F.3d 1494 (9th Cir. 1996) ...........................................................41, 45

*American Prof. v. Harcourt Brace Jovanovich*,
  108 F.3d 1147 (9th Cir. 1997) .......................................................40, 54, 57

*Azurity Pharms., Inc. v. Bionpharma, Inc.*,
  650 F. Supp. 3d 269 (D. Del. 2023).....................................................42

*Bryant v. Mil. Dep't of Mississippi*,
  597 F.3d 678 (5th Cir. 2010) ...............................................................46

*C.B. v. City of Sonora*,
  769 F.3d 1005 (9th Cir. 2014) (en banc) ...........................................27

*Cal. Comput. Prods., Inc. v. Int'l Bus. Machs. Corp.*,
  613 F.2d 727 (9th Cir. 1979) ...............................................................33

*California Motor Transp. Co. v. Trucking Unlimited*,
  404 U.S. 508 (1972)................................................................43, 44, 46

*Campbell v. Pennsylvania Sch. Boards Ass'n*,
  972 F.3d 213 (3d Cir. 2020) ...............................................................48

*Catch Curve, Inc. v. Venali, Inc.*,
  2008 WL 11334024 (C.D. Cal. Nov. 3, 2008) ...........................................45, 46

*City of Anaheim v. S. Cal. Edison Co.*,
  955 F.2d 1373 (9th Cir. 1992) ...............................................................35

*City of Groton v. Conn. Power & Light Co.*,
  662 F.2d 921 (2d Cir. 1981) ...............................................................34

*City of Mishawaka, Ind. v. Am. Elec. Power Co.*,
  616 F.2d 976 (7th Cir. 1980) ...............................................................32

*Constr. Cost Data, LLC v. Gordian Grp., Inc.*,
    814 F. App'x 860 (5th Cir. June 30, 2020).........................................39

*Constr. Cost Data, LLC v. Gordian Grp., Inc.*,
    2019 WL 1060352 (S.D. Tex. Jan. 22, 2019).................................39

*Cont'l Ore Company v. Union Carbide and Carbon Corp.*,
    370 U.S. 690 (1962)..................................................................31

*Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*,
    776 F.3d 1343 (Fed. Cir. 2014) ..............................................46

*Crowder v. LinkedIn Corp.*,
    2023 WL 2405335 (N.D. Cal. March 8, 2023).................................35

*Dreamstime.com, LLC v. Google LLC*,
    54 F.4th 1130 (9th Cir. 2022) ...............................................33

*Eatoni Ergonomics, Inc. v. Rsch. In Motion Corp.*,
    826 F. Supp. 2d 705 (S.D.N.Y. 2011) ....................................34

*ERBE Elektromedizin GMBH v. Canady Tech., LLC*,
    629 F.3d 1278 (Fed. Cir. 2010) ..............................................42

*Fedorczyk v. Carribean Cruise Lines, Ltd.*,
    82 F.3d 69 (3d Cir. 1996) .....................................................59

*In re Flonase Antitrust Litig.*,
    795 F. Supp. 2d 300 (E.D. Pa. 2011)......................................42

*Flowrider Surf, Ltd. v. Pacific Surf Designs, Inc.*,
    2020 WL 907058 (S.D. Cal. Feb. 25, 2020).................................14

*Freeman v. San Diego Ass'n of Realtors*,
    322 F.3d 1133 (9th Cir. 2003) ...............................................56

*FTC v. Facebook, Inc.*,
    560 F. Supp. 3d 1 (D.D.C. 2021)............................................34

*Gen-Probe, Inc. v. Amoco Corp., Inc.*,
    926 F. Supp. 948 (S.D. Cal. 1996)..........................................45

*Handgards, Inc. v. Ethicon, Inc.*,
 743 F.2d 1282 (9th Cir. 1984) ....................................................48

*Handgards, Inc. v. Ethicon, Inc.* (*Handgards I*),
 601 F.2d 986 (9th Cir. 1979) ..............................................39, 48

*Hanover 3201 Realty, LLC v. Village Supermarkets, Inc.*,
 806 F.3d 162 (3d Cir. 2015) ......................................................46

*Int'l Longshore & Warehouse Union v. ICTSI Ore., Inc.*,
 863 F.3d 1178 (9th Cir. 2017) ............................................42, 45

*Intergraph Corp. v. Intel Corp.*,
 195 F.3d 1346 (Fed. Cir. 1999) ................................................34

*Janjua v. Neufeld*,
 933 F.3d 1061 (9th Cir. 2019) ..................................................53

*Kaiser Found. Health Plan v. Abbot Labs, Inc.*,
 552 F.3d 1033 (9th Cir. 2009) ......................................45, 48, 49

*Kobe, Inc. v. Dempsey Pump Co.*,
 198 F.2d 416 (10th Cir. 1952) ..................................................36

*Kottle v. Nw. Kidney Centers*,
 146 F.3d 1056 (9th Cir. 1998) ..................................................42

*Litton Sys., Inc. v. Am. Tel. & Tel. Co.*,
 700 F.2d 785 (2d Cir. 1983) ......................................................48

*Masimo Corp v. Tyco Health Care Grp., L.P.*,
 2004 WL 5907538 (C.D. Cal. June 10, 2004) ..........................35

*Mayor and City Council of Baltimore v. AbbVie Inc.*,
 42 F.4th 709 (7th Cir. 2022) ....................................................38

*Mercatus Grp. LLC v. Lake Forest Hosp.*,
 641 F.3d 834 (7th Cir. 2011) ....................................................38

*Meridian Project Sys., Inc. v. Hardin Const. Co., LLC*,
 404 F. Supp. 2d 1214 (E.D. Cal. 2005) ..............................49, 50

*Monroe v. City of Phoenix*,
    248 F.3d 851 (9th Cir. 2001) ...............................................................26

*Murray v. Southern Route Mar. SA*,
    870 F.3d 915 (9th Cir. 2017) ...............................................................26

*Ne. Telephone Co. v. AT&T*,
    651 F.2d 76 (2d Cir. 1981) ...................................................................34

*Pac. Bell Tel. Co. v. LinkLine Commc'ns, Inc.*,
    555 U.S. 438 (2009)...............................................................32, 33, 36

*Pacific Surf Designs, Inc. v. WhiteWater West Industries, Ltd.*,
    2021 WL 461707 (S.D. Cal. Feb. 9, 2021).........................................17

*Padilla-Ramirez v. Bible*,
    882 F.3d 826 (9th Cir. 2017) ...............................................................47

*Paladin Assocs., Inc. v. Mont. Power Co.*,
    328 F.3d 1145 (9th Cir. 2003) .............................................................59

*PNY Technologies, Inc. v. SanDisk Corp.*,
    2012 WL 1380271 (N.D. Cal. April 20, 2012)....................................35

*Primetime 24 Joint Venture v. Nat'l Broad. Co.*,
    219 F.3d 92 (2d Cir. 2000) ...................................................................41

*Pro. Real Est. Investors, Inc. v. Columbia Pictures Indus.*,
    508 U.S. 49 (1993)..........................................................................*passim*

*PTI, Inc. v. Philip Morris, Inc.*,
    100 F. Supp. 2d 1179 (C.D. Cal. 2000) ..............................................39

*Puerto Rico Tel. Co. v. San Juan Cable LLC*,
    874 F.3d 767 (1st Cir. 2017)................................................................46

*Rebel Oil Co., Inc. v. Richfield Co.*,
    51 F.3d 1421 (9th Cir. 1995) ...............................................................56

*U.S. ex rel. Reed v. Callahan*,
    884 F.2d 1180 (9th Cir. 1989) .............................................................26

*Relevant Grp., LLC v. Nourmand*,
    2023 WL 4291654 (C.D. Cal. May 24, 2023) ....................................42

*Rosen v. Duel*,
    2022 WL 18231777 (C.D. Cal. Nov. 23, 2022) ..................................42

*SC Innovations, Inc. v. Uber Techs., Inc.*,
    434 F. Supp. 3d 782 (N.D. Cal. 2020).................................................54

*Sicor Ltd. v. Cetus Corp.*,
    51 F.3d 848 (9th Cir. 1995) ...............................................................57

*Simon & Simon, PC v. Align Tech., Inc.*,
    2020 WL 1975139 (D. Del. Apr. 24, 2020) .......................................34

*Skidmore as Tr. for Randy Craig Wolf Trust v. Led Zeppelin*,
    952 F.3d 1051 (9th Cir. 2020) .............................................26, 27, 28

*In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*,
    2015 WL 545870 (D.Mass Sept. 16, 2015).......................................34

*U.S. Futures Exchange, L.L.C. v. Bd. of Trade of the City of Chicago, Inc.*,
    953 F.3d 955 (7th Cir. 2020) .............................................................46

*United States v. Syufy Enters.*,
    903 F.2d 659 (9th Cir. 1990) .............................................................59

*USS-POSCO Indust. v. Contra Costa Cty. Bldg.*,
    31 F.3d 800 (9th Cir. 1994) .......................................................*passim*

*Waugh Chapel South, LLC v. United Food and Commercial Workers Union Loc. 27*,
    728 F.3d 354 (4th Cir. 2013) .............................................................46

*Westlake Services LLC v. Credit Acceptance Corp.*,
    800 Fed. Appx. 505 (9th Cir. 2020)...................................................48

*WhiteWater West Industries, Ltd. v. Alleshouse*,
    2019 WL 4261883 (S.D. Cal. Aug. 1, 2019)......................................13

*WhiteWater West Industries, Ltd. v. Alleshouse*,
    2019 WL 4261884 (S.D. Cal. March 26, 2019) .........................11, 12

*WhiteWater West Industries, Ltd. v. Alleshouse*,
2021 WL 2156181 (S.D. Cal. May 27, 2021) ....................................15

*WhiteWater West Industries, Ltd. v. Alleshouse*,
981 F.3d 1045 (Fed. Cir. 2020) ...........................................................13

*WhiteWater West Industries, Ltd. v. Pacific Surf Designs, Inc.*,
2021 WL 1265210 (S.D. Cal. April 5, 2021) .............................14, 15

*Wonderful Real Est. Dev. LLC v. Laborers Int'l Union of N. Am. Loc.
220*,
2020 WL 91998 (E.D. Cal. Jan. 8, 2020) ...................................42, 46

## Statutes

15 U.S.C. § 2 ..............................................................................................37

28 U.S.C. § 1927 .................................................................................13, 14

35 U.S.C. § 285 ...................................................................................13, 14

## Other Authorities

Daniel E. Crane, *Does Monopoly Broth Make Bad Soup?*, 76
ANTITRUST L.J. 76 (2010) ..................................................................32

Federal Rule of Evidence 50.............................................17, 19, 20, 21

Federal Rule of Evidence 51...................................................25, 27

Federal Rule of Evidence 51(a) ...............................................................25

Federal Rule of Evidence 51(b) ...............................................................25

Federal Rule of Evidence 51(c) ...............................................................25

Federal Rule of Evidence 51(d) ...............................................................25

Federal Rule of Evidence 51(d)(1)(B) .....................................................27

Federal Rule of Evidence 408.........................................................*passim*

 U.S. Const. amend. I .......................................................................*passim*

## INTRODUCTION

Richard Alleshouse founded Pacific Surf Designs, Inc. ("PSD") to make and sell what he called "knock offs" of popular "sheet wave" surfing simulator machines, on which WhiteWater West Industries, Ltd. held patents. He also used information he had learned at WhiteWater's predecessor to apply for patents in PSD's name. WhiteWater concluded that PSD's products infringed the WhiteWater patents and that Alleshouse had breached his prior employment contract. WhiteWater thus filed patent and contract lawsuits against Alleshouse and PSD. WhiteWater defeated their motions for summary judgment, lost at trial in the patent case, but won at trial in the contract case, although that win was later reversed on appeal. The judges in both cases found that the lawsuits were objectively reasonable and brought in good faith.

