No. 23-2609

# United States Court of Appeals for the Ninth Circuit

PACIFIC SURF DESIGNS, INC., a Delaware corporation,

*Plaintiff-Appellant,*

– v. –

WHITEWATER WEST INDUSTRIES, LTD.; GEOFFREY CHUTTER, an individual; FLOWRIDER, INC., a California corporation; MARSHALL MYRMAN, an individual; AQUATIC DEVELOPMENT GROUP, INC., a New York corporation; DAVID KEIM, an individual; THOMAS LOCHTEFELD, an individual,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR SOUTHERN CALIFORNIA IN CASE NO. 3:20-CV-01464-BEN-DDL, ROGER T. BENITEZ, DISTRICT JUDGE

## REPLY BRIEF OF APPELLANT

JENNIFER DUNCAN HACKETT
JAMES ROBERTSON MARTIN
ZELLE LLP
1775 Pennsylvania Avenue, Suite 375
Washington, DC 20006
(202) 899-4100
jhackett@zellelaw.com
jmartin@zellelaw.com

*Attorneys for Plaintiff-Appellant*

CP COUNSEL PRESS (800) 4-APPEAL • (327754)

# TABLE OF CONTENTS

TABLE OF CONTENTS ....................................................................................i

TABLE OF AUTHORITIES ...........................................................................iii

INTRODUCTION ...........................................................................................1

ARGUMENT ..................................................................................................4

I. PSD PROPERLY OBJECTED TO THE COURT'S PROPOSED JURY INSTRUCTIONS, AND *DE NOVO* IS THE APPROPRIATE STANDARD OF REVIEW ..................................................................................................4

II. THE DISTRICT COURT'S INSTRUCTIONS AND VERDICT FORM ON ANTICOMPETITIVE CONDUCT WERE ERRONEOUS ...........................8

A. *Noerr-Pennington* does not immunize the broader scheme alleged .....8

1. The jury heard evidence that WhiteWater engaged in an unlawful scheme ....................................................................8

2. Conduct covered by *Noerr-Pennington* can be combined with other conduct to establish anticompetitive activity ..................13

B. Regardless of whether the "series" exception applies, PSD's "monopoly broth" theory did not require it to prove that each of WhiteWater's actions was objectively baseless ..................................16

C. The district court erred by instructing the jury to apply the clear and convincing evidence standard on the question of anticompetitive conduct ..........................................................................................19

III. THE DISTRICT COURT ERRED BY PREVENTING THE JURY FROM HEARING EVIDENCE OF THE BAY HILL TAVERN MEETING .........21

IV. REVERSAL IS JUSTIFIED..........................................................................23

A. PSD submitted sufficient evidence for a jury to find, under its proposed instructions, that WhiteWater engaged in anticompetitive conduct ..........................................................................................23

B. PSD presented sufficient evidence for a jury to find monopoly power ....24

C. PSD presented sufficient evidence for a jury to find WhiteWater's conduct harmed competition ....27

CONCLUSION ....28

# TABLE OF AUTHORITIES

**Cases:**

*Amarel v. Connell*,
102 F.3d 1494 (9th Cir. 1996) ....................16, 17

*American Prof. Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns, Inc.*,
108 F.3d 1147 (9th Cir. 1997) ....................15

*Cal. Computer Prods., Inc. v. Int'l Bus. Machs. Corp*,
613 F.2d 727 (9th Cir. 1979) ....................11

*California Motor Transport Co. v. Trucking Unlimited*,
404 U.S. 508 (1972)....................18, 19

*Cassino v. Reichhold Chem., Inc.*,
817 F.2d 1338 (9th Cir. 1987) ....................22

*Catch Curve, Inc. v. Venali, Inc.*,
No. CV 05-04820 DD, 2008 WL 11334024 (C.D. Cal. Nov. 3, 2008) ........18

*City of Anaheim v. S. Cal. Edison Co.*,
955 F.2d 1373 (9th Cir. 1992) ....................12, 13

*City of Groton v. Connecticut Light & Power Co.*,
662 F.2d 921 (2d Cir. 1981) ....................12

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
370 U.S. 690 (1962)....................2, 8, 11, 12

*Dreamstime.com, LLC v. Google LLC,*
54 F.4th 1130 (9th Cir. 2022)....................11

*ExxonMobil Corp. v. S. California Edison Co.*,
722 F. App'x 619 (9th Cir. 2018)....................7

*Glen Holly Ent., Inc. v. Tektronix, Inc.*,
352 F.3d 367 (9th Cir. 2003) ....................27

*Handgards, Inc. v. Ethicon, Inc.*,
601 F.2d 986 (9th Cir. 1979) ....................20

*Handgards, Inc. v. Ethicon, Inc.*,
743 F.2d 1282 (9th Cir. 1984) ....................19

*Hanover 3201 Realty, LLC v. Vill. Supermarkets, Inc.*,
806 F.3d 162 (3d Cir. 2015) ....................17

*Harper House, Inc. v. Thomas Nelson, Inc.*,
889 F.2d 197 (9th Cir. 1989) ....................................................................7, 8

*Herman & MacLean v. Huddleston*,
459 U.S. 375 (1983)..............................................................................21

*In re Neurontin Antitrust Litigation*,
No. 02-1390, 2009 WL 2751029 (D.N.J. Aug. 28, 2009).........................9, 10

*In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*,
No. 13-MD-2445, 2017 WL 36371 (E.D. Pa. Jan. 4, 2017) ..........................10

*In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*,
622 F. Supp. 3d 22 (E.D. Pa. 2022).............................................................15

*Int'l Longshore & Warehouse Union v. ICTSI Ore., Inc.*,
863 F.3d 1178 (9th Cir. 2017). ....................................................................17

*Intergraph Corp. v. Intel Corp.*,
195 F.3d 1346 (Fed. Cir. 1999) ....................................................................12

*Kobe, Inc. v. Dempsey Pump Co.*,
198 F.2d 416 (10th Cir. 1952))......................................................................20