PSD then sued WhiteWater under Section 2 of the Sherman Act, claiming that WhiteWater had sought to maintain a monopoly in the sheet wave market by filing the patent and contract lawsuits and then telling potential customers about them. To get around the *Noerr-Pennington* doctrine's bar on antitrust liability based on litigation conduct, PSD alleged that (1) the prior lawsuits were a "sham" meant to harass PSD rather than enforce WhiteWater's rights, and (2) even if they were not a sham, the combination of the lawsuits and statements about them still amounted to a Section 2 violation despite *Noerr-Pennington*. The case was tried, and the jury returned a complete defense verdict for WhiteWater.

1

PSD now argues that the district court committed reversible error in instructing the jury on *Noerr-Pennington*. It says that the court should have told the jury to view WhiteWater's conduct—the prior lawsuits and the statements about them—"as a whole," and that it could find WhiteWater liable even if the lawsuits fell outside the "sham litigation" exception to *Noerr-Pennington*. PSD also claims that the district court should not have instructed the jury that the sham exception required a finding, by clear and convincing evidence, that the prior litigation was both objectively baseless as a whole and brought in bad faith.

Because PSD did not object on these bases after the district court disclosed its final proposed instructions, this Court reviews for plain error. Under either that standard or de novo review, PSD's jury instruction challenge fails.

*First*, the Supreme Court and this Court have held that separate categories of a defendant's lawful conduct cannot be combined to form an unlawful "scheme" creating Section 2 liability. That is particularly true when, as here, one of the types of conduct (non-sham litigation) is Constitutionally-immune and protected by the First Amendment's Petitioning Clause, while the other conduct (statements about the litigation) is merely truthful speech. No circuit has approved of Section 2 liability in that context, nor of jury instructions supporting that theory.

*Second*, PSD's interpretation of the "sham" exception to *Noerr-Pennington* is incorrect. While PSD claims that the jury should have been instructed on a version

2

of the exception for a "series" of lawsuits brought against a competitor, WhiteWater did not file enough lawsuits against PSD for that exception to apply. Even if it had, that exception would not excuse PSD from having to prove that the lawsuits were objectively baseless as a whole and brought in bad faith, and to prove it by clear and convincing evidence.

PSD also claims that the district court abused its discretion in excluding evidence of a conversation between Alleshouse and a WhiteWater employee shortly after WhiteWater's lawsuits were first filed. But Alleshouse's own written description of the conversation, as well as correspondence and a tolling agreement that the parties signed soon after, make clear that the conversation was a settlement discussion, and PSD admitted that it wanted to use the evidence to show that WhiteWater's prior lawsuits lacked merit. The district court excluded the statements from the prior patent trial under Federal Rule of Evidence 408, and then did the same when PSD sought to introduce them again in the antitrust trial. It was right both times.

Even if the district court had erred in its jury instructions and evidentiary ruling, reversal would be improper because those errors would be harmless, and could not have affected the result. The jury could not have reasonably found that WhiteWater's conduct was unlawful because the district courts' holdings in the prior lawsuits conclusively established that those lawsuits were not brought in bad faith,

which PSD concedes it had to prove in order to prevail. Even if PSD could have shown that WhiteWater's conduct was unlawful, it could not show, as a matter of law, either that WhiteWater had a monopoly in the sheet wave market or that WhiteWater's conduct harmed competition—both of which are required elements of a Section 2 claim.

Thus, the district court's judgment should be affirmed.

## ISSUES PRESENTED

1.     Suing a company for patent and contract infringement, and making truthful statements to others about that litigation, is lawful conduct protected under the First Amendment and the *Noerr-Pennington* doctrine. Did the district court commit plain error by not instructing the jury that such protected actions could combine to establish anticompetitive conduct under Section 2 of the Sherman Act?

2.     Did the district court commit plain error by instructing the jury that, to overcome *Noerr-Pennington* immunity, PSD had to prove, by clear and convincing evidence, that WhiteWater's related prior lawsuits were objectively baseless as a whole and were brought in bad faith?

3.     Shortly after WhiteWater first filed the lawsuits, its representative met with PSD's and discussed resolving the cases.  In a prior patent trial between the parties, the district court excluded the meeting communications under Federal Rule of Evidence 408. Did the court abuse its discretion in doing so again here, where PSD sought to introduce the statements to show that WhiteWater's prior lawsuits were invalid and in bad faith?

4.     A Sherman Act Section 2 claim based on sham litigation requires proof that the litigation was brought in bad faith, that the defendant had monopoly power in the relevant market, and that the defendant's actions harmed competition generally. Two courts previously found that WhiteWater's litigation was not in bad faith, and PSD introduced no evidence in this case of monopoly power or harm to competition. Was any error in the jury instructions or evidentiary ruling harmless?

## STATEMENT OF THE CASE

### A.    Industry, Product, and Patents

The parties sell "sheet waves," a type of surfing simulator that can be installed in water parks and other venues. AOB 5-7. Sheet waves were first developed and sold by Wave Loch Inc. under the brand name "FlowRider." *Id.* 5. Wave Loch held U.S. patents on the technology incorporated into FlowRiders, and later licensed the patents to Aquatic Development Group, Inc. (ADG) and WhiteWater; ADG built and sold FlowRiders in North America, and WhiteWater did the same in the rest of the world. *Id.* 5-7. Uncontested expert testimony showed that WhiteWater's share of the relevant market plummeted from 2013 to 2019, to as low as ten percent. 6-ER-1141; 9-ER-1761-62.

By 2012, most of Wave Loch's patents had expired. WhiteWater bought Murphy's Waves Ltd., which owned U.S. Patent No. 8,088,016 ("'016 Patent"), covering a design for a "half-pipe water ride." 1-SER-36, 8-ER-1527-28.

Two years later, in 2014, WhiteWater bought Wave Loch's assets, including its remaining patents. 11-ER-2028. One of the patents WhiteWater acquired was U.S. Patent No. 6,491,589 ("'589 Patent"), which concerned a design for a critical component of the sheet wave called a "nozzle flap." 1-SER-71; 8-ER-1535-36. WhiteWater licensed the former Wave Loch patents to ADG, which continued to

make and sell FlowRiders in the United States and eastern Canada, while WhiteWater did so in the rest of the world. AOB 7.

**B.    Alleshouse Leaves Wave Loch, Forms PSD, and Designs "Knockoffs."**

Alleshouse, a Wave Loch engineer, spent years working on FlowRider designs. AOB 8-9; 4-ER-662; 664-667. In 2012, he left Wave Loch to form PSD with his college friend Yong Yeh, planning to make what Alleshouse called "Flowrider knockoffs" to compete with WhiteWater. AOB 9; 1-SER-244. They designed a sheet wave, which they sold as the "ProFlow," and which looked and worked in a manner very similar to the FlowRider. 6-ER-1036-42.

 

**WhiteWater's FlowRider** (1-SER-254)          **PSD's ProFlow** (1-SER-99)

The sheet wave designs that PSD marketed and sold incorporated a nozzle flap that looked and functioned like the one covered by the '589 Patent. 6-ER-1036-1042; 8-ER-1636.

Alleshouse also told Yeh that he planned to make and sell a "halfpipe type wave" that was "basically [M]urphy[']s wave halfpipe but with water on the sides." 1-SER-244. PSD advertised on its website a design for a "half-pipe" sheet wave,

similar to the Murphy's Wave design covered by the '016 patent WhiteWater had

bought. 1-SER-36, 37, 64, 25-ER-809-810.

   

**Murphy's Wave Ride** (1-SER-98)        **PSD "half pipe"** (1-SER-248)

### C.    WhiteWater Sues PSD and Its Owners for Patent Infringement.

After evaluating PSD's advertised sheet wave products, WhiteWater

determined that they infringed on certain claims in the '589 and '016 Patents. 8-

ER-1632-37. In May 2014, WhiteWater (via subsidiaries that held the patent

rights) filed two lawsuits: one asserting infringement of the '589 Patent, and the

other asserting infringement of the '016 Patent. AOB 13-14; 9-ER-1819-20. The

'016 Patent case was assigned to the Honorable Roger T. Benitez. 1-SER-34.

Shortly after these lawsuits were filed, the parties discussed settlement. Per

Alleshouse, within days of the filing, WhiteWater employee Marshall Myrman met

Alleshouse at a bar in San Diego. 3-ER-326-328. According to notes that Alleshouse

claims he wrote after the meeting, he and Myrman discussed the lawsuit, and

8

Myrman said that "[t]here may be another way out of this thing (Richard comes to work for [WhiteWater])," that "the ball is in your court," and that Alleshouse should "[m]ake offer, call him." 3-ER-335-341.

The same month, Myrman reported to WhiteWater's owner Geoff Chutter that Alleshouse had requested a meeting. 3-ER-351. Chutter responded "[h]opefully linking settlement (dropping the suit) with employment[.]" *Id.*

The next month, before anything further had happened in the litigation, PSD and WhiteWater's subsidiaries signed a tolling agreement, stating that they had met to "discuss a possible business relationship that potentially would resolve all of the issues raised in the [lawsuits]," and that it was in their "respective interests" to toll statutes of limitations for six months so that they could "attempt to resolve their disputes and continue with settlement discussions." 3-ER-356. WhiteWater agreed to voluntarily dismiss the claims without prejudice, but reserved its rights to "refile similar actions." *Id.*

The parties did not reach a settlement, and PSD did not stop using the disputed designs. Thus, in August 2015, WhiteWater re-filed the same infringement claims on the '589 and '016 Patents, this time in a single, combined case before Judge Benitez. 1-SER-100; 9-ER-1820-21. PSD later noted that the new case was simply an "extension" of the earlier ones, which had simply been "refiled into this matter." 2-SER-480-481.

PSD defended the case vigorously. It first filed applications for *inter partes* review ("IPR") before the Patent Trial and Appeal Board (PTAB), seeking to have both the '589 and the '016 Patents declared invalid. 9-ER-1821. The PTAB rejected the IPR application for the '589 Patent, finding that PSD "does not show a reasonable likelihood that [it] would prevail in establishing the unpatentability of any challenged [patent] claim." 2-SER-487. But it instituted IPR as to the '016 Patent, and eventually found that the patent was invalid based on prior art. 9-ER-1821. WhiteWater appealed the decision to the Federal Circuit, which affirmed but also denied PSD's motion for sanctions, which had alleged that the appeal was frivolous. 2-SER-511; 536. Judge Benitez later dismissed the '016 Patent claim. 9-ER-1821-22.

Meanwhile, Judge Benitez found that WhiteWater, rather than FlowRider Surf, had standing for the '589 Patent claim. 9-ER-1821. WhiteWater asked to substitute in as plaintiff, but Judge Benitez denied the request and dismissed the claim without prejudice. 2-SER-539. Within weeks, WhiteWater re-filed the '589 Patent claim in its own name. 9-ER-1823; 4-SER-852.[1]

In the continuing '589 Patent litigation, PSD twice moved for summary judgment. 2-SER-426; 3-SER-567. Judge Benitez denied both motions. 3-SER-567.

---

[1] The Court ruled that its claims construction rulings and discovery from the prior patent case would apply in the re-filed case. 2-SER-564.

The case went to trial in December 2019. The jury returned a verdict for PSD. 9-ER-1823-24.