*Litton Sys., Inc. v. Am. Tel. & Tel. Co.*,
700 F.2d 785 (2d Cir. 1983) .........................................................................20

*Mayor and City Council of Baltimore v. AbbVie Inc.*,
42 F.4th 709 (7th Cir. 2022) .........................................................................14

*Monroe v. City of Phoenix, Ariz.*,
248 F.3d 851 (9th Cir. 2001), *overruled by*
*Acosta v. Hill*,
504 F.3d 1323 (9th Cir. 2007)..................................................................... 5-6

*Murray v. S. Route Mar. SA*,
870 F.3d 915 (9th Cir. 2017) ...........................................................................5

*Ne. Tel. Co. v. Am. Tel. & Tel. Co.*,
651 F.2d 76 (2d Cir. 1981) ............................................................................12

*Octane Fitness, LLC v. Icon Health & Fitness, Inc.*,
572 U.S. 545 (2014)........................................................................................21

*Pac. Bell Tel. Co. v. LinkLine Commc'ns, Inc.*,
555 U.S. 438 (2009)..........................................................................................8

*Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*,
508 U.S. 49 (1993)....................................................................................18, 19

*Ramsey v. United Mine Workers of America*,
401 U.S. 302 (1971)....................21

*Retrophin, Inc. v. Questcor Pharms., Inc.*,
41 F. Supp. 3d 906 (C.D. Cal. 2014)....................27

*Skidmore as Tr. for Randy Craig Wolfe Tr. v. Led Zeppelin*,
952 F.3d 1051 (9th Cir. 2020)....................5

*Stewart v. Wachowski*, No. CV 03-2873 MMM (VBKx),
2004 WL 5618386 (C.D. Cal. Sept. 28, 2004)....................22, 23

*U.S. for Use & Benefit of Reed v. Callahan*,
884 F.2d 1180 (9th Cir. 1989)....................6, 7

*U.S. Futures Exch., L.L.C. v. Bd. of Trade of the City of Chicago, Inc.*,
953 F.3d 955 (7th Cir. 2020)....................18

*United States v. Microsoft Corp.*,
253 F.3d 34 (D.C. Cir. 2001)....................23

*United States v. Topco Associates, Inc.,*
405 U.S. 596 (1972)....................20

*USS-POSCO Indus. v.*
*Contra Costa Cnty. Bldg. & Constr. Trades Council, AFL-CIO*,
31 F.3d 800 (9th Cir. 1994)....................14, 16, 17, 18, 19

*Veasman v. Nuance Commc'ns, Inc.*,
No. 2:21-cv-08423-MEMF(ASx), 2022 WL 2964411
(C.D. Cal. June 29, 2022)....................22

*Wall Data Inc. v. Los Angeles Cnty. Sheriff's Dep't*,
447 F.3d 769 (9th Cir. 2006)....................22

*ZF Meritor, LLC v. Eaton Corp.*,
696 F.3d 254 (3d Cir. 2012)....................9

**Rules:**

Fed. R. Evid. 51....................4

Fed. R. Evid. 408....................22, 23

# INTRODUCTION

In its Answering Brief, Defendant-Appellee WhiteWater West Industries, Inc. ("WhiteWater") asks this Court to apply an improper standard of review. It goes on to argue that, despite the novelty of the facts and issues presented, this case should be treated like any other antitrust case involving patent litigation. Finally, WhiteWater, without any basis for doing so, asserts that any error by the trial court with respect to the jury instructions and verdict form was harmless because the jury would have found no monopoly power or harm to competition. WhiteWater's arguments misrepresent the trial record, ignore the novelty of the facts and issues presented in this case, and ultimately cannot be reconciled with black-letter principles of antitrust law.

First, WhiteWater improperly asserts a plain error standard of review, arguing that Plaintiff-Appellant Pacific Surf Designs, Inc. ("PSD") failed to timely object to WhiteWater's proposed jury instructions. PSD, however, unequivocally objected to the instructions both before and after the District Court issued its decision on the topic. Moreover, PSD made its position on the appropriate standard of proof for the applicability of the sham exception to *Noerr-Pennington* and the need for a totality of the evidence instruction explicitly clear in the papers it filed on August 22, 2023. PSD fully reserved its right to assert the instant challenge to the District Court's jury instructions; therefore, *de novo* is the accurate standard of review.

Second, WhiteWater cites inapposite caselaw regarding separate forms of conduct combining to form an unlawful "scheme" under Section 2 of the Sherman Act. As stated in PSD's Opening Brief, the facts of this case are unique and WhiteWater's insistence on pulling the components of this case apart only illustrates PSD's point. No appellate court has had the opportunity to address a case like this one, in which a monopolist engages in predatory litigation—comprised of not only patent infringement allegations, but other civil claims—as a component of a broader, anticompetitive scheme.

At the same time, WhiteWater's take on what this Court and others have supposedly upheld contradicts well-settled antitrust principles. Courts have long concluded that juries must evaluate the evidence by looking at an antitrust defendant's conduct as a whole to determine whether the defendant's conduct unreasonably restrained competition. *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) (plaintiffs must be given the "full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each."). Further, WhiteWater's insistence on a clear and convincing standard of proof overlooks the fact that—except for a limited set of cases espousing a principle known as "sham litigation"—courts instruct juries to apply the preponderance of evidence standard to questions of fact. This case is

not one of the excepted few, and the district court should have instructed the jury to apply the preponderance standard to all questions of fact.

Finally, the District Court erred in excluding compelling evidence of WhiteWater's unlawful motive and intent when it held that evidence of the Bay Hill Tavern meeting was protected by Rule 408 of the Federal Rules of Evidence. WhiteWater improperly asserts that because this evidence was excluded in the prior patent trial, preclusion was similarly warranted in this antitrust case. It is wrong. Not only did the prior case involve an entirely different cause of action presenting very different questions of fact and law, but that ruling was never presented for appellate review. The facts and circumstances of the conversation at issue make it clear that it was a part of the anticompetitive scheme—a naked threat to stop competing or face extinction—not a legitimate settlement discussion, and the jury should have been allowed to hear it.