## D.    WhiteWater Sues PSD and Alleshouse for Technology Theft.

As a Wave Loch engineer, Alleshouse had access to the company's most valuable technology and intellectual property, and was paid to help develop it further. *WhiteWater West Industries, Ltd. v. Alleshouse,* 2019 WL 4261884, *3-4 (S.D. Cal. March 26, 2019). Thus, Wave Loch had Alleshouse sign an agreement providing that WaveLoch would have the rights to any inventions Alleshouse conceived of (a) "with the use of [Wave Loch's] time, materials, or facilities"; (b) "resulting from or suggested by [Alleshouse's] work for [Wave Loch]; or (c) "in any way connected to any subject matter within the existing or contemplated business of [Wave Loch]." *Id*.

Among the technology that Alleshouse worked on at Wave Loch were designs for a "half-pipe" ride and for water nozzles in a semicircular sheet wave machine later named the "WaveOz." *Alleshouse,* 2019 WL 4261884, *3-4. Within a day of leaving Wave Loch in August 2012, Alleshouse was sketching designs for rides and parts that looked much like those he had worked on at Wave Loch. *Id., *4; 1-SER-96-97. Two months later, in October 2012, PSD, Alleshouse, and Yeh applied for three patents for sheet wave-related designs based on those drawings. *Alleshouse,* 2019 WL 4261884, *4.

11

     

**WhiteWater WaveOz** (1-SER-258)          **Alleshouse Patent** (1-SER-235)

In March 2017, the PTO issued to PSD the last of three patents based on those applications. *Id.* WhiteWater believed those designs were developed at Wave Loch when Alleshouse worked there, and that under his contract with Wave Loch (transferred to WhiteWater), the resulting patents belonged to WhiteWater. 8-ER-1637. Thus, in March 2017, WhiteWater sued PSD, Alleshouse, and Yeh, seeking to have the patents transferred to WhiteWater. 9-ER-1822-23; *Alleshouse,* 2019 WL 4261884, *1. The case was eventually assigned to Judge Dana M. Sabraw. *Id.*

PSD moved for summary judgment, which Judge Sabraw denied. 3-SER-616. After a bench trial, Judge Sabraw ruled for WhiteWater, finding that Alleshouse's contract with Wave Loch was valid under California law, that the PSD patents were based on work "performed by Mr. Alleshouse for Wave Loch" which "emanated from Wave Loch's business and research," and that Alleshouse had thus breached the contract. *Alleshouse,* 2019 WL 4261884, *6-13.

12

PSD appealed to the Federal Circuit. Judge Sabraw denied PSD's motion to stay his judgment pending appeal, finding that PSD had not shown a "strong likelihood of success or a substantial case on the merits," nor "raised serious legal questions." *WhiteWater West Industries, Ltd. v. Alleshouse,* 2019 WL 4261883, *4-5 (S.D. Cal. Aug. 1, 2019). But in November 2020, resolving an issue of first impression under California law, the Federal Circuit held that the California Supreme Court would likely hold that the assignment provision in the contract was invalid under California law—a position that Judge Sabraw had rejected in ruling for WhiteWater—and reversed the judgment. *WhiteWater West Industries, Ltd. v. Alleshouse*, 981 F.3d 1045, 1059 (Fed. Cir. 2020).

## E.    Two Judges Find that WhiteWater's Lawsuits Were Reasonable and in Good Faith.

In all three cases—the '589/'016 Patent case, the later '589 Patent case, and the contract case—PSD moved for the award of attorney or expert fees, arguing that WhiteWater's claims were objectively baseless and brought in bad faith, and thus the patent cases should be found "exceptional" under 35 U.S.C. § 285, and the Court should impose sanctions against WhiteWater under 28 U.S.C. § 1927 and its own inherent power. 3-SER-639, 654; 3-SER-762. PSD alleged that WhiteWater knew its claims were frivolous, but brought them anyway as part of a "bad faith strategy to drive PSD out of business by repeatedly pursuing baseless and costly litigation against PSD." 3-SER-664; 3-SER-695, 730.

13

Judges Benitez and Sabraw rejected that assertion. Although Judge Benitez found that the '589/'016 Patent case was "exceptional" because the '016 Patent claim was unreasonable in light of prior art, he refused to grant sanctions under § 1927 or its inherent power. *Flowrider Surf, Ltd. v. Pacific Surf Designs, Inc.*, 2020 WL 907058, *6-7 (S.D. Cal. Feb. 25, 2020). Judge Benitez expressly "d[id] not find that [WhiteWater] acted with 'subjective bad faith,'" that it had "knowingly or recklessly raised a frivolous argument," or that it "brought th[e] case or continued to litigate it for the purpose of harassing [PSD]." *Id.* Rather, he found, "the record suggests that [WhiteWater's] purpose in litigating this matter was to protect its 'valuable intellectual property assets' from [PSD's] 'knock offs' water ride attractions." *Id.*, *7. He granted certain fees (as to the '016 Patent claims), but denied the rest. *Id.*

In the later, re-filed '589 Patent case, PSD again moved for fees under 35 U.S.C. § 285, arguing that WhiteWater's claims were "baseless." *WhiteWater West Industries, Ltd. v. Pacific Surf Designs, Inc.*, 2021 WL 1265210, *2-5 (S.D. Cal. April 5, 2021). Again, PSD alleged that WhiteWater had brought the case purely to "squash" and "starve out" PSD, "with the intention of eliminating the only threat to [WhiteWater's] market dominance." 3-SER-740-41, 749. Judge Benitez denied the motion. He found that "although WhiteWater's claims may have ultimately been unsuccessful, they were nonetheless reasonable and the proper subject of litigation."

14

*Pacific Surf Designs, Inc.*, 2021 WL 1265210, *3. He also noted that he had "already held that [WhiteWater] did not act in bad faith during the prior litigation," and that PSD's argument "again reads as an attempt to rehash disputes that were previously decided." *Id.*, *5.

In the contract case, PSD asked Judge Sabraw to award it expert fees under the Court's inherent power, again claiming that WhiteWater's claims were "baseless," and that WhiteWater's sole motive in pursuing the various cases was to drive PSD out of business. 3-SER-730. Judge Sabraw refused, finding that "although [PSD] prevailed on appeal in this case, the Court does not believe [WhiteWater's] claims were baseless." *WhiteWater West Industries, Ltd. v. Alleshouse*, 2021 WL 2156181, *3 (S.D. Cal. May 27, 2021). Pointing to Judge Benitez's rejection of the bad faith allegations in the patent cases, Judge Sabraw also found that "[t]he broader litigation between the parties also does not support a finding that [WhiteWater's] claims were baseless." *Id.*

## F.    WhiteWater Tells Only a Few Outsiders About the Litigation.

Contrary to PSD's theory, there is no evidence that WhiteWater actively "touted" its prior litigation against PSD to scare potential customers away from doing business with PSD. Unlike many companies that sue competitors, WhiteWater did not issue press releases when it filed any of the lawsuits. 7-ER-1349-50; 9-ER-

1675-76.[2] PSD's opening brief cites evidence of only two instances of WhiteWater telling others about the litigation: one involving statements that employees of either "Wave Loch or WhiteWater" made to Michael Pappalardo, and another in which WhiteWater's outside counsel spoke with customer Vidanta's lawyers about the litigation. AOB 18; 5-ER-958-959. Pappalardo testified that the statement was not made to him until 2019, when the prior litigation was nearly finished. 3-SER-849. Vidanta did not end up moving forward with its water park project at all, and thus any statements WhiteWater made to it had no ultimate effect. 7-ER-1303; 5-ER-958.

Of the other potential customers PSD references—Ocean Park, Six Flags, Moon Palace, Baha Mar, Whale's Tale, and Typhoon Texas—the record contains no evidence that WhiteWater said anything to them about the litigation. Virtually all of PSD's citations refer to examples of several WhiteWater employees discussing the *idea* of mentioning the litigation to customers (*see, e.g.*, 12-ER-2235-37, 2248), or hearsay claims by PSD's owners that customers were telling *them* about the litigation (AOB 17-18), or statements by WhiteWater employees that customers often talk to each other. AOB 18. None of this is evidence that WhiteWater "touted" the lawsuits to anyone.

---

[2] WhiteWater issued one brief press release when it won the trial on its contract claim against Alleshouse. 9-ER-1678.

16

In some cases, PSD actively misrepresents the evidence of WhiteWater's supposed statements about the litigation. For example, PSD cites an email exchange in which WhiteWater employee Franceen Gonzales suggests that CEO Chutter tell Vidanta about the patent litigation, and Chutter responds "cards were played last evening." 12-ER-2245. What PSD leaves out is that shortly afterward, Chutter forwarded to Gonzales an email showing exactly what he had told the customer, which was *not* a reference to the litigation, but rather the statement that the patents on WhiteWater's rides would help protect the customer from copycat designs by competing water parks. 7-ER-1347-49; 1-SER-69.

## G.    PSD Sues WhiteWater for Antitrust and RICO Violations.

PSD then filed this case, accusing WhiteWater, ADG, and several of their executives of engaging in federal RICO and antitrust schemes based on various alleged misdeeds. *Pacific Surf Designs, Inc. v. WhiteWater West Industries, Ltd.*, 2021 WL 461707, *1-2 (S.D. Cal. Feb. 9, 2021). The case was assigned to Judge Benitez. 12-ER-2435. The RICO and Sherman Act Section 1 claims were later dismissed. 12-ER-2439, 2442, 2450, 2454.

By the time the case came to trial, it consisted of a single monopolization claim under Sherman Act Section 2. PSD again alleged that WhiteWater had filed the prior patent and contract lawsuits in bad faith to drive PSD out of business, and

also complained that WhiteWater had told customers about the lawsuits to hurt PSD's reputation. 4-ER-577.

At the close of PSD's case, and again at the close of all evidence, WhiteWater moved for judgment as a matter of law under Rule 50. 8-ER-1493. Judge Benitez asked the parties to brief the issues, and they did. 8-ER-1509; 12-ER-2459. While Judge Benitez decided to "reserve" on the motion and let the case go to the jury, he indicated that it was a close call. 8-ER-1504-09, 1531; 1-SER-14.

## H. The Parties Propose Jury Instructions, the Court Provides Its Own Proposed Version—Without Objection from Either Party—and the Jury Finds for WhiteWater.

On June 28, 2023, the parties jointly filed proposed jury instructions, some disputed and some undisputed. 2-SER-271. On July 27, they jointly filed revised proposed instructions, again partly disputed and partly undisputed. 3-ER-360-449. The parties also filed memoranda discussing their arguments regarding the proper instructions. 1-SER-24, 27, 2-SER-265, 2-ER-75, 3-ER-198.

The parties agreed that one of the elements PSD would have to prove was that "WhiteWater 'willfully' acquired or maintained monopoly power in [the relevant market] by engaging in anticompetitive conduct." 3-ER-225. But they proposed different instructions to address what the jury would have to find for that element to be established.

18

PSD proposed that the instruction include the following language:

PSD contends that WhiteWater engaged in an anticompetitive scheme that includes (1) filing multiple lawsuits pursuant to a policy of starting legal proceedings without regard to the merits and for the purpose of injuring a market rival; (2) using the fact of the lawsuits to discourage potential customers from doing business with PSD; and (3) disparaging PSD to customers and potential customers. WhiteWater contends that its actions were all taken for a pro-competitive business purpose.

In analyzing the evidence, you must consider the evidence as a whole, giving PSD the full benefit of its proof without compartmentalizing the various factual components and wiping the slate clean after scrutiny of each.

3-ER-400.