The jury in this case heard ample evidence to support a finding that WhiteWater held monopoly power in the relevant market as determined by the jury—sheet wave machines sold worldwide except for China. Indeed, prior to PSD, WhiteWater effectively was the ***only*** participant servicing the entire market. And there was ample evidence showing WhiteWater's conduct harmed competition in that market by marginalizing and restraining PSD's ability to provide buyers with an alternative to WhiteWater. But for the District Court's erroneous jury instructions

and pre-trial evidentiary ruling, PSD could have met its burden of proof. Accordingly, the judgment must be reversed, and a new trial ordered.

## ARGUMENT

### I. PSD PROPERLY OBJECTED TO THE COURT'S PROPOSED JURY INSTRUCTIONS, AND *DE NOVO* IS THE APPROPRIATE STANDARD OF REVIEW

As set forth in PSD's Opening Brief, *de novo* review of the District Court's selected jury instructions and verdict form is proper here because this challenge questions whether the substance of each accurately tracks the relevant antitrust laws. AOB 42. WhiteWater, however, argues that the plain error standard should apply because PSD purportedly failed to object to the two jury instructions at issue in satisfaction of Rule 51. AAB 25. This is factually incorrect and exposes WhiteWater's lack of confidence in its arguments on the merits. WhiteWater cites discussions that took place before the District Court on August 25, 2023, but omits the fact that disputes pertaining to the two jury instructions at issue on this appeal had already been settled the previous day. It was on that date, August 24, 2023, that PSD made its objections known and explicitly preserved the issues for appeal. 1-SER-18-19. At that time, in a discussion pertaining to the sham litigation jury instruction, the court asked: "But they have to look at the litigation as a whole, right? That's what they have to do. They have to look at the litigation as a whole to determine whether as a whole it was pursued in bad faith, right?" *Id.* Mr. Martin,

counsel for PSD, responded, "yes." *Id.* The District Court continued: "And that intent alone is not enough right; that's basically the law as I understand it, right?" *Id.* To which Mr. Martin stated: "That sounds about right, although subject to our objections too. The objective baselessness and the position we've said, that P[O]SCO was the real standard. Again, that's one of our objections we're preserving; we made it, you ruled against us." *Id.* The District Court clearly understood PSD's position, responding, "[a]ll right." *Id.*

For its proposition that the plain error standard should apply, WhiteWater primarily relies on a case in which this Court found that "there is a real possibility that the district court simply overlooked the instruction, and would have been willing to give one had the omission been brought to its attention." *Skidmore as Tr. for Randy Craig Wolfe Tr. v. Led Zeppelin*, 952 F.3d 1051, 1073 (9th Cir. 2020). In its ruling, the Court reasoned that the party had failed to put "the district court on notice of an objection to a refused instruction" and that the objection was therefore deemed forfeited. *Id*. The additional cases WhiteWater relies on for its position are similarly distinguishable. For example, in *Murray v. S. Route Mar. SA*, the appellant challenging a jury instruction "did not raise the objection to Instruction 14 with sufficient specificity to 'bring into focus the precise nature of the alleged error.'" 870 F.3d 915, 921 (9th Cir. 2017) (citation omitted); *Monroe v. City of Phoenix, Ariz.*, 248 F.3d 851, 858–59 (9th Cir. 2001), *overruled by Acosta v. Hill*, 504 F.3d

1323 (9th Cir. 2007) (appellant "did not take exception at any point and did not argue the issue in his trial brief, motions for judgment as a matter of law, or motion for new trial, nor did he otherwise make his position known to the district court"); *U.S. for Use & Benefit of Reed v. Callahan*, 884 F.2d 1180, 1184 (9th Cir. 1989) (appellant's "objections were made for the first time in the motion for new trial"). That was not what transpired here; PSD specifically raised its objections and expressly preserved the issue for appeal.

Furthermore, PSD had already made its position abundantly clear to the District Court in an August 22, 2023, trial brief proposing alternative jury instructions to the ones currently at issue, i.e., the failure to instruct on viewing the evidence as a whole and the sham litigation instruction that was selected by the court in lieu of PSD's proposed instruction. 2-ER-75. The trial brief included PSD's proposed instruction on the willful maintenance of monopoly power, which included language regarding the jury's obligation to view the evidence as a whole. 2-ER-78. PSD's subsequent trial brief on its proposed instructions also included a proposed instruction on sham litigation. 2-ER-82. Notably, Mr. Martin also referenced this trial brief during the course of the August 24 discussion, shortly before he preserved PSD's objections on the record. 1-SER-15:16-18..

The applicability of the "objectively baseless" requirement was also addressed in PSD's trial brief regarding the effect of the "Walker Process" Doctrine on the

allegations in this case. 2-ER-99. There, PSD argued that the series exception under *POSCO* should be offered to the jury and that, regardless, PSD asserted a "monopoly broth" claim under which "even where no aspect of a defendant's conduct standing alone is illegal, the evidence must be viewed as a whole." *Id.* at 100-02. This Court has "not required the pointless formality of a specific objection" when "in the process of settling the jury instructions the court was made fully aware of the objections of the party and the reasons therefor and further objection would be unavailing." *Callahan*, 884 F.2d at 1184; *see also ExxonMobil Corp. v. S. California Edison Co.*, 722 F. App'x 619, 621 (9th Cir. 2018) (appellant did not waive its objection to the omission of instruction by failing to raise the issue at the parties' final jury instruction conference where appellant's arguments about instructions before that conference—in the joint disputed instructions—showed that further objection would have been a "'pointless formality.'") (citation omitted).

Via two filed briefs and various on-the-record discussions, PSD made the District Court fully aware of its proposals and objections. This Court confirmed the sufficiency of these efforts under analogous circumstances in *Harper House*. There, the instructions at issue on appeal had also been the subject of pre-trial briefing and a motion for directed verdict. *Harper House, Inc. v. Thomas Nelson, Inc.*, 889 F.2d 197, 207 (9th Cir. 1989). As such, the Court concluded that any further objection would have been unavailing, and it was satisfied that the "vague objection …

adequately preserves the issue for appeal." *Id*. The same is true here. Nothing in the record indicates that the District Court understood PSD to have waived its arguments. Thus, *de novo* review is proper.