WhiteWater opposed that language. *Id.* It proposed instead an additional instruction on "*Noerr-Pennington* Immunity and Sham Litigation," which stated in part that to establish an antitrust violation, PSD had to prove, by clear and convincing evidence, two things as to "each individual lawsuit" at issue: (1) the lawsuit was "objectively baseless"; and (2) the lawsuit was "an attempt to harass or interfere directly with the business relationships of one or more competitors through the use of governmental process as opposed to through the outcome of the lawsuit or lawsuits." 3-ER-406.

PSD opposed that language, and instead proposed that it read:

> But when a defendant files multiple lawsuits as part of a pattern or practice of successive filings undertaken essentially for purposes of injuring a market rival, that conduct may—without more—serve as a very effective restraint on trade because litigation is invariably costly, distracting and time-consuming. As I instructed you above, PSD alleges an anticompetitive scheme that includes, but is not limited to, the filing of multiple lawsuits and you should make your determination based on your analysis of the evidence as a whole and WhiteWater's course of conduct as opposed to the merits of any given proceeding. In determining WhiteWater's purpose in filing the lawsuits, you may consider whatever direct and circumstantial evidence of WhiteWater's motivation for bringing the lawsuits is available to you.

3-ER-409. WhiteWater opposed. *Id.*

WhiteWater also proposed separate instructions on the meaning of "objectively baseless" and "sham litigation-primary objective"; PSD opposed both. 3-ER-416.

PSD later told the court that under its proposed instructions, the jury would first be asked to decide whether the evidence "viewed as a whole" showed anticompetitive conduct. 2-ER-76. If the jury found that it did, it would then be told that the "sham litigation" doctrine is a "complete defense" to liability unless "(1) the conduct shows that WhiteWater filed multiple lawsuits as part of a pattern or practice of successful filings undertaken essentially for purposes of injuring a market rival; or (2) one or more individual lawsuits were objectively baseless and that

20

WhiteWater's primary objective in bringing the lawsuit or lawsuits was to hurt PSD by bringing or continuing the lawsuit regardless of the ultimate outcome of the lawsuit." 2-ER-76-77. Thus, the jury would be told that "if it finds that WhiteWater's conduct, viewed as a whole but *without* immunized lawsuits, was insufficient to show willful maintenance of monopoly power, then it should render a verdict for WhiteWater." *Id*. PSD also proposed instructing the jury that to establish a sham, "PSD must prove" that either the series of lawsuits or the individual lawsuits were brought for improper reasons. 2-ER-7.

On August 25, 2024, the court presented to the parties a set of proposed final jury instructions and verdict form, and noted that the parties "have now seen the jury instructions I propose to give," as well as the proposed verdict form. 2-ER-16; 9-ER-1788; AOB 33. As to "Willful Maintenance of Monopoly Power," the Court used ABA Model Instruction 9, without the additional language proposed by PSD. 2-ER-34.

As to *Noerr-Pennington* and sham litigation, the court adopted neither side's proposal entirely, but instead merged them into a combined version, under which PSD was required to prove that (1) WhiteWater's lawsuits were "baseless as a whole"—that is, they were brought "pursuant to a policy of starting legal proceedings without regard to the merits"—and (2) the lawsuits were an "attempt to harass, interfere with the business relationships of, or otherwise injure PSD," and

21

that WhiteWater's primary objective in the lawsuits was not to "win favorable judgments." 2-ER-38.

The court also included an instruction summarizing for the jury the prior litigation, including what Judges Benitez and Sabraw had concluded regarding baselessness and bad faith in that litigation. 2-ER-41.

After providing the proposed final instructions to the parties, the court asked: "Are there any final comments, anything that anyone wants to add?" 9-ER-1788. Counsel for both sides raised certain points regarding the verdict form (irrelevant here), but neither party raised any objections to the proposed final instructions, either as to what was included or as to what was left out. 9-ER-1788-1797. The jury was then brought in and read the unopposed instructions. *Id.* at 1797.

After brief deliberations, the jury returned a unanimous verdict, finding that PSD had proven its case as to the relevant market, but that it had not proven that the sham litigation exception to *Noerr-Pennington* applied. 2-ER-11.

## SUMMARY OF ARGUMENT

Whether under plain error or de novo review, PSD's jury instruction challenges fail because the instructions given correctly stated the law. Even under the "monopoly broth" theory, a Sherman Act Section 2 claim cannot be based on a combination of two or more forms of conduct that are lawful in themselves, much less on a combination involving conduct immune from antitrust liability under *Noerr-Pennington*. More precisely, a company that files more than one lawsuit against a competitor reasonably and in good faith, and then tells others in the industry that it has done so, cannot be held liable under Section 2 for that conduct. The district court thus properly declined to instruct the jury that even if WhiteWater's conduct—suing PSD and telling people about it—was immune and lawful, the jury could still find WhiteWater liable if that conduct was anticompetitive "as a whole."

The district court's instructions regarding *Noerr-Pennington* and the sham litigation exception to it were also appropriate. WhiteWater's patent and contract lawsuits did not amount to an entire "series" of litigation that would trigger application of the so-called *USS-POSCO* version of the sham exception. Even if they had, that test requires clear and convincing evidence, and a showing that the litigation was baseless as a whole. The district court instructed accordingly.

Separately, the district court did not abuse its discretion in excluding evidence of settlement discussions between representatives of the two parties. The district

23

court correctly excluded the same evidence on the same basis in prior litigation, and even if it could have changed its position, there was no basis to do so. In both the prior case and this one, PSD sought to use statements made during that settlement conversation to show that WhiteWater's claims were invalid, something that Rule 408 forbids.

Finally, even if the jury instructions or evidentiary ruling were incorrect, any error was harmless, because judgment could not have been properly entered for PSD on this record. Even if PSD's proposed jury instructions had been given, they would have required showing that the prior litigation was in bad faith, something that two district court judges had already found was not true. Nor did PSD introduce evidence sufficient to show that WhiteWater had monopoly power in the relevant market, or that its challenged conduct harmed competition in that market. Thus, PSD could not prevail on its Section 2 claim even if its preferred jury instructions were given and evidence admitted.

## STANDARD OF REVIEW

Because PSD did not properly and timely object to the district court's proposed jury instructions, this Court should review those instructions for plain error. Rule 51 governs giving and objecting to jury instructions. Under Rule 51(a), the parties may file requests for jury instructions at or before the close of evidence. Under Rule 51(b), the court must inform the parties of its proposed instructions and proposed action on the requests before instructing the jury, and must give the parties an opportunity to object. Under Rule 51(c), a party who objects to an instruction or the failure to give an instruction must do so on the record when given an opportunity, before the instructions are read to the jury. And under Rule 51(d), a party may assign an error in an instruction given *if* the party objected, or a failure to give an instruction *if* the party requested it *and*—unless the court "rejected the request in a definitive ruling on the record"—*also* properly objected. Otherwise, the appellate court *may* consider a "plain error" in the instructions if it "affects substantial rights."

Rule 51(d) makes clear that to preserve a jury instruction objection for appeal, it is not enough for a party to request its own preferred instructions, or to object to instructions that the other side proposes. The party must wait until the trial court has advised of the instructions it plans to give, and then clearly state its objections to *those* instructions: both those included and those omitted. If it does not object,

25

review is for plain error. *Skidmore as Tr. for Randy Craig Wolf Trust v. Led Zeppelin*, 952 F.3d 1051, 1073 (9th Cir. 2020).[3]

PSD did not object at all—much less timely object—to the specific jury instructions at issue here. On August 25, 2023,[4] before giving the instructions, the court presented to the parties a set of proposed final instructions, noted that the parties "have now seen the jury instructions I propose to give," as well as the proposed verdict form, and asked: "Are there any final comments, anything that anyone wants to add?" 2-ER-16-74; 9-ER-1788. WhiteWater's counsel responded that "[g]iven that the court just issued what it issued" (*i.e.*, the proposed final instructions), it would raise objections only to certain aspects of the verdict form. 9-ER-1788-1791. PSD's counsel responded only as to the verdict form. *Id.* 1790-1796. Neither party objected to the proposed final instructions, either as to what was included or as to what was left out. The jury was then brought in and read the unopposed instructions. *Id.* 1797 – 1844.

In its opening brief, PSD notes that both parties submitted proposed instructions, and that the court accepted some of WhiteWater's proposals but not

---

[3] *See also, e.g.*, *Murray v. Southern Route Mar. SA*, 870 F.3d 915, 921 (9th Cir. 2017) (plain-error review applied when defendant proposed instruction on issue and objected to different instruction, but did not object to particular instruction as given); *Monroe v. City of Phoenix*, 248 F.3d 851, 858 (9th Cir. 2001) (same); *U.S. ex rel. Reed v. Callahan*, 884 F.2d 1180, 1184 (9th Cir. 1989) (same).

[4] *See* Excerpts of Record—Index Volume, at 2; AOB 33.

some of PSD's—those it now says should have been given. AOB 29-33. But that falls short of claiming or showing that it objected to the instructions as ultimately proposed by the court, even when given an express opportunity. As Rule 51 and this Court's decisions make clear, PSD did not preserve this issue for appeal.

Nor can PSD claim that the court rejected PSD's requested instructions in a "definitive ruling on the record," for purposes of Rule 51(d)(1)(B). The parties had submitted a long series of proposed instructions, the court had synthesized them into a final, composite set, and it gave each side a chance to respond to that final proposal and note objections. PSD chose not to do so. *See Skidmore*, 952 F.3d at 1072-73 (no definitive ruling rejecting requested instruction where court let parties state objections for the record and entertained discussion about proposed instructions).

Discretionary plain-error review thus applies. Under this standard, this Court may reverse if (1) there was an error; (2) the error was obvious; (3) the error affected substantial rights, in that it affected the outcome of the trial court proceedings; and (4) correcting the error is necessary to avoid "seriously impair[ing] the fairness, integrity, or public reputation of judicial proceedings" and to "prevent a miscarriage of justice." *Id.* at 1073-1074. That is a high standard. "Rare is the case where the district court's errors are so grave" as to meet it; such errors must "reach the pinnacle of fault." *Id.*; *C.B. v. City of Sonora*, 769 F.3d 1005, 1016-19 (9th Cir. 2014) (en banc). Even if all of those elements have been met, this Court retains discretion as

27

to whether to correct the error, and should consider the costs of doing so, such as the burden on the parties, court, and jurors of another trial. *Skidmore*, 952 F.3d at 1073.

Separately, the Court should review the district court's exclusion of evidence for abuse of discretion. AOB 54-55.

**ARGUMENT**

**I.    The District Court Did Not Err, Let Alone Plainly Err, in Instructing the Jury on Anticompetitive Conduct and *Noerr-Pennington* Immunity.**

The parties agreed, and the Court instructed the jury, that to establish a Section 2 claim, PSD had to prove that WhiteWater willfully maintained monopoly power through anticompetitive conduct. 3-ER-225; 9-ER-1799-1800. PSD alleged WhiteWater did so by filing lawsuits against PSD and telling several third parties about them. There is no dispute that, ordinarily, the act of filing litigation is immune from antitrust liability under *Noerr-Pennington*. Nor is there any dispute that on their own, WhiteWater's statements about the litigation did not violate the Sherman Act.

PSD argues that even if WhiteWater's lawsuits were immune, they could be combined with the statements about the lawsuits into a "monopoly broth" that violated Section 2, and that the district court should have told the jury to decide whether such a "broth" existed. But this Court and others have held that Section 2 anticompetitive conduct cannot be created by combining wholly lawful conduct with other wholly lawful conduct, particularly when the conduct is also protected under *Noerr-Pennington*. Thus, the district court was correct in instructing that if *Noerr-Pennington* applied, WhiteWater could not be liable.