## II. THE DISTRICT COURT'S INSTRUCTIONS AND VERDICT FORM ON ANTICOMPETITIVE CONDUCT WERE ERRONEOUS

### A. *Noerr-Pennington* does not immunize the broader scheme alleged

WhiteWater attempts to deconstruct PSD's unified theory into two discrete theories: one of pure sham litigation and one of pure disparagement, which it argues cannot be combined into a single meritorious antitrust claim and are each individually unsuccessful due to the applicability of *Noerr-Pennington* and the *Harcourt* test. WhiteWater is wrong on all counts. PSD alleges an overarching anticompetitive scheme that must be viewed as a whole.

#### 1. The jury heard evidence that WhiteWater engaged in an unlawful scheme

In response to PSD's claim that the jury should have been instructed consistent with *Continental Ore*, WhiteWater claims that lawful conduct cannot be combined with lawful conduct to establish anticompetitive activity. WhiteWater primarily relies on *Pac. Bell Tel. Co. v. LinkLine Commc'ns, Inc*., 555 U.S. 438, 457 (2009). There, the Supreme Court found that the plaintiffs' theory was "nothing more than an amalgamation of a meritless claim at the retail level and a meritless claim at the wholesale level," and rejected the plaintiffs' attempt to "alchemize them into a new form of antitrust liability." *Id.* at 452, 457.

That case has no bearing here because PSD does not seek to create a new form of antitrust liability. To the contrary, it seeks only to apply long-standing principles of antitrust law by allowing the jury to consider the evidence as a whole to determine whether WhiteWater unlawfully monopolized the relevant market. The court simply held only that "two antitrust theories cannot be combined to form a new theory of antitrust liability." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 280 (3d Cir. 2012). By contrast, PSD has only ever alleged one theory of liability—a scheme to monopolize.

The court in *In re Neurontin Antitrust Litigation*, citing *Linkline*, noted a difference "between analyzing individual acts or categories of anticompetitive conduct as contrasted with individual theories of liability derived from those acts." No. 02-1390, 2009 WL 2751029, at *15 (D.N.J. Aug. 28, 2009). In *Neurontin*, the court specified that "Plaintiffs' legal theory itself advances a monopolization scheme claim" and held, "[i]f an antitrust plaintiff can allege that a series of actions, when viewed together, were taken in furtherance and as an integral part of a plan to violate the antitrust laws, that series of actions may trigger antitrust liability as an overall scheme. . . ." *Id.* This case is analogous, and this Court ought to similarly reject WhiteWater's reliance on *Linkline* "as a basis to set aside established law in 'scheme' cases." *Id*. at *16.

As explained in *Neurontin*, "*Linkline* deals only with the viability of a price squeeze claim in a particular factual situation and in a particular legal context." *Id*. The *Neurontin* court further reasoned, "[t]he *Linkline* Court did not discuss the sufficiency of other monopolization scheme claims, nor does anything in the *Linkline* decision indicate an intention on the part of the Court to overrule long-established principles concerning the viability of claims alleging an overall scheme to unlawfully maintain a patent monopoly by excluding generic competition." *Id. See also In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, No. 13-MD-2445, 2017 WL 36371, at *9 (E.D. Pa. Jan. 4, 2017) (finding *Linkline* only "demarcates the outer limits of a plaintiff's ability to allege an overall scheme or what *Amneal* has termed its 'tapestry' theory…by prohibiting a plaintiff from creating a new theory of antitrust liability by joining multiple claims, all of which are specifically foreclosed by existing antitrust precedent.").

PSD does not attempt to create a new theory of antitrust liability by joining multiple claims, and there is no antitrust precedent that should have prevented the jury from being instructed on its unified theory of WhiteWater's unlawful scheme to monopolize. Accordingly, the District Court should have instructed the jury to consider whether WhiteWater's conduct, viewed as a whole, was undertaken in furtherance of an anticompetitive scheme, instead of asking the jurors to evaluate whether each discrete act independently violated the antitrust laws.

This approach is consistent with the court's ruling in *Continental Ore*, which *Linkline* does not acknowledge, let alone reject. WhiteWater dismisses *Continental Ore* based on a misreading of *Dreamstime.com, LLC v. Google LLC,* 54 F.4th 1130 (9th Cir. 2022). In that case, the plaintiff brought a Section 2 claim accusing Google of taking various actions to impede the plaintiff's use of Google's paid advertising services and harming the plaintiff's performance on Google's search engine. *Id*. at 1134-36. This Court found "'there can be no synergistic result' from 'a number of acts none of which show *causal antitrust injury' to the plaintiff*,'" even under the *Continental Ore* approach. *Id.* at 1142 (quoting *Cal. Computer Prods., Inc. v. Int'l Bus. Machs. Corp*, 613 F.2d 727, at 748 (9th Cir. 1979)) (emphasis added). Respectfully, WhiteWater's analysis reads too much into *Dreamstime* because in that case, all but one of the component facts were directed at other markets, not the relevant market that plaintiffs chose to litigate. *Id*. And the only act directed at the relevant market did not plausibly allege an anticompetitive act. *Id*. Thus, none of the component acts could be interpreted to cause "antitrust injury" (harm arising from an antitrust violation). The plaintiffs' focus in *Dreamstime* on other markets is why this Court dismissed the plaintiffs' claim. Importantly, the Court ***did*** consider the facts taken as a whole—which is all that PSD seeks here. *Dreamstime*, 54 F.4th at 1142 ("The Supreme Court has instructed courts to give plaintiffs in antitrust actions 'the full benefit of their proof without tightly compartmentalizing' each

individual allegation, because the character and effect of an antitrust injury should not 'be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole.'") (quoting *Cont'l Ore*, 370 U.S. at 699).