The parties also agreed that "sham" litigation falls outside *Noerr-Pennington* protection. PSD argues that because WhiteWater filed more than one lawsuit against PSD, the standard "sham" litigation test did not apply, but was replaced by an

29

alternate "series" test that used only a preponderance of evidence standard and did not require proof of objective baselessness. But no court has applied that series test to the circumstances of this case, featuring essentially two prior WhiteWater lawsuits. Under the correct formulation of that test, PSD had to prove both objective baselessness and subjective bad faith by clear and convincing evidence. The instructions were thus proper.

### A. PSD cannot circumvent *Noerr-Pennington* by combining prior litigation with related statements into an antitrust "scheme."

At trial, PSD introduced evidence that WhiteWater had sued PSD for patent infringement and breach of contract, and had then told two potential customers about the lawsuits. PSD does not dispute that, absent a *Noerr-Pennington* exception, the prior litigation is immune from antitrust liability, nor claim that WhiteWater's statements about the litigation could by themselves create antitrust liability. But PSD asserts that when a defendant engages in both *Noerr-Pennington*-immune conduct and independently lawful speech, the combination can abrogate any immunity and violate Sherman Act Section 2. PSD argues that the district court erred in not instructing the jury that it should consider WhiteWater's conduct "as a whole" and decide whether—even if no *Noerr-Pennington* exception applied to the prior litigation—WhiteWater's statements about it rendered the action collectively unlawful under Section 2.

30

To WhiteWater's knowledge, neither this Court nor any other court has ever supported that view or approved (much less required) PSD's proposed instructions under these facts. Rather, while some courts have agreed that multiple types of conduct can be combined into an anticompetitive "monopoly broth," they have not approved of using *Noerr*-immunized litigation as one of the ingredients, nor of creating such a brew out of independently lawful actions. Whether under plain error or de novo review, PSD's argument for adopting what PSD admits would be a novel rule falls short.

### 1. Lawful conduct cannot be combined with other lawful conduct to establish anticompetitive activity.

PSD's argument is grounded in the "monopoly broth" theory of Section 2 liability, which originated in *Cont'l Ore Company v. Union Carbide and Carbon Corp.*, 370 U.S. 690 (1962). In that case, the plaintiff alleged that the defendants had improperly blocked its access to a material critical to its business, and thus caused five different projects to fail. *Id.* at 693-695. This Court looked at each of the projects individually, and found that for each one, the plaintiff had not shown enough evidence that the defendants' conduct had caused the project failures to support a verdict for the plaintiffs. *Id.* at 695-696. But the Supreme Court reversed, stating that "[i]n cases such as this, plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each." *Id.* at 698-699. The Seventh Circuit later used the

term "monopoly broth" to describe a Section 2 causation theory based on combination of a monopolist's various actions.[5]

The "monopoly broth" term has been often quoted, and the doctrine often misapplied, by plaintiffs seeking to circumvent rulings that certain conduct is not anticompetitive under the Sherman Act.[6] But the Supreme Court, this Court, and others have refused to let plaintiffs use it to combine separate lawful actions into an anticompetitive "scheme." For example, in *Pac. Bell Tel. Co. v. LinkLine Commc'ns, Inc.*, 555 U.S. 438, 457 (2009), the plaintiffs asserted that the defendant had engaged in an unlawful "price squeeze" by charging a high price for wholesale services to competitors and a low price to retail customers, thus making it impossible for the plaintiffs (who had to buy the wholesale services from AT&T) to compete with AT&T for retail sales. *Id.* at 442-443. The wholesale pricing did not meet the test for an unlawful "refusal to deal" under established law, and the retail pricing did not qualify as "predatory pricing." *Id.* at 448-449. The Supreme Court found that the plaintiffs' theory was "nothing more than an amalgamation of a meritless claim at the wholesale level and a meritless claim at the retail level," and rejected the plaintiffs' attempt to "alchemize them into a new form of antitrust liability." *Id.* at

---

[5] *City of Mishawaka, Ind. v. Am. Elec. Power Co.*, 616 F.2d 976, 986 (7th Cir. 1980).

[6] *See generally* Daniel E. Crane, *Does Monopoly Broth Make Bad Soup?*, 76 ANTITRUST L.J. 663 (2010) (discussing the use and misuse of the doctrine).

452. As the Court put it, "[t]wo wrong claims do not make one that is right." *Id.* at 457.

This Court has been even more explicit in rejecting the notion that *Continental Ore* permits aggregating independently lawful actions into an anticompetitive "broth." In *Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130 (9th Cir. 2022), the plaintiff brought a Section 2 claim accusing Google of taking various actions to impede the plaintiff's use of Google's paid advertising services and harm the plaintiff's performance on Google's search engine. *Id.* at 1134-36. This Court found that none of the cited actions were anticompetitive taken individually. *Id.* at 1140-42. Citing *Continental Ore*, the plaintiff argued that the district court had erred by "not assessing the anticompetitive effect of Google's predatory acts taken together as an overall scheme." *Id.* at 1142. But citing its earlier decision in *Cal. Comput. Prods., Inc. v. Int'l Bus. Machs. Corp.*, 613 F.2d 727, 746 (9th Cir. 1979), this Court found that even under the *Continental Ore* approach, "'there can be no synergistic result' from 'a number of acts none of which show causal antitrust injury' to the plaintiff." *Id.* (quoting *Continental Ore*). As it explained, "[b]ecause each individual action alleged by [the plaintiff] does not rise to anticompetitive conduct in the relevant market, their collective sum likewise does not." *Id.*

Other circuits have done the same. *See, e.g.*, *Ne. Telephone Co. v. AT&T*, 651 F.2d 76, 95-96 (2d Cir. 1981) (where plaintiff had alleged various actions by

33

plaintiff, none of which individually amounted to unlawful predatory pricing, *Continental Ore* did not permit aggregating those actions to establish Sherman Act liability); *City of Groton v. Conn. Power & Light Co.*, 662 F.2d 921, 928 (2d Cir. 1981) ("reject[ing] the notion that if there is a fraction of validity to each of the basic claims and the sum of the fraction is one or more, the plaintiffs have proved a violation."); *Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346, 1366-67 (Fed. Cir. 1999) (dismissing overall monopolization scheme because each allegation independently failed to allege a plausible claim of anticompetitive conduct). District courts have followed suit.[7]

PSD's authorities do not support its reading of *Continental Ore*, much less its proposal to quote a portion of that decision in the jury instructions. To the contrary, this Court's decision in *City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373 (9th

---

[7] *See also, e.g.*, *FTC v. Facebook, Inc.*, 560 F. Supp. 3d 1, 25 (D.D.C. 2021) (to support liability, anticompetitive scheme had to be made up of actions that "were themselves independent violations"); otherwise, companies could be liable for actions that are "categorically protected from [antitrust] scrutiny" for policy reasons recognized by courts) (citations omitted); *Eatoni Ergonomics, Inc. v. Rsch. In Motion Corp.*, 826 F. Supp. 2d 705, 709-710 (S.D.N.Y. 2011) (rejecting proposition that "a series of unilateral acts that do not violate the antitrust laws may be aggregated into an unlawful 'course of conduct'"); *Simon & Simon, PC v. Align Tech., Inc.*, No. 19-506, 2020 WL 1975139, at *8 (D. Del. Apr. 24, 2020) (plaintiff could not combine lawful refusals to deal into anticompetitive "scheme"); *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, No. 14-md-02503-DJC, 2015 WL 545870, at *12 (D.Mass Sept. 16, 2015) (no Section 2 "overarching scheme" where none of the alleged conduct was independently anticompetitive).

Cir. 1992), warns *against* the approach PSD urges here. In that case, the plaintiffs alleged that a utility company had violated Section 2 by improperly raising rates and then denying access to a particular facility. *Id.* 1374-76. While this Court agreed that it should consider the "overall combined effect" of the defendant's actions, it added that "[a]t the same time, if all we are shown is a number of perfectly legal acts, it becomes much more difficult to find overall wrongdoing." *Id.* at 1376. Finding that the district court had not erred in determining that neither of the defendant's challenged actions was in itself improper, this Court affirmed the district court's judgment for the defendant. *Id.* at 1376-81. District courts have cited *City of Anaheim* for the proposition that individually lawful actions cannot be aggregated into a violation of Section 2.[8]

As to PSD's other authorities (*see* AOB 44-45), virtually all involved allegations of conduct that was individually *un*lawful, whether or not combined with other conduct. The sole exception, *Kobe, Inc. v. Dempsey Pump Co.*, 198 F.2d 416, 425 (10th Cir. 1952), predates *Noerr, Pennington*, *Continental Ore*, and the other authorities cited above.

---

[8] *Crowder v. LinkedIn Corp.*, 2023 WL 2405335, *3, 7 (N.D. Cal. March 8, 2023); *see also Masimo Corp v. Tyco Health Care Grp., L.P.*, 2004 WL 5907538, *5 (C.D. Cal. June 10, 2004) (*City of Anaheim* "does not allow for clearly legal acts to be thrown into the mix to bolster a plaintiff's antitrust case"); *PNY Technologies, Inc. v. SanDisk Corp.*, 2012 WL 1380271, *5, n.4 (N.D. Cal. April 20, 2012) (no aggregate violation "if none of the acts alleged is an antitrust violation").

In this case, PSD alleged that WhiteWater's improper actions were suing PSD and telling others in the industry about the lawsuit. But under *Pac. Bell*, *Dreamstime*, and other authorities, the district court should have dismissed PSD's claim or granted WhiteWater judgment as a matter of law, as it appeared inclined to do if the verdict had gone PSD's way. In any case, failing to instruct as PSD now proposes was not error, let alone plain error.

### 2.    Conduct protected by *Noerr-Pennington* cannot be combined with other conduct to establish anticompetitive activity.

PSD's "monopoly broth" instructions would have been particularly improper here because WhiteWater's conduct was not only lawful but immune under the First Amendment's petitioning clause and the *Noerr-Pennington* doctrine. That doctrine provides that a company cannot be liable under the Sherman Act for petitioning the government, including by pursuing litigation against a competitor. *Pro. Real Est. Investors, Inc. v. Columbia Pictures Indus.*, 508 U.S. 49, 56 (1993) ("*PREI*"). While there is an exception for "sham" litigation, discussed further below, PSD's argument is that even if WhiteWater's lawsuits fell within *Noerr-Pennington*'s protection, they could *still* be combined with other conduct—even lawful efforts to enforce a patent—to form an anticompetitive scheme under Section 2. That is not a correct statement of law.

Neither the Supreme Court nor this Court has decided whether Section 2's "anticompetitive conduct" element can be satisfied by combining *Noerr-*

36

*Pennington*-protected actions with other conduct. But as discussed above, both courts (and others) have already found that even *non*-immune conduct that is lawful cannot be combined with other conduct to create liability. *A fortiori*, those decisions apply with at least as much force—and arguably more—in these circumstances.