WhiteWater's citation of cases from other circuits is similarly inapposite. *See Ne. Tel. Co. v. Am. Tel. & Tel. Co.*, 651 F.2d 76, 95 at n. 28 (2d Cir. 1981) ("[W]e have not ignored Continental Ore's edict. We have found, however, that in numerous critical respects Northeastern's proof was utterly lacking. Under such circumstances, treating Northeastern's claims collectively cannot have any synergistic effect."); *City of Groton v. Connecticut Light & Power Co.*, 662 F.2d 921, 928-29 (2d Cir. 1981) ("Generally we agree with the dictum in *City of Mishawaka* that '(i)t is the mix of the various ingredients of utility behavior in a monopoly broth that produces the unsavory flavor,' … The proper inquiry is whether, qualitatively, there is a 'synergistic effect.'") (citation omitted)*; Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346, 1366-67 (Fed. Cir. 1999) (reiterating the court's holding in *Continental Ore* that the "factual components" of a case should be viewed together, "not the pieces of legal theory."). The other cases to which WhiteWater cites are also irrelevant, as they involve different causes of action, not an overarching monopolization scheme claim.

WhiteWater further attempts to argue that this Court's decision in *City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373 (9th Cir. 1992), "warns against the

approach PSD urges here." AAB 34-35. In that case, however, this Court agreed that it should consider the "overall combined effect" of the defendant's actions, and it explicitly stated that lawful activities taken together could amount to a claim. *Anaheim*, 955 F.2d at 1376 ("In so doing, we agree that it would not be proper to focus on specific individual acts of an accused monopolist while refusing to consider their overall combined effect.").

Ultimately, none of the caselaw WhiteWater cites should be interpreted to mean that the jury should not have been allowed to consider the evidence as a whole. To the contrary, they support PSD's position.

**2. Conduct covered by *Noerr-Pennington* can be combined with other conduct to establish anticompetitive activity**

WhiteWater attempts to invoke *Noerr-Pennington* protection because some of the conduct in WhiteWater's alleged scheme to monopolize involves litigation. In doing so, however, it conveniently ignores the fact that the lawsuits filed against PSD were but one ingredient in PSD's "monopoly broth" theory—with an additional component being WhiteWater's weaponizing of the lawsuits to discourage potential customers from doing business with PSD.

WhiteWater argues that because *some* of the scheme involved petitioning the courts, *all* of its "conduct was not only lawful but immune under the First Amendment's petitioning clause and the *Noerr-Pennington* doctrine." AAB 36. This is not so. *Noerr-Pennington* does not immunize the misuse of lawsuits for

anticompetitive purposes, nor does it apply as a blanket shield for an antitrust defendant, who uses lawsuits as one component of a broader scheme to monopolize. *USS-POSCO*, 31 F.3d at 811.

WhiteWater relies *on Mayor and City Council of Baltimore v. AbbVie Inc.*, 42 F.4th 709 (7th Cir. 2022), to argue that activities protected under *Noerr-Pennington* cannot not be combined with other conduct to support a Section 2 claim. AAB 38. The facts surrounding the allegedly protected conduct in that case, however, differ significantly from the facts here. First, that case involved lobbying, not litigation, and second, the defendant actually won its protected petitioning activity. *AbbVie*, 42 F.4th at 713-14. By contrast, all of the lawsuits WhiteWater filed were ultimately resolved in PSD's favor.

While WhiteWater did not prevail in any of the actions it filed against PSD, the lawsuits distracted PSD from its business, consumed its limited resources, and drastically limited its ability to compete on the merits. *See, e.g.*, 7-ER-1209:3-9. These are precisely the circumstances the court in *AbbVie* acknowledged could, even without the other alleged anticompetitive conduct, give rise to a successful Section 2 claim: "[u]nsuccessful petitioning can be a source of liability when the petitioner runs up rivals' costs and so stifles competition independent of a petition's success. An example would be filing a frivolous suit, as many a suit is more costly to defend than to prosecute." 42 F.4th at 713.

In short, *Noerr-Pennington* does not immunize all of WhiteWater's alleged anticompetitive conduct. *See, e.g.*, *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, 622 F. Supp. 3d 22, 77 (E.D. Pa. 2022) ("The fact of Reckitt's petitioning—and its role in the overall scheme—does not become untrue simply because the conduct is not independently non-actionable. And certainly, Plaintiffs are permitted to establish that this activity, lawful or not, was just another building block in causing the overall anticompetitive injury.").

The "second" theory WhiteWater attributes to PSD is one of disparagement, and it proceeds to deploy the same arguments that it did in its summary judgment papers. The District Court correctly rejected those arguments in its summary judgment ruling, and this Court should reject them again now. As an initial matter, PSD does not allege a separate claim for disparagement. Again, PSD has and continues to pursue a "monopoly broth" theory of liability, wherein WhiteWater undertook a scheme of filing various meritless lawsuits and weaponizing those lawsuits in its communications with PSD's potential customers in order to preserve its monopoly power. Disparagement plays no role, and neither does this Court's decision in *American Prof. Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns, Inc.*, 108 F.3d 1147 (9th Cir. 1997).

As the District Court wrote in its summary judgment ruling: "Defendants essentially argue that Plaintiff's evidence fails to meet any of the prongs of the

Harcourt test. … Plaintiff does not address the six Harcourt factors in their Opposition. … However, the thrust of Plaintiff's argument is that the Court cannot view Defendants' conduct in isolation, as separate courses of action which occurred in a vacuum. Plaintiff instead urge the Court take a more holistic approach, akin to those cases which considered the effect of defendant's conduct as a whole to create a 'monopoly broth.' It is this reading that the Court finds persuasive." 4-ER-507-08.

### B. Regardless of whether the "series" exception applies, PSD's "monopoly broth" theory did not require it to prove that each of WhiteWater's actions was objectively baseless

As stated in *USS-POSCO Indus. v. Contra Costa Cnty. Bldg. & Constr. Trades Council, AFL-CIO*, 31 F.3d 800, 811 (9th Cir. 1994), "[w]hen dealing with a series of lawsuits, the question is not whether any one of them has merit—some may turn out to, just as a matter of chance—but whether they are brought pursuant to a policy of starting legal proceedings without regard to the merits and for the purpose of injuring a market rival. The inquiry in such cases is prospective: Were the legal filings made, not out of a genuine interest in redressing grievances, but as part of a pattern or practice of successive filings undertaken essentially for purposes of harassment?"