In fact, in *Pennington* itself, the Supreme Court rejected a position very much like PSD's. The plaintiff claimed that the defendants had engaged in various anticompetitive actions in violation of Section 2, some of which involved lobbying the federal government for certain advantages. *United Mine Workers v. Pennington,* 381 U.S. 657, 659-61 (1965). The district court instructed the jury that the lobbying was legal unless it was done "for the purpose of driving the small operators out of business," and the Sixth Circuit agreed. *Id.* at 670. Citing *Noerr,* the Supreme Court reversed, finding that it was improper to let the jury "attribute illegality" to the lobbying "as part of a general plan to eliminate" the plaintiff, as efforts to influence public officials are not illegal "either standing alone or as part of a broader scheme itself violative of the Sherman Act." *Id.* The Court held that the jury should have been so instructed. *Id.*

Other courts have been more explicit. In *Mercatus Grp. LLC v. Lake Forest Hosp.*, 641 F.3d 834 (7th Cir. 2011), the plaintiff alleged that the defendant engaged in a broad scheme to keep the plaintiff out of the market by lobbying the members of the city government to deny it certain permits and by making false and derogatory

statements about the plaintiff. *Id.* at 837-38. The district court granted summary judgment, finding that the lobbying was protected by *Noerr-Pennington*, and the alleged statements were "mere speech that was not actionable under the Sherman Act." *Id.* at 839. The Seventh Circuit affirmed. While citing *Continental Ore*, it held that it was improper to "aggregate the effects of conduct immunized from antitrust liability with the effects of conduct not so immunized," as "[t]hat approach would nullify the immunity." *Id.* Instead, the correct approach was to "first identify any conduct that is immunized" and then consider the "*remaining challenged conduct* in the aggregate to see if it is sufficient to support antitrust liability." *Id.* (emphasis added). In *Mayor and City Council of Baltimore v. AbbVie Inc.,* 42 F.4th 709 (7th Cir. 2022), the same court applied this approach in affirming the dismissal of Section 2 claims based on a defendant's *Noerr-Pennington*-immunized assertion of patents, rejecting the argument that the protected conduct should be combined with other lawful conduct to support the claims, as "0 + 0 = 0." *Id*. at 715.[9]

Again, one of PSD's main authorities for this point directly refutes it. PSD cites *Constr. Cost Data, LLC v. Gordian Grp., Inc.*, No. 4:16-cv-00114, 2019 WL

---

[9] *See also 3Shape Trios A/S v. Alight Tech., Inc.*, No. 18-1332-LPS, 2019 WL 3824209, *11 (D. Del. Aug. 15, 2019) (*Continental Ore* did not mean that "unilateral acts otherwise insulated from antitrust scrutiny"—such as patent enforcement—"can be pled together to state a Section 2 violation"); *PTI, Inc. v. Philip Morris, Inc.*, 100 F. Supp. 2d 1179, 1194 & n.13 (C.D. Cal. 2000) (citing *Pennington*'s rejection of the *Continental Ore* principle as applied to *Noerr-Pennington*-immune conduct).

1060352 (S.D. Tex. Jan. 22, 2019), in which the jury found that the sham litigation exception to *Noerr-Pennington* did not apply, but then found the defendant liable under Section 2 regardless; PSD complains that the jury here was prevented from doing the same. AOB 47. PSD fails to mention that the district court in that case entered judgment for the defendant notwithstanding the verdict, finding that the answer on *Noerr-Pennington* was dispositive. *Constr. Cost Data, LLC v. Gordian Grp., Inc.*, 814 F. App'x 860, 862 (5th Cir. June 30, 2020). The Fifth Circuit unanimously affirmed, finding that the district court's analysis was correct. *Id.* at 867. The same is true here.

That the immunized conduct here involves patent enforcement tips the scales even further against PSD's approach. In this circuit, juries are instructed that "a patentee's infringement suit is presumptively in good faith," requiring a particularly strong showing to establish antitrust liability based on pursuit of patent litigation. *Handgards, Inc. v. Ethicon, Inc.* (*Handgards I*), 601 F.2d 986, 996 (9th Cir. 1979).

PSD's position is weakened further by the fact that the "other" conduct here—besides the prior litigation itself—is WhiteWater's statements to others about the litigation. PSD does not assert that those statements in themselves are anticompetitive. Nor could it: this Court's decision in *American Prof. v. Harcourt Brace Jovanovich*, 108 F.3d 1147 (9th Cir. 1997), precludes treating disparaging statements as anticompetitive conduct under the Sherman Act unless the plaintiff

shows that the statements were "clearly" false, material, likely to induce reasonable reliance, continued for prolonged periods, and not readily susceptible of neutralization by the plaintiff. *Id.* at 1152. Those requirements were incorporated into a jury instruction that PSD does not contest on appeal. 9-ER-1825. PSD has never claimed it could meet them.

PSD invites this Court to reach the novel holding that a company can be liable for unlawful monopolization under the Sherman Act if it files reasonable, good-faith lawsuits to enforce its patent and contract rights, and then truthfully tells others in the market that it has done so. Such a holding would mean that a defendant's First Amendment right to petition would not protect it from liability if it also exercised its First Amendment right to speech. This would chill both speech and patent enforcement at once. The Court should decline this invitation.

### B. PSD cannot overcome *Noerr-Pennington* and sham litigation requirements by citing WhiteWater's filing of more than one prior lawsuit.

PSD also complains that the district court erred by instructing the jury that, to establish WhiteWater's conduct was not immune from liability under *Noerr-Pennington*, PSD had to prove by clear and convincing evidence that WhiteWater's prior litigation was "baseless as a whole." AOB 50-53. According to PSD, because WhiteWater filed more than one lawsuit against it, PSD did not have to meet the "sham litigation" exception described in "*PREI*." *Id.* Instead, PSD asserts that a

different test applies under *USS-POSCO Indust. v. Contra Costa Cty. Bldg.*, 31 F.3d 800 (9th Cir. 1994), under which PSD had only to show that WhiteWater brought the lawsuits "pursuant to a policy of starting legal proceedings without regard to the merits and for the purpose of injuring a market rival." *Id.* at 51-53. Under that "series" test, PSD argues, it was not required to show that the prior litigation was objectively baseless, and it was not required to prove the exception by clear and convincing evidence. *Id.* at 48-53. Again, it is wrong.

### 1. The *USS-POSCO* "series" test does not apply because the number of lawsuits WhiteWater filed was insufficient.

For the "series" exception to apply, the defendant must have brought "huge volumes" of prior lawsuits. *Primetime 24 Joint Venture v. Nat'l Broad. Co.*, 219 F.3d 92, 101 (2d Cir. 2000). A handful of lawsuits is not enough; this Court has refused to apply that test when the plaintiff alleged only two "baseless" suits. *Amarel v. Connell*, 102 F.3d 1494, 1519 (9th Cir. 1996).[10] Other courts, including a number in this district, have found that three, four, or even nine prior lawsuits would be insufficient.[11] One court in this circuit has observed that "five or six lawsuits

---

[10] *See also Int'l Longshore & Warehouse Union v. ICTSI Ore., Inc.*, 863 F.3d 1178, 1187-88 (9th Cir. 2017); *Kottle v. Nw. Kidney Centers*, 146 F.3d 1056, 1060 (9th Cir. 1998).

[11] *See ERBE Elektromedizin GMBH v. Canady Tech., LLC*, 629 F.3d 1278, 1291 (Fed. Cir. 2010) (three suits not enough); *Relevant Grp., LLC v. Nourmand*, No. CV 19-05019 PSG, 2023 WL 4291654 (C.D. Cal. May 24, 2023) (four suits not enough); *Rosen v. Duel*, No. 2:21-cv-08935-FWS-RAO, 2022 WL 18231777, at *9 (C.D. Cal. Nov. 23, 2022) (five or six suits not enough); *Azurity Pharms., Inc. v. Bionpharma,*

[appears to be] on the lower end of what can constitute a pattern or series." *Wonderful Real Est. Dev. LLC v. Laborers Int'l Union of N. Am. Loc. 220*, No. 1:19-cv-00416-LJO, 2020 WL 91998, at *10 (E.D. Cal. Jan. 8, 2020) (quoting *In re Flonase Antitrust Litig.,* 795 F. Supp. 2d 300, 309-310 (E.D. Pa. 2011).

Here, while WhiteWater technically filed five lawsuits, in functional terms it was only two: a patent case and a contract case. The patent case, alleging infringement of the '016 Patent and the '589 Patent, was first filed as two separate actions simultaneously, then voluntarily dismissed by agreement, then re-filed together as a combined action. The '589 claim was dismissed from that consolidated action because the plaintiff, a WhiteWater subsidiary, was found to lack standing. WhiteWater immediately refiled the claim in its own name. At trial in this case, the district court recognized that "there really hasn't been five lawsuits," and both the court and PSD said that even if counted separately, four of the five cases had merit. 8-ER-1505.

Whether counted as two lawsuits or as five, WhiteWater's litigation did not amount to the "series" or "pattern" contemplated in *USS-POSCO*, and was subject

---

*Inc.*, 650 F. Supp. 3d 269, 279-80 (D. Del. 2023) (seven suits not enough); *In re Flonase Antitrust Litig.,* 795 F. Supp. at 309 n.10 ("No court has applied the [series] test to a 'series' of five petitions; indeed, courts have expressly declined to apply the test in cases involving up to nine petitions.")

to the standard sham litigation test established in *PREI*. PSD does not claim that it could have prevailed under that test.

## 2. The *USS-POSCO* test requires a showing of objective baselessness.

Even if the *USS-POSCO* "series" test applied, it would require proof that the prior litigation was objectively baseless "as a whole," which is exactly what the district court instructed the jury.

*USS-POSCO,* like *PREI*, was based on *California Motor Transp. Co. v. Trucking Unlimited,* 404 U.S. 508 (1972). In that case, the Supreme Court held that "sham" litigation could include "a pattern of *baseless*, repetitive claims . . . instituted *without probable cause* and *regardless of the merits*." *Id.* at 513 (emphasis added). The Court in *PREI* further "recognized that recourse to agencies and courts should not be condemned as sham until a reviewing court has discerned and drawn the 'difficult line' separating objectively reasonable claims from a '*pattern of baseless*, repetitive claims' which leads the factfinder to conclude that the administrative and judicial processes have been abused." *PREI*, 508 U.S. at 58 (quoting *California Motor*, 404 U.S. at 513). The Court later reiterated that a "sham" involved institution of legal proceedings "*without probable cause*." *Id.*

The *PREI* Court pointed out that *Noerr* itself rejected the argument that one could lose immunity for actions taken to petition the government even if one's "sole purpose . . . was to destroy [one's] competitors," as the right of the people to petition

43

"cannot properly be made to depend upon their intent in doing so." *Id.*, 508 U.S. at 57-58. "*Noerr*," the Court explained, "shields from the Sherman Act a concerted effort to influence public officials regardless of intent or purpose." *Id*. Thus, in *PREI*, the Supreme Court *extended* the *California Motor* decision to hold that litigation could not be deemed a sham excluded from *Noerr-Pennington* protection unless it was objectively baseless and lacking probable cause—even if it were brought in bad faith. *Id.* at 58-60.

In *USS-POSCO*, this Court acknowledged the objective baselessness requirement: "[N]othing in *California Motor Transport* retreated from the principle that unprotected activity must lack objective reasonableness . . . regardless of intent or purpose." *Id.* The Court also noted that, under *California Motor*, when the defendant is accused of bringing a "whole series of legal proceedings," then "the question is not whether any one of them has merit—some may turn out to, just as a matter of chance—but whether they are brought pursuant to a policy of starting legal proceedings without regard to the merits and for the purpose of injuring a market rival." *Id.* at 811. The court held that "the fact that a small number in the series of lawsuits turn out not to be frivolous will not be fatal to a claim under *California Motor Transport*." *Id.*

Since then, this Court and others within this circuit have reiterated the point. In *Kaiser Found. Health Plan v. Abbot Labs, Inc.*, 552 F.3d 1033 (9th Cir. 2009),

44

this Court found that under the *California Motor/USS-POSCO* test, a series of 17 lawsuits was not a sham even though most were unsuccessful, in part because in each of the unsuccessful cases the litigant had a "plausible argument on which it could have prevailed." *Id.* at 1045-1046. In *Int'l Longshore*, *supra,* 863 F.3d 1178, this Court rejected the "series" exception where there was no "pattern of baseless claims." *Id.* at 1187-88.[12] In *Gen-Probe, Inc. v. Amoco Corp., Inc.*, 926 F. Supp. 948 (S.D. Cal. 1996), the court found that a "defining characteristic of a *California Motor Transport* claim is the baselessness of the pattern of litigation," and that the sham series exception could apply only where the series of lawsuits were "baseless as a whole." *Id.* at 959. And in *Catch Curve, Inc. v. Venali, Inc.*, No. CV 05-04820 DD, 2008 WL 11334024 (C.D. Cal. Nov. 3, 2008), the court found that "[w]hether the lawsuits at issue are baseless is a component of the *USS-POSCO* approach." *Id.* at *6.[13]

---

[12] *See also Amarel*, 102 F.3d at 1518-19 (series exception requires "pattern of *baseless*, repetitive claims") (emphasis added).