The thrust of WhiteWater's argument is that PSD alleged an insufficient number of lawsuits to constitute a "series." AAB 41 (citing *Amarel v. Connell*, 102

F.3d 1494, 1519 (9th Cir. 1996) ("A handful of lawsuits is not enough; this Court has refused to apply that test when the plaintiff alleged only two 'baseless' suits.")). In *Amarel*, however, the Ninth Circuit also explicitly declined to "define [] the number of legal proceedings needed to allege a 'series' or 'pattern' of litigation as required in *USS-POSCO*." *Id*. Accordingly, even if PSD relied solely on the filing of lawsuits for its claim, there is no specific number of lawsuits PSD needed to have asserted in order to satisfy the "series" exception.

WhiteWater's argument against the series exception also relies on *Int'l Longshore & Warehouse Union v. ICTSI Ore., Inc.*, where this Court rejected the exception because there was no "pattern of baseless claims." 863 F.3d 1178, 1187-88 (9th Cir. 2017). As *Longshore* itself makes clear, in the context of alleged sham proceedings, "'the question is not whether any one [suit] has merit … but whether they are brought pursuant to a policy of starting legal proceedings without regard to the merits and for the purpose of injuring a market rival.'" *Id.* (quoting *USS-POSCO*, 31 F.3d at 811) (alterations in original); *see also Hanover 3201 Realty, LLC v. Vill. Supermarkets, Inc.*, 806 F.3d 162, 180 (3d Cir. 2015) ("*Professional Real Estate* requires a showing of objective baselessness before looking into subjective motivations in order to prevent any undue chilling of First Amendment activity. In contrast, a more flexible standard is appropriate when dealing with a pattern of petitioning. … [E]ven if a small number of the petitions turn out to have some

objective merit, that should not automatically immunize defendants from liability."). It is a prospective, rather than retrospective, standard. WhiteWater's authorities agree. *See Catch Curve, Inc. v. Venali*, *Inc.*, No. CV 05-04820 DD, 2008 WL 11334024, at *7 (C.D. Cal. Nov. 3, 2008) ("Although a court must apply the *USS-POSCO* test with attention to the baselessness or merit of the claims, the antitrust defendant's motivation in bringing those suits is relevant to the inquiry as well. As described by the *USS-POSCO* court, the larger question to be answered focuses on whether the defendant has a policy of filing claims for the purpose of injuring a market rival, without regard for the merits.").

WhiteWater argues that "[e]ven if PSD's reading of *USS-POSCO* were plausible, the Court should avoid extending that precedent in a way that creates or deepens a circuit split." AAB 46. The cases WhiteWater cites here, however, are not interpreting *POSCO* as creating an exception distinct from *PREI*. Rather, those cases attempt to reconcile *California Motor* (which acknowledges the series exception) with *PREI* (which posits the objectively baseless requirement for a single alleged sham litigation). *POSCO* is the Ninth Circuit decision that similarly tries to bridge this divide, and it found that the tests actually do apply to different situations. *See U.S. Futures Exch., L.L.C. v. Bd. of Trade of the City of Chicago, Inc.*, 953 F.3d 955, 965 (7th Cir. 2020) ("Tracing the Ninth Circuit's lead in *USS-POSCO*, the

Second, Third, and Fourth Circuits all reconciled *California Motor* and *PRE* 'by reading them as applying to different situations.'").

When analyzed fully, none of the cases WhiteWater proposes supports its contention that the objectively baseless standard was appropriate, let alone required, in a Section 2 claim based on a monopoly broth theory of liability. The series exception under *POSCO* does not require a finding that all of the conduct at issue was objectively baseless. Rather, "[w]hen dealing with a series of lawsuits, the question is not whether any one of them has merit—some may turn out to, just as a matter of chance—but whether they are brought pursuant to a policy of starting legal proceedings without regard to the merits and for the purpose of injuring a market rival." *USS-POSCO*, 31 F.3d at 811.

### C. The district court erred by instructing the jury to apply the clear and convincing evidence standard on the question of anticompetitive conduct

WhiteWater argues that the "clear and convincing evidence standard" was proper for PSD's claim under *USS-POSCO* because the "Ninth Circuit has 'established a clear and convincing evidence standard for a jury's factual finding of bad faith' in prior litigation for antitrust purposes." AAB 47 (citing *Handgards, Inc. v. Ethicon, Inc.*, 743 F.2d 1282, 1288-89 (9th Cir. 1984) ("*Handgards II*")). But *Handgards II* is inapplicable to the "series" exception as well as PSD's "monopoly broth" claim.

The "clear and convincing" standard of proof was established by the Ninth Circuit in the context of claims for prosecution of a patent infringement action in bad faith. *Handgards, Inc. v. Ethicon, Inc.*, 601 F.2d 986 (9th Cir. 1979) ("*Handgards I*"). However, the Ninth Circuit stressed that such a requirement was not meant to be imposed in cases—such as this—alleging an "overall scheme to monopolize." *Id.* at 994 (citing *Kobe, Inc. v. Dempsey Pump Co.*, 198 F.2d 416, 425 (10th Cir. 1952)). As such, this Court concluded that the "barrier" imposed in *Handgards I* was "not one intended to be utilized in antitrust litigation generally." *Id.* at 996. Rather, it was "fashioned in response to the unique characteristics of proceedings in which the alleged violation of the antitrust law consists solely of one or more infringement actions initiated in bad faith." *Id.* (emphasis added).