[13] *See also Wonderful Real Estate Development,* 2020 WL 91998, *10 (finding it "clear" that *USS-POSCO* "series" exception requires "some allegations pertaining to baselessness"); *Puerto Rico Tel. Co. v. San Juan Cable LLC*, 874 F.3d 767, 771-72 (1st Cir. 2017); *Bryant v. Mil. Dep't of Mississippi*, 597 F.3d 678, 690–91 (5th Cir. 2010); *U.S. Futures Exchange, L.L.C. v. Bd. of Trade of the City of Chicago, Inc.*, 953 F.3d 955, 963-65 (7th Cir. 2020); *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1350 (Fed. Cir. 2014).

It is true that some courts have interpreted *USS-POSCO* as creating a *Noerr-Pennington* exception distinct from *PREI*'s two-part sham litigation test and omits the objective baselessness element.[14] The First and Seventh Circuits, however, have rejected that view. As the Seventh Circuit explained, the Supreme Court made plain in *California Motor* and *PREI* that the same two objective and subjective elements of the sham litigation test apply no matter how many lawsuits were filed, and there is "little logic in concluding that a petitioner loses the right to file an objectively reasonable petition merely because it chooses to exercise that right more than once in the course of pursuing its desired outcome." *U.S. Futures Exch., LLC v. Bd. of Trade of the City of Chicago, Inc.*, 953 F.3d 955, 965 (7th Cir. 2020); *see also Puerto Rico Telephone*, 874 F.3d at 771-72.

Even if PSD's reading of USS-POSCO were plausible, the Court should avoid extending that precedent in a way that creates or deepens a circuit split. *See Padilla-Ramirez v. Bible*, 882 F.3d 826, 836 (9th Cir. 2017). This case would be a particularly poor vehicle for such an extension, as the district court's instructions actually favored PSD on this issue. The court told the jury that "[a] series of lawsuits can be considered baseless as a whole if they were brought pursuant to a policy of

---

[14] *See Hanover 3201 Realty, LLC v. Village Supermarkets, Inc.*, 806 F.3d 162, 178 (3d Cir. 2015); *Waugh Chapel South, LLC v. United Food and Commercial Workers Union Loc. 27*, 728 F.3d 354, 356 (4th Cir. 2013).

starting legal proceedings without regard to the merits." 9-ER-1817. That language—which was taken from PSD's proposed instructions (3-ER-261, 264, 265, 274, 288)—could have been understood as allowing the baselessness element to be satisfied merely based on WhiteWater's subjective intent. While that would not be a proper application of this Court's and the Supreme Court's prior holdings, it was precisely what PSD claims it wanted the jury to be told.

In any case, if the Court does find that *USS-POSCO* must be read as PSD proposes, it should overrule that decision, on en banc review if necessary.

### 3.    The *USS-POSCO* test requires that the plaintiff establish the exception by clear and convincing evidence.

PSD agreed that the jury should be instructed that it was PSD's burden to show that the sham exception to *Noerr-Pennington* applied. AOB 33; 2-ER-82. But it argues that the applicable standard of proof is preponderance of the evidence, not clear and convincing evidence. It is wrong.

The Ninth Circuit has "established a clear and convincing evidence standard for a jury's factual finding of bad faith" in prior litigation for antitrust purposes. *Handgards, Inc. v. Ethicon, Inc.*, 743 F.2d 1282, 1288-89 (9th Cir. 1984) ("*Handgards II*").[15] When the prior litigation involved patent enforcement, "the jury

---

[15] *See also Kaiser*, 552 F.3d at 1044 (sham must be proven by clear and convincing evidence); *Westlake Services LLC v. Credit Acceptance Corp.*, 800 Fed. Appx. 505, 509 (9th Cir. 2020) (citing *Kaiser*).

should be instructed that a patentee's infringement suit is presumptively in good faith and that this presumption can be rebutted only by clear and convincing evidence." *Handgards I*, 601 F.2d at 996.

This is because *Noerr-Pennington* is a First Amendment doctrine. "As a general rule, the Supreme Court instructs that the heightened clear and convincing standard is necessary 'where important individual interests or rights are at stake.'" *Campbell v. Pennsylvania Sch. Boards Ass'n*, 972 F.3d 213, 222 (3d Cir. 2020). "Since *Noerr-Pennington* cases will necessarily involve constitutional rights, a clear and convincing standard initially seems appropriate." *Id.*

PSD does not cite any decision of the Supreme Court or any court within this circuit applying a preponderance standard to the issue of sham litigation. Instead, it cites *Litton Sys., Inc. v. Am. Tel. & Tel. Co.*, 700 F.2d 785, 812 (2d Cir. 1983), a 41-year-old decision from a different circuit. That decision predated *PREI*, and does not appear to have been followed in any published decision of any court. PSD's other authorities do not concern sham litigation at all.

PSD argues that the clear and convincing standard applies only when the defendant asserts a *Noerr-Pennington* defense to *Walker Process* claims, a type of antitrust claim involving fraudulently obtaining and then using a patent in litigation. AOB 49. But none of the sources PSD cites for this proposition—*Nunag-Tanedo*, *Kaiser*, and the ABA Model Antitrust Instructions— limits the clear and convincing

48

standard either to *Walker Process* claims or to the patent context more generally. Rather, in *Kaiser*, the Court specifically held that the plaintiff was required to prove sham litigation by clear and convincing evidence. *Kaiser*, 552 F.3d at 1044.

In any case, there is no dispute that each of WhiteWater's prior lawsuits—other than the breach-of-contract suit that WhiteWater won at trial—involved patent claims. While PSD notes that one of the short-lived 2014 actions featured other causes of action, it cites no authority holding that this would negate the clear and convincing standard. To the contrary, *Noerr-Pennington* cannot be overcome unless the entire *lawsuit*, and not merely certain claims within it, is a sham. *Meridian Project Sys., Inc. v. Hardin Const. Co., LLC*, 404 F. Supp. 2d 1214, 1221-22 (E.D. Cal. 2005) (citing *Freeman v. Lasky, Haas, & Cohler*, 410 F.3d 1180, 1184 (9th Cir. 2005)).

## II.    The District Court Did Not Abuse Its Discretion in Excluding Evidence of Settlement Discussions.

Before the 2019 patent trial, PSD sought to introduce evidence of a 2014 conversation between Alleshouse and Myrman in which Myrman purportedly made statements about the litigation and proposed a settlement under which Alleshouse would work for WhiteWater. 4-SER-881. PSD wanted to use the alleged statements to show that WhiteWater's claims were invalid and only used to harass and pressure PSD. *Id.* The district court excluded the evidence under Rule 408 as part of a settlement discussion. 4-SER-879. PSD sought to introduce the same evidence for

the same purpose in this case; again, the district court excluded the statements. 3-ER-313; 1-ER-5. PSD argues that the court's decision was an abuse of discretion. It is wrong.

### A.    The 2014 conversation was a settlement communication.

PSD denies that the May 2014 conversation was a settlement communication. The record shows otherwise.

Alleshouse's own purported notes of the conversation confirm that he and Myrman discussed settlement at the meeting. One of the first statements it recites, attributed to Myrman, is "[t]here may be another way out of this thing [Alleshouse] comes to work for WWI." 3-ER-340-341. Myman also allegedly said "Ball is in your court," "Make offer, call [me]," "I don't see another way out of this," and that WhiteWater's CEO Chutter knew Myrman was at the meeting. *Id*. Alleshouse allegedly responded "we have to answer [y]our complaint and in the meantime you want to make an offer, send it over." 3-ER-341.

Subsequent events show these settlement discussions continuing. Later that month, Myrman reported to Chutter that Alleshouse had requested a meeting through his counsel, and Chutter responded "[h]opefully linking settlement (dropping the suit) with employment." 3-ER-351. A few weeks later, WhiteWater's subsidiaries signed a tolling agreement with PSD stating that the parties had "met to discuss a possible business relationship that potentially would resolve all of the issues raised

50

in the Action," and that they agreed to toll the statute of limitations "so they can attempt to resolve their disputes and continue with settlement discussions." 3-ER-356.

In light of these undisputed facts, the district court did not abuse its discretion in concluding (again) that the conversation concerned settlement of the litigation, and thus was subject to Rule 408.

### B. PSD sought to introduce the 2014 conversation to prove the invalidity of WhiteWater's prior litigation claims.

PSD argues that even under Rule 408, the 2014 conversation was admissible because it was not being offered to prove the validity or invalidity of a claim, but rather to "show WhiteWater's motive and intent." AOB 56-57. But PSD's theory *presumes* that the evidence has a forbidden purpose. It asserts that Myrman's statements at the meeting show that WhiteWater's 2014 patent and other claims were invalid, and thus the only real purpose of those claims was to harass PSD. That is precisely what Rule 408 prohibits.

**III.     Any Error in the Instructions or Exclusion of Evidence Would Not Justify Reversal Because It Would Not Have Affected the Result.**

Even if the district court had erred in its jury instructions or in excluding evidence of the 2014 meeting, there would be no basis to reverse the judgment and force the parties and court to repeat a two-week antitrust trial. PSD could not have prevailed whether or not its preferred instructions were given or its evidence was admitted. Indeed, the court should (and likely would) have granted judgment to WhiteWater as a matter of law, for three reasons: (1) two judges had already found that WhiteWater's prior lawsuits were not in bad faith; (2) there was no dispute  that WhiteWater by itself lacked monopoly power; and (3) PSD did not introduce evidence to prove that WhiteWater's conduct harmed competition generally.

Thus, the district court's challenged decisions did not determine the result of the case, and affirming the judgment would not seriously impair the fairness, integrity, or public reputation of judicial proceedings or enable a miscarriage of justice. Under either the plain error or the de novo harmless error tests, this Court should affirm.

**A.     Even under its proferred instructions, PSD did not prove WhiteWater pursued litigation in bad faith.**

As discussed above, PSD's own proposed instructions would have predicated liability on a finding that either the prior litigation was in bad faith, or that the statements about the litigation were independently unlawful.

52

In the prior cases, however, the courts found that WhiteWater had not litigated in bad faith. *Supra*, Statement of Case, Section E. Those decisions had issue-preclusive effect, because (1) the issue at stake was identical in both proceedings; (2) the issue was actually litigated and decided in the prior proceedings; (3) PSD had a full and fair opportunity to litigate the issue in the prior proceedings; and (4) the issue was necessary to decide the merits of the prior proceedings. *Janjua v. Neufeld*, 933 F.3d 1061, 1065 (9th Cir. 2019).