Crucially, this is an antitrust case alleging a monopolistic scheme in which only some of the conduct involved patent litigation. The underlying litigation was a mix of tort, contract, and two unsuccessful patent claims. As such, the District Court should have instructed the jury to apply the preponderance of the evidence standard on the question of anticompetitive conduct. *See, e.g.*, *Litton Sys., Inc. v. Am. Tel. & Tel. Co.*, 700 F.2d 785, 813-14 (2d Cir. 1983) ("We see no reason to impose any higher burden of proof on the antitrust plaintiff asserting sham than would ordinarily be applicable in any civil issue.") (citing *United States v. Topco Associates, Inc.,* 405 U.S. 596, 610 (1972)); *see also Kobe*, 198 F.2d at 425 (holding patent holder's

"infringement action and the related activities, of course, in themselves were not unlawful, and standing alone would not be sufficient to sustain a claim for damages which they may have caused, but when considered with the entire monopolistic scheme which preceded them … they may be considered as having been done to give effect to the unlawful scheme."); *Ramsey v. United Mine Workers of America*, 401 U.S. 302 (1971); *Octane Fitness, LLC v. Icon Health & Fitness, Inc.*, 572 U.S. 545, 558 (2014); *Herman & MacLean v. Huddleston*, 459 U.S. 375, 390 (1983). The District Court erred by giving a clear and convincing evidence standard instead.

## III. THE DISTRICT COURT ERRED BY PREVENTING THE JURY FROM HEARING EVIDENCE OF THE BAY HILL TAVERN MEETING

As established in PSD's Opening Brief, evidence of WhiteWater's meeting at the Bay Hill Tavern should have been allowed. WhiteWater fails to rebut any of PSD's arguments. WhiteWater's recitation of facts is materially incorrect. WhiteWater improperly conflates the Bay Hill Tavern conversation with the legitimate settlement discussion that occurred weeks ***later***, prompted by Mr. Alleshouse's counsel. AAB 50. It cites the tolling agreement's statement that the parties "met to discuss a possible business relationship that potentially would resolve all of the issues raised in the Action" (*id.* at 50-51), but it fails to acknowledge that the date of that meeting was nearly a month ***after*** the Bay Hill Tavern meeting—on June 9, 2014. 3-ER-356. If, as WhiteWater would have this Court believe, the Bay

Hill Tavern meeting constituted a settlement discussion, the tolling agreement would have said so.

Rule 408 only applies to communications that occur after settlement discussions "crystallized." *Wall Data Inc. v. Los Angeles Cnty. Sheriff's Dep't*, 447 F.3d 769, 783-84 (9th Cir. 2006)).  Here, the record is clear that settlement discussions had not "crystallized."

Moreover, Mr. Myrman did not offer "valuable consideration," as required by Rule 408.  Rather, the only "consideration" offered was a threat that the "only way out" was for Mr. Alleshouse to quit competing with WhiteWater and return to work for it.  3-ER-327.  Such "offers" are not protected by Rule 408.  *See, e.g.*, *Veasman v. Nuance Commc'ns, Inc.*, No. 2:21-cv-08423-MEMF(ASx), 2022 WL 2964411, at *2 (C.D. Cal. June 29, 2022) ("Rule 408's prohibition does not apply to communications described as a 'settlement offer' when the communication 'tend[s] to be coercive rather than conciliatory.'") (quoting *Cassino v. Reichhold Chem., Inc.*, 817 F.2d 1338, 1342 (9th Cir. 1987)); *see also Stewart v. Wachowski*, No. CV 03-2873 MMM (VBKx), 2004 WL 5618386, at *4 (C.D. Cal. Sept. 28, 2004) ("The purpose of Rule 408 is to encourage dispute resolution, not to encourage threatening litigation by protecting admissions made in such threats.").

Rather than address PSD's arguments, WhiteWater argues that the same evidence was properly excluded during the prior patent trial.  AAB 49-50.  But this

case is different and the prior ruling was never appealed. Here, unlike there, the meeting was among the alleged anticompetitive acts. 3-ER-315-316.

Even if one assumed *arguendo* that the meeting included legitimate settlement communications (it did not), Rule 408 would only preclude that evidence if it were offered to prove the validity or invalidity of the underlying ***patent*** claim because that was supposedly the subject of the meeting. Rule 408 does not apply to the antitrust lawsuit spawned by that meeting. *See, e.g.*, *United States v. Microsoft Corp.*, 253 F.3d 34, 77 (D.C. Cir. 2001) ("Microsoft's internal documents and deposition testimony confirm both the anticompetitive effect and intent of its actions."). *See also, e.g.*, *Wachowski*, 2004 WL 5618386, at *5 ("'Courts have admitted evidence of offers or agreements to compromise … to show the defendant's knowledge and intent.'") (citation omitted).

## IV. REVERSAL IS JUSTIFIED

### A. PSD submitted sufficient evidence for a jury to find, under its proposed instructions, that WhiteWater engaged in anticompetitive conduct

WhiteWater asserts "PSD's own proposed instructions would have predicated liability on a finding that either the prior litigation was in bad faith, or that the statements about the litigation were independently unlawful." AAB 52. But none of PSD's proposed jury instructions support this argument. *See* 3-ER-250-54, 269-71, 400-04, 409. In fact, PSD explicitly objected to WhiteWater's proposed

inclusion of language stating that the jury may not find it "willfully maintained monopoly power through anticompetitive means if it has maintained that power solely … by pursuing litigation that is not objectively baseless and pursued in bad faith; or by truthfully communicating information to its customers." *See* 3-ER-252, 254. PSD objected on the grounds that: "That language is not in the Model Instruction and it materially misstates the standard of review for PSD's claims. As this Court held, the 'monopoly broth' approach is applicable to PSD's claims and thus, 'it would not be proper to focus on specific individual acts of an accused monopolist while refusing to consider their overall combined effect.' ECF No. 176 at 33. WhiteWater's proposed language ignores the Court's findings and should be rejected." 3-ER-254.

PSD's actual proposed instructions did not include a bad faith requirement, nor did they require a finding that WhiteWater's statements relating to the prior litigation were "independently unlawful." Rather, PSD sought to have the jury make their determination based on their "analysis of the evidence as a whole and WhiteWater's course of conduct as opposed to the merits of any given proceeding." 3-ER-264.