While PSD is technically correct that those findings were not reached in the original 2014 lawsuits, that does not mean that those lawsuits were not considered, or that they could be separately viewed as "shams" even if the re-filed versions were not. The patent claims filed in 2014 were the same as those filed later, and there is no way to conclude that the original claims were filed for a different and more sinister purpose. Indeed, no reasonable jury could find that WhiteWater was seeking to drive PSD out of business through litigation even though it agreed to dismiss the claims after a month to talk settlement, and did not re-file any claims for six months after that. There is simply no way that either of the original 2014 lawsuits, any more than the later ones, could be found to meet the subjective test of the "sham" exception.

With the litigation excluded, there is nothing left of PSD's Section 2 claim other than WhiteWater's several statements to others about the litigation. Under

instructions that PSD does not contest, and consistent with this Court's holding in *Harcourt*, 108 F.3d at 1152, the jury was told that disparaging statements about PSD could only qualify as anticompetitive conduct if it met the required *Harcourt* elements. 9-ER-1824-25. PSD has never argued that it could do so.

### B.    PSD did not prove that WhiteWater had monopoly power.

PSD did not and does not object to the jury instruction that, to establish a Section 2 violation, PSD must prove that WhiteWater had monopoly power in the worldwide market for sheet wave machines, excluding China, from 2013 to 2020. 9-ER-1806; 3-ER-225-238. Nor does PSD contest that instruction now. But PSD did not introduce any competent evidence to establish that element, and thus it could not have prevailed on its Section 2 claim.

### 1.    WhiteWater and ADG were not a single entity.

PSD has never disputed that only a single entity can be a monopolist. Courts do not recognized "shared" or "joint" monopolies of two or more firms for Section 2 purposes. *SC Innovations, Inc. v. Uber Techs., Inc.*, 434 F. Supp. 3d 782, 794-95 (N.D. Cal. 2020).

PSD's monopoly power argument, however, relied on treating WhiteWater and ADG together as a single entity. PSD's expert witness, David Barth, assumed that the two companies could be viewed as a single entity and did not attempt to determine whether WhiteWater would have monopoly power on its own. 6-ER-

1136-1137. Neither Dr. Barth nor PSD disputed that, by itself, WhiteWater never had more than 50 percent of the relevant market during the relevant period, or that its market share fell to around ten percent by the end of that period. 6-ER-1004; 9-ER-1761-62. PSD presented no evidence other than Dr. Barth's testimony to demonstrate monopoly power.

But WhiteWater and ADG were not a single entity for Section 2 purposes. As the jury was instructed—again, without objection—it could not treat them as a single entity unless it found that: (1) they were an economic unit; and (2) they were not actual or potential competitors. 2-ER-31. To determine whether two firms were an economic unit, they were to consider whether the companies (a) had substantial common ownership, (b) had a fiduciary obligation to act for one another's economic benefit, or (c) had an agreement to divide profits and losses, as opposed to revenues. 2-ER-31; 9-ER-1809.

WhiteWater and ADG were not an economic unit. There was no dispute that they did not have any common ownership. 6-ER-1138. Nor did PSD claim that either had a fiduciary (rather than contractual) obligation to act for the other's benefit, nor that the two companies had ever agreed to divide profits and losses. The CEOs and owners of WhiteWater and ADG, both of whom testified at trial, confirmed that these elements were not met. 8-ER-1548-1550, 1611-1612.

Likewise, there was no genuine dispute that WhiteWater and ADG were actual, or at least potential, competitors; Dr. Barth expressly admitted this. 6-ER-1138. They both sold the same product—the FlowRider—and had the ability to sell within the same territories to a limited extent. 6-ER-1140-1141. That alone made them potential competitors. *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1148-49 (9th Cir. 2003). While their licensing agreement largely kept them from competing in practice, it had exceptions that allowed WhiteWater to make some sales in ADG's territory: the United States and eastern Canada. 8-ER-1543-1544, 1552-1559. WhiteWater made use of those exceptions, in some cases competing directly against ADG for projects. *Id.*; 6-ER-998-999; 3-SER-837-841, 843.

### 2. Even combined, WhiteWater and ADG lacked sufficient market share for monopoly power under the indirect test.

As the jury was instructed (without objection), there are two ways to prove monopoly power: direct evidence and indirect evidence. 9-ER-1806-12. Indirect evidence is the more common approach and requires consideration of market share (both level and direction), barriers to entry, entry and exit by other companies, and the number and size of other alleged competitors. *Rebel Oil Co., Inc. v. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995). Based on the record at trial, no reasonable jury could have found that PSD had established that WhiteWater had monopoly power in the relevant market.

The analysis of PSD's own expert, Dr. Barth, showed that WhiteWater's market share—alone or combined with ADG—declined rapidly over the relevant period. The data Dr. Barth used showed that the combined market share of the two companies fell from 88% in 2013 to 52% in 2020. 6-ER-1141. That does not suggest monopoly power.

At the same time, there was no dispute that numerous companies entered the market during that period. 6-ER-1141-42, 1126-27; 5-ER-751; 7-ER-1362.

Dr. Barth testified that barriers to entry in the market included (1) the know-how required to build sheet waves; (2) WhiteWater's "established brand name and history of installations"; and (3) WhiteWater's ability to assert its patents (6-ER-1096-1097). The first two are not barriers to entry for Sherman Act purposes,[16] and PSD argues that "all [WhiteWater's] material patents expired" before PSD was formed. AOB 8-9. In any case, the very fact that so many new companies entered the market and gained market share from WhiteWater and ADG showed that any barriers were not all that high.

### 3.    PSD presented no direct evidence of monopoly power.

As the jury was instructed (without objection), to show that WhiteWater had monopoly power through direct evidence, PSD had to prove that WhiteWater was

---

[16] *See Sicor Ltd. v. Cetus Corp.*, 51 F.3d 848, 855 (9th Cir. 1995) ("technological complexities" not barriers to entry); *Harcourt*, 108 F.3d at 1154 ("reputation alone" insufficient barrier).

able to profitably set and keep prices above competitive levels, or to exclude competitors from the market. 9-ER-1810-1812. But PSD never introduced any evidence of what a "competitive" market price was for sheet wave machines in any part of the global market, or any empirical analysis of how WhiteWater's actions affected that price. 8-ER-1508. PSD's witnesses admitted that WhiteWater's conduct had caused them to *lower* prices in some cases. 4-ER-706; 7-ER-1213-14.

To support PSD's position, its expert (Barth) cited evidence that WhiteWater offered lower prices when it was competing with PSD than when it was not. 6-ER-1079-1084. He also pointed to statements by WhiteWater personnel that it was often able to obtain full price without giving a discount, that its products were "known" as more expensive than competitors' (6-ER-1081-1082), and that WhiteWater's gross profit margins were "high." 6-ER-1095. None of that supports a finding that WhiteWater's prior litigation and statements about that litigation caused prices in the market to be higher than they would have been otherwise.

Similarly, PSD made no effort to show that WhiteWater was able to exclude anyone from the market. Rather, PSD admitted that it entered the market and increased its own market share, as did various other companies. 6-ER-1127; 5-ER-751. Dr. Barth could not identify any company that was denied entry into the market. 6-ER-1127. Instead, he simply *assumed* that the initial high market share of WhiteWater and ADG combined demonstrated that the other competitors must have

58

been "excluded." 6-ER-1090. That is not a permissible assumption.[17] And as discussed above, during the same period, WhiteWater's market share dropped sharply, which is inconsistent with WhiteWater possessing monopoly power. *United States v. Syufy Enters.*, 903 F.2d 659, 665–66 (9th Cir. 1990).

### C. PSD did not prove WhiteWater's conduct harmed competition.

As the jury was instructed (without objection), to prevail on its claim, PSD had to prove that WhiteWater's prior lawsuits and statements about them had "a significant and enduring adverse impact on competition in the relevant markets." 9-ER-1816. This meant that harm to PSD itself was not enough; it had to show "a reduction in competition that results in the loss of some of the benefits of competition, such as lower prices, increased output, or higher product quality." *Id.*[18]

PSD did not introduce sufficient evidence for a reasonable jury to find harm to competition in general, let alone a "significant and enduring impact." Dr. Barth testified that he found WhiteWater's alleged conduct (the litigation and statements about it) "resulted in higher prices and less innovation" in the market. 6-ER-1103. But he admitted that he did not calculate any effect of the conduct on the market. 6-

---

[17] *See, e.g.*, *Fedorczyk v. Carribean Cruise Lines, Ltd.*, 82 F.3d 69, 75 (3d Cir. 1996) (expert opinion cannot be based on "speculation or conjecture").

[18] *See also, e.g.*, *Paladin Assocs., Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1158 (9th Cir. 2003) ("Where the defendant's conduct harms the plaintiff without adversely affecting competition generally, there is no antitrust injury").

ER-1132-1133. And the substance of his testimony did not support a finding of any effect at all.

As to pricing, Dr. Barth admitted that he did no statistical analysis to determine what WhiteWater's average price was either before or after PSD entered the market (6-ER-1114), or whether the price changed when PSD entered. 6-ER-1124. He admitted that he could not say how much lower prices would have been absent WhiteWater's alleged conduct. 6-ER-1127-1128. PSD's principals admitted that WhiteWater's litigation enabled customers to obtain *lower* prices from PSD. 4-ER-706; 7-ER-1213-1214. PSD's counsel admitted that it did not even have evidence of what a "competitive" price would be. 8-ER-1508.

Dr. Barth's analysis was limited to noting that PSD's competition with WhiteWater led to lower prices on some sales, and assuming that "stronger competition would have resulted in customers receiving lower prices more often." 6-ER-1102. It does not follow that WhiteWater's litigation or related statements caused prices across the global sheet wave market to be higher.

As to innovation, Dr. Barth cited an alleged statement by WhiteWater's CEO that WhiteWater "will copy improvements made by entrants," and another statement by WhiteWater's salesman that WhiteWater redesigned a part "in response to things that PSD had done." 6-ER-1102. From those two examples, Dr. Barth concluded that "stronger competition would have resulted in more innovation in the market[.]"

6-ER-1102. He failed to mention that the WhiteWater CEO statement also showed that there were multiple entrants into the market, which contradicted the rest of Dr. Barth's analysis. 11-ER-2210. In any case, this evidence does not support a finding that WhiteWater's conduct caused market innovation to suffer.

Notably, after PSD rested its case, Judge Benitez said that he "ha[d]n't heard anything that would lead me to conclude that there's actually been any harm to competition in this case." 8-ER-1507-1508.

## CONCLUSION

PSD was fortunate that the case made it to a jury at all. Its proposed instructions, which have no apparent precedent and which conflict with decades of case law from the Supreme Court and other courts, would be improper under any standard of review, let alone the plain-error standard. Even if those instructions had been given and PSD's proffered evidence admitted, PSD still could not have prevailed as a matter of law. The Court should affirm.

Respectfully submitted,

DATED:  April 24, 2024    **BUCHALTER APC**

By: _____
    Joshua M. Robbins
    Roger L. Scott
    Robert M. Dato
    Attorneys for Defendant-Appellee
    **WhiteWater West Industries, Ltd.**

61

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that this Consolidated Answering Brief complies with Circuit Rule 32-1(a) because this brief contains 13,060 words, excluding the parts of the brief exempted by Fed.R.App.P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed.R.App.P. 32(a)(5) and the type style requirements of Fed.R.App.P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 14-point Times New Roman.

DATED:  April 24, 2024                     **BUCHALTER APC**

By:  _____

Joshua M. Robbins
Roger L. Scott
Robert M. Dato
Attorneys for Defendant-Appellee
**WhiteWater West Industries, Ltd.**

62

## **CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on April 24, 2024.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

_____

## **STATEMENT OF RELATED CASES**

Pursuant to Circuit Rule 28-2.6, Defendant-Respondent states that it is unaware of any related cases pending in this Court.