### B. PSD presented sufficient evidence for a jury to find monopoly power

The inquiry into monopoly power begins with the relevant market. At trial, the jury found that PSD established both a relevant product and relevant geographic

market. 2-ER-11. These were defined as (1) sheet wave machines using sheet wave technology and (2) "worldwide, excluding China." *Id*. WhiteWater and PSD were the "only two companies to choose from" within this market. 5-ER-819:13. At the time of trial there were more than 200 FlowRiders installed around the world as compared to only nine installations by PSD. 9-ER-1686:10-17; 5-ER-752:22-753:3. Thus, the jury could have easily found that WhiteWater had monopoly power in the relevant market. 4-ER-681:11-14.

The jury heard ample evidence that would allow it to find that WhiteWater had monopoly power. Dr. Barth, PSD's economic expert, calculated market share from 2013-2019, concluding that WhiteWater and ADG accounted for over 72% of sheet wave machines in a market that was overinclusive and, accordingly, WhiteWater possessed monopoly power. 6-ER-1094:2-6; 6-ER-1103:2-13. WhiteWater's own internal documents did the same. For example, the 2019 FlowRider Business Plan identifies market share for the years 2012-2018 and includes ADG sales in that calculation. 12-ER-2276. As the jury was instructed, these numbers are sufficient to establish indirect evidence of monopoly power. 2-ER-29.

WhiteWater argues that the market shares should not have been combined because WhiteWater and ADG were not a single entity. But PSD presented sufficient evidence to show that their market shares should have been combined for

the purposes of determining monopoly power. First, the jury was shown an explicit admission by ADG in the form of an interrogatory response that stated: "Both parties thus share in the profits resulting from ADG's sale of FlowRider machines, and both parties have legitimate financial and business interests in maximizing the number of FlowRiders sold." 11-ER-2220-21. It went on to state, "ADG and WhiteWater share a common objective—the sale of FlowRiders." *Id.* Similarly, PSD submitted evidence to establish that WhiteWater and ADG were not actual or potential competitors, including the licensing agreement which set forth WhiteWater and ADG's obligations not to compete in the other's designated territories and to collaborate on marketing the FlowRider. 10-ER-1974; 10-ER-1989; 8-ER-1543:6-17. Employees at WhiteWater understood this as a restriction on competition between the two companies. *See, e.g.*, 7-ER-1319:10-13 (Ms. Gonzales testifying that "in general" WhiteWater and ADG did not compete); 5-ER-964:7-964:10 (Mr. Thatcher testifying that WhiteWater did not view ADG as a competitor).

PSD also offered evidence that would allow a jury to conclude that WhiteWater had monopoly power even if ADG sales were not included. Dr. Barth considered numerous direct indicators of monopoly power, finding that "prices were high" and that gross margins were high as well. 6-ER-1095:5-15. As he testified, both direct and indirect indicators "pointed in the same direction which was that WhiteWater had monopoly power." 6-ER-1097:20-24. Evidence in the trial record

also shows that prices were above a competitive level. For instance, Mr. Thatcher wrote to Marshall Myrman and others at WhiteWater that PSD was "around 10% to 15% cheaper." 5-ER-906:25-907:2.

### C. PSD presented sufficient evidence for a jury to find WhiteWater's conduct harmed competition

WhiteWater is correct that PSD had the burden at trial of proving harm to competition and that a jury could find the requisite harm through a showing of "a reduction in competition that results in the loss of some of the benefits of competition, such as lower prices, increased output, or higher product quality." AAB 59. However, WhiteWater fails to acknowledge that this was precisely what the jury heard in PSD's case-in-chief—in which the entire theory was the exclusion from the market of unique, higher quality products and the impact that had on prices customers paid for sheet-wave machines. That this case involved a monopolist and its efforts to exclude the plaintiff-competitor is pertinent as well. In such an instance, the plaintiff's "injury—exclusion from the Relevant Markets—is inseparable from the alleged harm to competition." *See Retrophin, Inc. v. Questcor Pharms., Inc.*, 41 F. Supp. 3d 906, 914 (C.D. Cal. 2014). This is particularly true where the anticompetitive conduct succeeds in "leaving only one product, no choices, and no competition in its wake." *Glen Holly Ent., Inc. v. Tektronix, Inc.*, 352 F.3d 367, 377 (9th Cir. 2003).

WhiteWater's criticisms with respect to harm to competition largely rehash arguments that are also mentioned in its section on monopoly power. WhiteWater argues that (1) Dr. Barth's analysis did not provide details as to average or competitive prices and (2) "it does not follow that WhiteWater's litigation or related statements caused prices across the global sheet wave market to be higher." AAB 60. The former is unpersuasive because Dr. Barth was able to conclude that prices were lower when WhiteWater faced competition. 6-ER-1083:24-1084:3. The latter argument is also unavailing as Dr. Barth specifically evaluated "the effect of the alleged conduct by WhiteWater on competition and consumers." 6-ER-1071:11-19. Dr. Barth thus properly opined that the conduct caused higher prices, reduced output, and reduced innovation.

## CONCLUSION

PSD respectfully asks that the judgment be reversed and remanded for a new trial.

DATED: May 15, 2024

Respectfully Submitted,

**ZELLE LLP**

By: *Ⲋ/s/ Jennifer Duncan Hackett*
Jennifer Duncan Hackett
*Attorneys for Plaintiff Appellant Pacific Surf Designs, Inc.*

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

**Form 8. Certificate of Compliance for Briefs**

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 23-2609

I am the attorney or self-represented party.

**This brief contains** 6,643 **words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

- [x] complies with the word limit of Cir. R. 32-1.
- [ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.
- [ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).
- [ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.
- [ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  - [ ] it is a joint brief submitted by separately represented parties.
  - [ ] a party or parties are filing a single brief in response to multiple briefs.
  - [ ] a party or parties are filing a single brief in response to a longer joint brief.
- [ ] complies with the length limit designated by court order dated ______.
- [ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s/ Jennifer Duncan Hackett **Date** 5/15/2024
*(use "s/[typed name]" to sign electronically-filed documents)*